**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil No: 4:21-CV-00185-BO**

| | |
|---|---|
| MONTOYAE DONTAE SHARPE, <br><br> Plaintiff, <br><br> v. <br><br> DAVID RICKY BEST, JEFFREY D. SHROCK, and THE CITY OF GREENVILLE, NORTH CAROLINA, <br><br> Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO THE CONSTITUTIONAL CLAIMS ALLEGED IN COUNTS I, II, V, VI and VII** |
| MONTOYAE DONTAE SHARPE, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN MELVIN, <br><br> Defendant. | Civil No: 4:22-CV-00088-BO-RJ <br> (Consolidated with 4:21-cv-00185-BO) |

Plaintiff Montoyae Dontae Sharpe, through the undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.2 and 56.1, hereby submits the following Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment.

## INTRODUCTION

On July 27, 1995, Montoyae Dontae Sharpe was wrongfully convicted of the murder of George Radcliffe. Mr. Sharpe endured more than twenty-five years in prison before his murder conviction was finally overturned on August 22, 2019. After numerous post-conviction proceedings and a multi-year investigation by the Duke Law Wrongful Convictions Clinic, Governor Roy Cooper, a former state prosecutor and North Carolina Attorney General, granted

Mr. Sharpe a full and unconditional Pardon of Innocence on November 12, 2021. Notwithstanding the Pardon of Innocence, counsel for the Defendants have focused their efforts in this case on attempting to establish Mr. Sharpe's guilt.

Mr. Sharpe's wrongful conviction was the result of the misconduct of Defendants Shrock, Best, Melvin, and the City of Greenville. Continued misconduct by Defendants Best and Shrock after Mr. Sharpe's conviction extended his period of wrongful confinement by decades. Defendant Melvin, the named lead detective in the investigation that led to Mr. Sharpe's arrest and conviction, has stated under oath in this case—as well as in a televised documentary—that she never believed Mr. Sharpe was guilty. Furthermore, Defendants deliberately, and in bad faith, concealed material exculpatory and impeachment evidence from the District Attorney prior to Mr. Sharpe's trial regarding the credibility of the state's chief witness in the case and the facts surrounding how this witness, a juvenile, first came into contact with, and provided evidence to, the police. Defendants Best and Shrock continued to conceal the exculpatory and impeachment evidence in bad faith in post-conviction proceedings to hide their original misconduct.

## STATEMENT OF THE CASE

On December 20, 2021, Sharpe filed a civil action pursuant to 42 U.S.C. § 1983 against Defendants David Ricky Best, Jeffrey D. Shrock and the City of Greenville, alleging violations of Sharpe's 4th and 14th Amendment rights (ECF No. 1). The case number for the original action is 4:21-CV-00185-BO. On July 29, 2022, Sharpe filed a separate civil action against Carolyn Melvin in case number 4:22-CV-88-M. Along with the filing of the Complaint against Melvin, Sharpe filed a Motion to Consolidate Cases under F. R. Civ. P. 42(A) to consolidate the original action and the separate action filed against Melvin (4:22-CV-88-M, ECF No. 3). On October 31, 2022, this Court entered an Order consolidating the original case (4:21-CV-00185-BO) and the action

against Melvin (4:22-CV-88-M) (*see* 4:22-CV-88-M, ECF No. 20). At the Court's direction, Sharpe filed a Consolidated Complaint (ECF No. 53; hereafter, the "Consolidated Complaint") in the original action on November 14, 2022, and Shrock, Best, and the City filed their Answer to the Consolidated Complaint on November 28, 2022. Melvin did not file an Answer or other response to the Consolidated Complaint. Following the conclusion of fact discovery, the compelled deposition of Melvin on April 2 and 4, 2024, the service of expert reports on May 14 and June 28, 2024, and the depositions of experts on June 11, July 15, and July 24, Plaintiff filed a Motion to Amend the Consolidated Complaint on July 26, 2024 (ECF No. 163) to conform the pleadings to the evidence adduced in discovery. Given that the Court has not yet ruled on Plaintiff's Motion to Amend Complaint, Plaintiff's Motion for Partial Summary Judgment is based on the claims set forth in the currently operative Consolidated Complaint (ECF No. 53).[1]

## SUMMARY OF THE MOTION

Plaintiff has alleged that Defendants Carolyn Melvin, Ricky Best, Jeffrey Shrock, and the City of Greenville intentionally and/or recklessly deprived him of his constitutional rights. Although Plaintiff has asserted that Defendants are responsible for multiple constitutional violations and state torts during that time, he is moving for summary judgment only as to the following Counts as set forth in the Consolidated Complaint:

| | |
|---|---|
| Counts I and II: | Due Process claims relating to the use of false evidence; |
| Count V: | Due Process claim relating to the failure to investigate; |
| Count VI: | Due Process claim relating to the concealment of exculpatory and impeachment evidence; and |
| Count VII: | Due Process claim relating to the denial of Plaintiff's constitutional right of effective access to the courts. |

---

[1] However, the constitutional claims set forth in Counts I, II, V, VI, and VII of the current Complaint (ECF No. 53) on which Plaintiff seeks summary judgment are the same as the constitutional claims set forth in Counts I, II, V, VI and VII of the proposed amended complaint (ECF Nos. 163 and 167).

**STATEMENT OF FACTS**

A.     <u>The Murder of George Radcliffe on February 11, 1994.</u>

On February 11, 1994, George Radcliffe was shot and killed in Greenville, North Carolina. Plaintiff's Statement of Undisputed Material Facts ("Undisputed Facts") ¶ 1. His body was found in his pickup truck. *Id*. ¶ 2. A single bullet had entered Radcliffe's body at his upper left arm and travelled diagonally in a straight line across his chest, exiting the right side of his chest and lodging in his upper right arm. *Id*. at ¶ 4. His legs were under the steering wheel and his head and shoulders were lying over in the floorboard of the passenger side. *Id*. at ¶ 10. The driver's side door was closed, the keys were still in the ignition, and the window was between halfway and three-quarters of the way down. *Id*. at ¶¶ 7-9. An army jacket, which belonged to a man named Wilbur Mercer (a/k/a "Marciana"), was lying in the front seat next to Radcliffe's body with blood on it. *Id*. at ¶¶ 12, 20. Blood was found inside the truck and on papers lying on the seat on the right side of Radcliffe's body. *Id*. at ¶¶ 14, 15. No blood was found anywhere outside the truck or on the street. *Id*. at ¶ 15.

B.     <u>The Investigation Before April 7, 1994: Five Interviews</u>

Defendant Carolyn Melvin was assigned to be the lead investigator on the night of the murder, April 11, 1994. *Id*. at ¶¶ 22. GPD records establish that in the immediate aftermath of the murder of George Radcliffe, Melvin conducted five brief interviews, none of which implicated Dontae Sharpe. *Id*. at ¶¶ 28, 29, 34, 35, 36. On February 14, 1994, Melvin interviewed Martha Ann Stewart, who lived on the block where the murder occurred. *Id.* at ¶ 28. All Stewart could say was that she saw two black males approach Radcliffe's truck, but did not recognize them and could not describe them. *Id*. That same day, Melvin interviewed Wilbur Mercer. *Id.* at ¶ 29. During this interview, Mercer admitted that he had formed a plan on February 11, 1994, to rob Radcliffe, that

Radcliffe had given him $75 to buy cocaine that night, that Mercer had left his (Mercer's) jacket in Radcliffe's truck, and that he had stolen Radcliffe's money. [2] *Id*. at ¶¶ 30-31. As a result, Melvin considered Mercer to be the prime suspect in the murder, *id*. at ¶ 32, but Mercer was never arrested or charged in connection with the murder.

Defendant Best was assigned to assist Melvin on February 15, 1994. *Id*. at ¶ 33.

On February 16, 1994, Melvin interviewed Alonzo Vines, a neighbor who had first reported the incident to the police, but all he could say was that he heard a loud noise, looked out his window, and saw two men who he did not recognize and could not describe. *Id*. at ¶ 34. On February 17, 1994, Melvin and Best interviewed George Radcliffe's wife; she had no information about the murder. *Id.* at ¶ 35. Neither did her employer, who was interviewed on February 24, 1994. *Id.* at ¶ 36. The case remained unsolved during February, March, and the first week of April 1994, and no further witness interviews were conducted between February 24, 1994 and April 7, 1994. *Id*. at ¶¶ 37-38. Dontae Sharpe was not a suspect prior to April 7, 1994. *Id.* at ¶ 83.

**C.** **Defendant Melvin Suffered from Alcoholism and Memory Loss.**

At the time she was assigned to investigate the Radcliffe murder, Melvin was suffering from alcoholism, memory loss, and Graves' disease. *Id.* at ¶ 23. Melvin was struggling with these afflictions as early as 1993, and she reported to her supervisors that she had significant memory problems, including temporary amnesia, as a result of her alcoholism. *Id*. at ¶ 24, 25. Melvin's supervisors knew that she was an alcoholic with significant memory problems. *Id*.

---

[2] Mercer's statement to Melvin was inconsistent with what he had told Officer Jones at the scene on the night of the murder. Mercer said nothing to Jones of his plan to rob Radcliffe. Undisputed Facts, ¶ 20, 21.

**D.** **Shrock Transports Charlene Johnson to the Adolescent Psychiatry Ward at Pitt County Memorial Hospital.**

As of the date of the murder, Charlene Johnson, who became the state's primary witness against Plaintiff, was 13 years old. *Id*. at ¶ 39. She had a history of significant mental and emotional turmoil and instability. *Id*. Charlene's full-scale IQ at the time was 78. *Id*. at ¶ 40. Charlene's parents were never married, and Charlene only saw her father, who was imprisoned for murder, "a few times" in her life. *Id*. at ¶ 41.

In the six months prior to the murder of George Radcliffe, Charlene had been living in and out her mother's house, drinking alcohol "heavily," using drugs, selling drugs, and not going to school. *Id*. at ¶ 42. Charlene had been truant since October 1993, and the school had initiated a legal proceeding against Charlene's mother regarding the truancy. *Id*. at ¶ 43. In the months prior to the murder, Charlene had also run away from home and her mother had gone to county juvenile services to ask for help, describing Charlene as "defiant and disrespectful." *Id*. at ¶ 46, 47. Charlene engaged in extreme and reckless behavior, such as "giving gestures and running back and forth in front of police cars." *Id*. at ¶ 50.

On February 17, 1994, Shrock was on routine patrol in Greenville when Charlene caught his attention. *Id*. at ¶ 51. Charlene pretended she was going to jump in front of Shrock's car, cursed at Shrock, appeared to be on drugs, and was emotionally out of control. *Id*. at ¶¶ 51-53. As a result of Charlene's behavior, Shrock stopped and picked her up, took her home and, at the request of her mother, transported Charlene to Pitt County Memorial Hospital ("PCMH") for the purpose of having Charlene involuntarily committed. *Id*. at ¶ 54. Charlene was admitted to the PCMH adolescent psychiatric ward for treatment later that night. *Id*. at ¶ 55. She remained a patient in the psychiatric ward for almost three weeks, until March 10, 1994. *Id*. at ¶ 57. Shrock wrote no report regarding his interactions with Charlene or her mother, or regarding Charlene's admission to the

adolescent psychiatric ward at PCMH. *Id*. at ¶ 66. He also never informed the District Attorney of these facts. *Id*. at ¶ 67.

### E. Shrock Questions Charlene Johnson About the Radcliffe Murder.

Following her discharge from the PCMH adolescent psychiatric unit on March 10, 1994, Charlene ran away from home and was missing for an additional three-week period, from March 14, 1994, to April 5, 1994. *Id*. at ¶ 77. Charlene's mother filed (or caused to be filed) a missing person's report on Charlene on March 14, 1994. *Id*. at ¶ 78. The missing person's report prepared by Greenville Police Department ("GPD") Officer Hines states: "D. Bandy [Charlene's mother] advised [that] her daughter Charlene was released from PCMH Psychiatric ward 3-10-94 . . ." *Id*. at ¶ 79. A "Supplementary Investigation" report prepared by GPD Ofc. Suggs on April 5, 1994, states that (1) Charlene had been located; (2) Charlene had a pending juvenile-court date regarding her prior behavior; (3) Officer Suggs "stressed" to Charlene and her mother the importance of Charlene changing her behavior prior to her court date; (4) Officer Suggs "explained the consequences to Charlene" to encourage her to "straighten up." *Id*. at ¶ 81.

The evidence indicates that on or about April 5 or April 6, Shrock "stopped by [Charlene's] house." *See Id*. at ¶ 64. [3] Shrock told the GPD in a 2014 interview requested by the District Attorney that, "I mean just was talkin' to her about this, that and the other and it just popped in my head well shit, let me ask her and see if she's heard anything through the grapevine about that [murder]." *Id*. Although she had never told anyone at PCMH during the three weeks she was hospitalized and undergoing treatment that she had witnessed a murder, *id*. at ¶ 85, and although she had never told

---

[3] To summarize the undisputed evidence, Charlene was taken by Shrock to PCMH on February 17, 1994, released on March 10, 1994, and reported missing on March 14, 1994. She was not found and brought home until April 5, 1994. *Id*. at ¶ 77. Thus, the undisputed evidence indicates that the only days on which Shrock could have "stopped by her house" and spoken to her was either April 5 or April 6. He contacted Best and Melvin on April 7, 1995.

her mother she had witnessed a murder, *id*. at ¶ 86, Charlene allegedly volunteered to Shrock, in response to his question about "hearing anything through the grapevine," that she had seen the Radcliffe murder. *Id*. at ¶ 64. Shrock made no notes and wrote no report regarding this alleged statement by Charlene. *Id*. at ¶ 66. There is no record of how long they spoke, what he told her, what she told him, what questions he asked, or what she said in response. *Id*.

Thereafter, Shrock informed Best that Charlene claimed to have witnessed the Radcliffe murder. *Id*. at ¶ 71. At the time, Shrock told Best that Charlene had been "acting strange." *Id*. at ¶ 75. Shrock did not document his meeting with Best regarding Charlene Johnson. *Id*. at ¶ 72. Likewise, Best did not take any notes or write a report about what Shrock told him about Charlene allegedly witnessing a murder. *Id*. at ¶ 74.

F.       **Charlene Johnson Provides a False Statement.**

Prior to April 7, 1994, neither Melvin nor Best considered Dontae Sharpe a suspect in the murder of George Radcliffe. *Id*. at ¶ 83 On April 7, 1994, based on the information provided by Shrock, Best and Melvin picked up Charlene Johnson in Greenville and brought her to the police station. *Id*. at ¶ 82. There is no report regarding what time she was brought to the police department, what her condition was at that time, how long she was questioned before she provided a statement, what information she provided in response to those questions, what information was inadvertently (or purposely) provided to her by Best or Melvin through their questions or statements to her, or what she said in response to any questions she was asked. *Id*. at ¶ 93. According to Best, when Charlene arrived at the GPD offices he simply requested that she write out a statement describing what she allegedly saw, *id*. at ¶ 87, and Charlene then wrote the following two paragraphs. *Id*. at ¶ 88, 90.

At 1:30 pm, Charlene wrote:

> On February 11, 1994 I was walking down 14th on my way too Lucky Spot, I stop at the stop sign And I so Donta and a white male and Mark Joy. Donta was about to sale that white male a rock but he only had $18.00. Donta said I can't do it you have to have the money straight up and the white male said Fuck you man. Donta push him and then he pulled out a gun a shot him.

*Id*. at ¶ 88. Her statement contained no other details about what she allegedly saw or how she saw it. It contained no descriptions of people or clothing. There were no details about the lighting, the weather, or the distance at which she allegedly observed the shooting or could hear the conversation she claimed to hear.

But the primary problem with Charlene's statement was that it was inconsistent with the physical evidence at the scene. Radcliffe's body was found inside his truck, not on the street. Radcliffe's truck was found some distance away in a neighbor's yard, not on the street where she claimed he had been shot. Radcliffe had more than $18 dollars. He had $53 in the wallet found on his body. *Id*. at ¶¶ 2, 5, 17, and 88. No gun was located during an area search conducted by the GPD that night. *Id*. at ¶ 16. Her statement therefore had little or no value as evidence.

Charlene testified that Best then told her what she needed to add in a second paragraph. Four minutes later she wrote the following "clarification":

> Also Donta move the truck a ran it in the field. And Mark and Donta pick the white male up [interlineated on the line above – "from where he got shot"] put him in the truck and Donta throw the keys and the gun somewhere And Mark and Donta split up and meet each other and got into a red escort.

*Id*. at ¶ 90. While this second statement "fixed" the inconsistencies about where Radcliffe's truck and his body were found, it was still inconsistent with the physical evidence at the scene. No blood was found on the street where she claimed Radcliffe had been shot and fell to the ground. No blood was found on the outside of the truck, the door, or the door handle. The keys were still in the

ignition, they had not been thrown "somewhere." No gun had been thrown away. No weapon was found during a search of the area. *Id*. at ¶¶ 8, 16, and 90.

Not surprisingly under the circumstances, Melvin did not believe Charlene's story was truthful. *Id*. at ¶ 92. Despite this, neither she nor Best confronted Charlene regarding the inconsistencies between her statements and the physical evidence at the scene, *id*. at ¶ 94, 95, nor did they even ask her about these inconsistencies. *Id*. at ¶ 96. Nor was any investigation done by Best or Melvin as to Charlene's history of psychiatric illnesses, her treatment and evaluation in the adolescent psychiatric ward at PCMH, or her history of drug and alcohol use. *Id*. at ¶ 104.

### G. <u>Dontae Sharpe Is Arrested Based on Charlene Johnson's Statement.</u>

As of April 7, 1994, the only direct evidence linking Dontae Sharpe to the Radcliffe murder was Charlene Johnson's false statement. *Id*. at ¶ 101-103. No physical evidence connected Sharpe to the crime. *Id*. at ¶ 101. Fingerprints lifted from the truck in which the victim, George Radcliffe, was found dead excluded Sharpe. *Id*. at ¶ 102. No murder weapon had been recovered or tied to Sharpe. *Id*. at ¶ 103. Melvin did not believe that probable cause existed to charge Sharpe with the murder of George Radcliffe. *Id*. at ¶ 105. Melvin still believed that Wilbur Mercer was the prime suspect for the murder. *Id*. at ¶ 106.

Despite this, Melvin prepared an affidavit in support of an arrest warrant charging Dontae Sharpe with the murder of George Radcliffe. *Id*. at ¶ 107.[4] The sole basis for the warrant was Charlene Johnson's April 7, 1994, statement. *Id*. at ¶ 108. Best and Melvin had no physical evidence corroborating Charlene's statement. *Id*. at ¶ 101. They did not attempt to interview Dontae Sharpe before applying for the warrant. *Id*. at ¶ 100.

---

[4] Melvin has testified that she was directed to do this by her supervisor, Lt. Howard Connor. *Id.* at ¶ 107.

Based on this warrant, at approximately 4:00 pm on April 7, 1994, less than three hours after Charlene Johnson signed her statement, Dontae Sharpe was arrested and charged with the murder of George Radcliffe. *Id*. at ¶ 98. After he was arrested, Sharpe provided Melvin and Best with the names of the people he was with on the night, and during the time, Radcliffe was killed. *Id*. at ¶ 109. Neither Best nor Melvin interviewed the alibi witnesses provided by Dontae Sharpe. *Id*. at ¶ 110.

**H.      Dontae Sharpe Is Indicted Based on Charlene Johnson's Statement.**

On April 18, 1994, Sharpe was indicted by the Pitt County Grand Jury for the murder of George Radcliffe. *Id*. at ¶ 113. Best was the only witness who testified to the grand jury. *Id*. at ¶ 114. At this time, Charlene Johnson's two-paragraph statement was still the only direct evidence implicating Dontae Sharpe in the murder. *Id*. at ¶ 108.

Prior to testifying to the grand jury, Best had done nothing to corroborate or verify the accuracy of Charlene's statement. *Id*. at ¶ 94 – 97. The day *after* Best obtained the indictment charging Sharpe with the Radcliffe murder, Best scheduled Charlene to be polygraphed regarding the truthfulness of her April 7, 1994, statement. *Id*. at ¶ 115. Best did not take notes nor write a report about taking Charlene to the SBI in order to take a polygraph, or the results of the polygraph. *Id*. at ¶ 116. Although the results of Charlene's polygraph were "inconclusive" as to whether she was telling the truth, *id*. at ¶ 117, no further investigation was done by Best or Melvin regarding the truthfulness of Charlene's statement, or the alibi evidence provided by Sharpe. *Id*. at ¶ 118.[5]

_____

[5] Mark Joyner, who was also named by Charlene Johnson in her statement of April 7, 1994, was also arrested and provided the names of his alibi witnesses. There is no record that either Melvin or Best investigated Joyner's alibi witnesses. *Id*. at ¶ 118.

### I. Best Produces a Second Alleged Eyewitness Three Months After the Murder.

In May 1994, Best told the District Attorney that he had received information about the Radcliffe murder from Beatrice Stokes. *Id*. at ¶ 122. Stokes was a crack addict with a criminal record involving drug offenses, among other things. *Id*. at ¶ 123. At this time, Stokes was facing charges for possession of drug paraphernalia, providing fictitious information to an officer, and disorderly conduct. *Id*. at ¶ 124. Best's habit and custom was to take notes during a conversation with a witness or suspect and then write a report, *id*. at ¶ 128, but Best did not take notes or write a report about what Stokes allegedly told him. *Id*. at ¶¶ 125, 126. According to the District Attorney, this was the first time Best had not written a report about a witness who Best claimed was an eyewitness to a murder. *Id*. at ¶ 131. Melvin, the lead detective in the case, did not meet or talk with Beatrice Stokes until the day Stokes testified at Dontae Sharpe's trial. *Id*. at ¶ 132. She doubted Best's story about Stokes. *Id.* at ¶ 132.

### J. Best Provides Benefits to Charlene Johnson Before Sharpe's Trial.

Between April 7, 1994, and July 1995, Charlene Johnson came to the police station to see Best on a number of occasions. *Id*. at ¶ 133. During this time, Best "took Charlene . . . under [his] wing." *Id*. at ¶ 134. He considered her "a friend." *Id*. at ¶ 135. He gave her food and money, *id*. at ¶ 137, and helped arrange for Crime Stoppers to give Charlene a reward of $500.00 even though she did not qualify it. *Id*. at ¶ 139. On some occasions, Best would ask another officer to give Charlene a ride to school if Charlene missed the school bus. *Id*. at ¶ 144. Other police officers gave her gifts such as a stereo, a book bag, candy, and other things of value. *Id*. at ¶ 138. Charlene, whose own father had long been absent from her life, began to refer to Best as "Daddy Ricky." *Id*. at ¶ 136.

Best did not make any notes or reports about any of his many meetings with Charlene or the benefits he gave her between April 7, 1994, and Sharpe's trial in July 1995. *Id*. at ¶ 142. This was contrary to his habit and custom of documenting in notes and/or reports anything relevant gathered from a witness. *Id*. at ¶ 128.

Melvin was aware at the time that: (1) Charlene was regularly visiting Defendant Best at the GPD; (2) Charlene had begun calling Best "Daddy Ricky"; (3) Best gave Charlene money and gifts; and (4) Best paid at least one utility bill for Charlene's family. *Id*. at ¶ 145.

But neither Best nor Melvin disclosed any of these facts to the District Attorney before or during Dontae Sharpe's trial. *Id*. at ¶ 143.

## K.    Defendants Best and Melvin Conceal Exculpatory Evidence Prior to and During Sharpe's Trial.

Charlene Johnson's statement was the only evidence presented to the Magistrate at the time the warrant was obtained on April 7, 1994. *Id*. at ¶ 146. Melvin did not inform the Magistrate that she did not believe Charlene's statement to be true, nor did she inform the Magistrate that she did not believe Sharpe had committed the Radcliffe murder. *Id*. at ¶ 147.

Prior to and during Dontae Sharpe's trial in July 1995, the District Attorney was never informed by Best, Melvin or Shrock, either in a written report or orally, of the following exculpatory evidence:

     (a)     That Melvin did not believe Charlene's April 7, 1994, statement to be true. Appx. W, p. 34:10–22.

     (b)     That Melvin did not believe Sharpe had committed the Radcliffe murder. Appx. X, p. 60:19–24; Appx. W, p. 69:1–3.

     (c)     That Melvin believed Wilbur Mercer was the prime suspect and never ruled him out as the murderer. Appx. W, p. 25:2–8; 24–25; p. 26, line 1.

(d) That on February 14, 1994, Defendant Shrock observed Charlene Johnson run in front of his patrol car and curse at him, and that she appeared to be on drugs. *Id.* at ¶ 186(d),(e).

(e) That Defendant Shrock drove Charlene to PCMH on February 14, 1994, where she was admitted to the PCMH adolescent psychiatric ward for three weeks. *Id.* at ¶ 186(g),(i).

(f) That Charlene was again admitted to the adolescent psychiatric ward at PCMH in September 1994. *Id.* at ¶ 186(i).

(g) That Best (and others at the GPD) had given Charlene Johnson and her brother money and gifts prior to Dontae Sharpe's trial. *Id.* at ¶ 186(j).

(h) That Melvin had developed a drinking problem several years before the Radcliffe investigation, that Melvin was suffering from alcoholism during the investigation of the Radcliffe murder, and that as a result of her alcoholism, Melvin was experiencing memory problems during the time of the investigation and trial. *Id.* at ¶ 186(k),(l),(m),(n).

(i) That while Best had subjected Charlene Johnson to a polygraph in 1994 to satisfy himself that she was telling the truth, the results of the polygraph were inconclusive. *Id.* at ¶ 186(o).

**L.    Charlene Johnson and Beatrice Stokes Testify at Dontae Sharpe's Trial.**

During Dontae Sharpe's trial, Charlene Johnson and Beatrice Stokes testified as prosecution witnesses. *Id.* at ¶ 150. Their testimony was the only direct evidence offered at trial that implicated Dontae Sharpe in the murder of George Radcliffe. *Id.* at ¶ 149, 150. Dontae Sharpe was convicted of murdering Radcliffe and was sentenced to life in prison.

**M.    Best and Shrock Intentionally Provide False Information and Conceal Material Facts Relating to Dontae Sharpe's 1997 Motion for Appropriate Relief Hearing.**

In 1997, Dontae Sharpe filed a Motion for Appropriate Relief ("MAR") seeking to vacate his conviction based upon the false testimony of Charlene Johnson at his trial. *Id.* at ¶ 165. Prior to that hearing, as a matter of his habit and custom, District Attorney Clark Everett met with Best

and Shrock to determine what they knew about the issues raised in the MAR, and what their testimony would be. *Id*. at ¶ 167. As a result, District Attorney Everett called Best and Shrock as state's witnesses at the MAR and elicited the following testimony from Defendant Best:

- To "satisfy himself" of the accuracy of Charlene's April 7, 1994, statement, Best testified he "scheduled a polygraph at the State Bureau of Investigation office." *Id*. at ¶ 170.

- Best testified, "I wanted to make sure her statement was the truth. We didn't want to put the wrong person in jail. . . . [W]e actually carried her to the State Bureau of Investigation Officer [*sic*] here in Greenville where she was administered separate tests." *Id*.

Best's testimony was false. The results did *not* confirm that she had told the truth. *Id*. at ¶ 170. Furthermore, the polygraph was not administered until after Sharpe had already been indicted. *Id*. at ¶ 171.

Similarly, District Attorney Everett elicited the following testimony from Defendant Shrock:

- That on the night Shrock took Charlene to PCMH to be evaluated, Charlene became "level-headed" when they arrived at the hospital. *Id*. at ¶ 174.

- That Charlene was released from PCMH the same night. *Id*.

- That Shrock then took her home. *Id*.

Shrock's testimony was false. The true facts were that on that same night, Charlene was brought to the PCMH Adolescent Psychiatric Ward for an involuntary commitment and was admitted for evaluation and treatment for a period of *nearly three weeks*, from February 18, 1994, to March 10, 1994. *Id*. at ¶ 175.

Based on what Shrock had told him, District Attorney Everett elicited this additional evidence from Shrock: That Charlene told him that same night (February 17, 1994) at the hospital

15

that a person named "Dontae" had committed the Radcliffe murder. *Id.* at ¶ 176. This was also

false. As Shrock subsequently admitted to GPD Det. Groccia during a 2014 reinvestigation:

> It wasn't that night when she told me. Um, she told it was one day that I
> stopped by her house and uh, and I mean just was talkin' to her about this,
> that and the other and it just popped in my head well shit, let me ask her and
> see if she's heard anything through the grapevine about that.[6]

*Id.* at ¶ 64. Critically, in his MAR testimony, Best corroborated Shrock's false account regarding

how Charlene first came to be a witness in the case by falsely testifying Shrock's account was

accurate. *Id.* at ¶ 65.

In short, the evidence establishes that as a result of Best and Shrock providing false

information to District Attorney Everett prior to the hearing, Everett elicited false evidence

regarding Charlene Johnson's testimony from them during the MAR hearing. In addition, as a

result of Best and Shrock concealing material impeachment information about Charlene Johnson's

credibility from District Attorney Everett prior to the hearing, Everett failed to disclose this

material impeachment evidence to Sharpe's counsel or to the presiding judge at the MAR hearing.

*Id.* at 186-192.

The true facts regarding Shrock's interactions with Charlene were not provided to the

District Attorney. *Id.* at ¶ 186. They were therefore not disclosed to Sharpe's counsel or to the

Court. Based upon the false evidence elicited at the MAR hearing regarding the circumstances of

Charlene Johnson's statement, and the failure to disclose at the MAR hearing evidence impeaching

the credibility of Charlene Johnson, the judge presiding at the MAR hearing made the following

---

[6] The records of Pitt Memorial Hospital establish that during the time Charlene was evaluated and treated
at the psychiatric ward from February 17 until March 10, 1994, during which time she was interviewed and
interacted with hospital staff daily, she did not tell her treating physicians or hospital staff that she had
witnessed a murder. Sharpe 4749 – 4818. Cite to PSUF Charlene also never told her mother that she had
witnessed the Radcliffe murder. Melvin Depo., part 1, p. 65, lines 9 – 25; p. 66, line 1. Cite to PSUF

factual finding: "The undersigned is reasonably well satisfied that Johnson testified truthfully at the trial of the Defendant . . . " *Id.* at ¶ 177. Based upon this factual finding, the presiding judge denied Sharpe's MAR. *Id.* As a result, Dontae Sharpe spent an additional 21 years in prison for a crime he did not commit.

**ARGUMENT**

### I.     STANDARD OF REVIEW

A motion for summary judgment must be granted if there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. *Tarlton v. Sealey*, 2018 WL 1129976 at *4 (E.D.N.C., Mar. 1, 2018). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets this burden, the non-moving party must establish the specific material facts in dispute to survive summary judgment. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). In this analysis, the court views the evidence and inferences in the light most favorable to the non-moving party. *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

### II.    DEFENDANTS VIOLATED DONTAE SHARPE'S CONSTITUTIONAL RIGHT TO DUE PROCESS BY FAILING TO INVESTIGATE THE TRUTHFULNESS OF CHARLENE JOHNSON'S APRIL 7, 1994, STATEMENT AND THE ALIBI WITNESSES PROVIDED BY SHARPE.

A claim for intentional or reckless failure to investigate is derived from decades-old United States Supreme Court precedent establishing that the police must conduct criminal investigations in a way that conforms with traditional notions of fairness and justice. In *Waybright v. Frederick Cnty.*, the United States Court of Appeals for the Fourth Circuit explained "the Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less." 528 F.3d 199, 205 (4th Cir. 2008)

(quoted portion from *Rochin v. California*, 342 U.S. 165, 172 (1952)). In *Rochin*, a decision from more than six decades ago, the Supreme Court recognized a "general requirement that States in their prosecutions respect certain decencies of civilized conduct." *Rochin*, 342 U.S. at 173. Furthermore, "[d]ue process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Id*.

In 1976, the Supreme Court addressed the need for a fair investigation as follows:

> *Law enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly* as illustrated by the Brady line of cases requiring the state to disclose exculpatory evidence to the defense. Although charged with investigating and prosecuting the accused with "earnestness and vigor," officers must be faithful to the overriding interest that "justice shall be done."

*United States v. Agurs*, 427 U.S. 97, 110–11 (1976) (emphasis added), *overruled on other grounds*, *United States v. Bagley,* 473 U.S. 667 (1985).

Courts in this jurisdiction have uniformly recognized this fundamental principle of due process. *See Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019) (recognizing a due process claim stemming from failure to investigate and suppression of evidence); *Shaw v. Town of Mint Hill*, 2024 WL 2162891 at *7 (W.D.N.C., May 14, 2024); *Howard v. City of Durham*, 487 F. Supp. 3d 377, 426 (M.D.N.C. Sep. 16, 2020) (denying the defendant's motion for summary judgment on an inadequate-investigation claim and recognizing "a due process claim for failure to perform an adequate investigation if an officer takes bad faith actions to shield his wrongful acts"); *Kline v. Cleveland Cty.*, 2020 WL 1692348 *12 (W.D.N.C. April 7, 2020) (acknowledging that intentionally or recklessly ignoring exculpatory information during an investigation is "an arbitrary and oppressive exercise of power amounting to a substantive due process violation" and denying defendant's motion to dismiss plaintiff's substantive due process claim alleging DSS employees

"intentionally declined to review [exculpatory] information" and thereby failed "to conduct a prompt, fair, and thorough investigation); *Humbert v. O'Malley*, No. WDQ-11-0440, 2014 WL 1266673, at *13 (D. Md., Mar. 25, 2014) (Under the 14th Amendment, "[p]olice officers may be liable under § 1983 for deliberate or reckless failures to investigate readily available exculpatory evidence"). *See also*, *Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012) (due process right against a reckless investigation was clearly established in 1986). Put another way, where state officials "have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Wilson v. Lawrence Cty.*, 260 F.3d 946, 956 (8th Cir. 2001).

In sum, Defendants had deliberately and/or recklessly failed to investigate readily available impeachment evidence regarding Charlene Johnson's April 7, 1994, statement and had concealed impeachment evidence regarding that statement to shield these wrongful acts.

Prior to April 7, 1994, Dontae Sharpe was not considered a suspect in the murder of George Radcliffe. The police had not questioned Sharpe, nor anyone associated with him about the murder. No tips had been received naming Dontae Sharpe in connection with the shooting. No eyewitness had named him. No physical evidence tied him to the murder.

Then, on April 7, 1994, Melvin and Best were presented with Charlene Johnson, a fourteen-year-old whom Officer Shrock had transported to PCMH six weeks earlier, where she had been admitted for three weeks for psychiatric evaluation and treatment. Charlene's two-paragraph statement on April 7, 1994, was directly contradicted by the physical evidence gathered by the police at the scene of the Radcliffe murder.

Despite this, Defendants Melvin and Best chose not to ask Charlene a single question about any of these contradictions. They chose not to ask her to describe any of the details of what she

claimed to have observed or heard, or of the weather or lighting at the time. They chose not to try to corroborate anything she told them, nor to investigate what she allegedly said to Shrock and the circumstances under which she said it. They chose not to interview her mother, and they chose not to obtain the records from her three-week inpatient psychiatric hospitalization. They chose to do nothing to investigate her credibility.

Melvin did not believe Charlene's story. She did not believe that Sharpe had participated in the murder of George Radcliffe. She believed that Wilbur Mercer was the likely perpetrator. Yet the defendants did nothing to investigate Mercer. As in *Humbert v. O'Malley, supra,* this was a "deliberate or reckless failure to investigate readily available exculpatory evidence." Even worse, Melvin swore under oath that there was probable cause to believe Sharpe had committed the murder, although she did not actually believe probable cause existed. Then, after Sharpe was arrested, Defendants chose not to investigate his alibi witnesses and evidence. There is no evidence that they investigated the alibi witnesses and evidence offered by his alleged co-defendant, Mark Joyner.

After Best and Melvin chose not to investigate the credibility of Charlene Johnson's April 7, 1994, statement despite its obvious conflicts with the physical evidence, and then chose not to investigate the alibi evidence provided by Dontae Sharpe and Mark Joyner, which would have established the lack of any probable cause to arrest Sharpe, they concealed material impeachment evidence from the District Attorney before trial and then again before the 1997 MAR. The actions of Best, Melvin, and Shrock in concealing this impeachment evidence was done for the bad-faith purpose of hiding the fact that they did not have probable cause to arrest and indict Sharpe.

Once Best and Melvin arrested and indicted Sharpe for the Radcliffe murder on the basis of Charlene's fictitious statement, it became necessary for them, and Shrock in a later proceeding,

to conceal the impeachment evidence that undermined the credibility of her statement. *See Gilliam*, 932 F.3d at 241. The undisputed facts establish that Melvin and Best deliberately and/or recklessly violated Donte Sharpe's due process right to a constitutionally adequate and fair investigation.

Plaintiff's Motion for Summary Judgment as to Count V should therefore be granted.

## III. DEFENDANTS VIOLATED DONTAE SHARPE'S CONSTITUTIONAL RIGHT TO DUE PROCESS BY KNOWINGLY AND/OR RECKLESSLY USING FALSE EVIDENCE TO SECURE HIS WRONGFUL ARREST AND CONVICTION.

Counts I alleges in pertinent part that Best knowingly, intentionally, and/or recklessly "used the fabricated statement [of Charlene Johnson] to prosecute Dontae Sharpe, (ECF 53, ¶ 155) and that "Best's procurement and use of fabricated evidence directly and proximately caused Dontae Sharpe's conviction and deprivation of liberty without due process of law." *Id*. at ¶ 164. Similarly, Count II alleges in pertinent part that Melvin "knowingly, intentionally and/or recklessly allowed the fabricated statement to be used to charge Dontae Sharpe with the murder of George Radcliffe (ECF 53, ¶ 173), and that "the procurement and use of fabricated evidence directly and proximately caused Dontae Sharpe's wrongful arrest, conviction and deprivation of liberty without due process of law." *Id*. at ¶ 181. The undisputed facts confirm that Charlene Johnson's statement was false.

The knowing use of false evidence was a clearly established constitutional right as early as 1959. As articulated by the United States Supreme Court, "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of State of Ill*., 360 U.S. 264, 269 (1959). *See also Miller v. Pate*, 386 U.S. 1, 7 (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by

the knowing use of false evidence. There has been no deviation from that established principle."); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact.") (*citing Miller v. Pate, supra*); *Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019).

It is also well established that acting with reckless disregard for the truth is the legal equivalent of acting with "knowledge." *Franks v. Delaware*, 438 U.S. 154, 155 (1978); *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017), *as amended* (Aug. 22, 2017). As to Defendant Melvin, she has admitted under oath that on April 7, 1994, *she did not believe* Charlene Johnson's story. Despite this, she falsely swore that *she did believe* that there was probable cause to believe that Dontae Sharpe had murdered George Radcliffe. Melvin knowingly and/or recklessly used false evidence to secure Sharpe's arrest for this murder. Similarly, Defendant Best ignored the obvious inconsistencies between Charlene's April 7, 1994, statement and the physical evidence when he secured Dontae Sharpe's indictment by the grand jury for the murder of George Radcliffe. Plaintiff's Motion for Summary Judgment as to Counts I and II should therefore be granted.

## IV. DEFENDANTS VIOLATED SHARPE'S CONSTITUTIONAL RIGHT TO DUE PROCESS BY FAILING TO DISCLOSE EXCULPATORY AND IMPEACHMENT EVIDENCE THAT UNDERMINED THE CREDIBILITY OF CHARLENE JOHNSON'S TRIAL TESTIMONY.

Law enforcement officers have a duty to turn over to the prosecutor any material evidence that is favorable to a criminal defendant. *Barbee v. Warden*, 331 F.2d 842, 846-47 (4th Cir. 1964). This includes evidence that tends to impeach a government witness. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021). This obligation to turn over favorable evidence to the District Attorney applies "to any officer who has

knowledge of the exculpatory and impeachment evidence." *Owens v. Baltimore City State Atty's Office*, 767 F.3d 379, 397-98 (4th Cir. 2014); *Johnson v. Baltimore Police Dep't*, 2022 WL 9976525 (D. Maryland, Oct. 14, 2022).

A claim for the suppression of exculpatory evidence requires that the plaintiff establish (1) that the evidence at issue was materially favorable to him; (2) that the officers suppressed the evidence in bad faith; and (3) that prejudice ensued. *Owens*, 767 F.3d. at 396-97; *Blankenship*. 19 F.4th at 692.

With respect to the materiality requirement, the question is "whether, in the absence of disclosure, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id*. at 397, quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "[I]t is enough that the suppression of evidence cast serious doubt on the proceedings' integrity." *Owens*, 767 F.3d at 398; *Gilliam v. Sealey*, 932 F.3d 216, 238 (2019). The materiality of evidence must be evaluated cumulatively rather than individually. *Wearry v. Cain*, 577 U.S. 385 (2016); *Kyles*, 514 U.S. at 436-37.

In regard to the bad-faith requirement, bad faith by a law-enforcement officer "may be inferred . . . from the failure to disclose 'the most relevant and exculpatory evidence in the case . . . .'" *Johnson*, 2022 WL 9976525 at *45, quoting *Gilliam*, 932 F.3d at 239-240. In *Gilliam*, the court found the plaintiff had adequately alleged bad faith through allegations that the defendants had intentionally "failed to disclose *the most relevant and exculpatory evidence in the case*." *Gilliam*, 932 F.3d at 239-40 (emphasis added).

In the present case, the most relevant exculpatory evidence pertained to the credibility of the state's star witness, Charlene Johnson, whose first contact with the GPD came when she was just 13 years old. She was the first witness called to testify at the trial, and the only witness who

testified (albeit falsely) that she actually saw Dontae Sharpe shoot George Radcliffe. It was her statement that was used to secure Sharpe's arrest warrant and his indictment for the Radcliffe murder.

After Charlene recanted her testimony in 1996, Plaintiff filed an MAR in 1997 challenging his conviction. Out of the twenty-four numbered paragraphs comprising the 1997 Order denying Plaintiff's 1997 MAR, eighteen of the paragraphs pertain to the credibility of Charlene Johnson.[7] Charlene's credibility was critical to the case, and the evidence she provided was clearly material. *See Owens*, 767 F.3d 379 (2014) (materiality requirement satisfied where the impeachment evidence related to the "star witness" without whom "the case could not have gone forward.").

Best and Melvin concealed from the District Attorney, Sharpe's lawyer, and the Court the true facts regarding the credibility of the information she provided to Defendants Shrock, Melvin, and Best. Because this evidence was concealed by Defendants, the state court judge wrongly concluded that Charlene had testified truthfully at trial.

The evidence regarding Charlene Johnson's credibility that Defendants concealed is as follows:

A.     **Impeachment Evidence Regarding Charlene Johnson.**

Defendants concealed from the District Attorney, Plaintiff and the Court the following facts relating to the credibility of Charlene's statements to Defendants:

> (i)    That Charlene Johnson had first been noticed by Shrock on February 17, 1994, after she ran in front of his patrol car and cursed at him, and that she appeared to be on drugs at that time. *Id*. at ¶ 186(d), (e).

> (ii)   That at the request of her mother, Shrock transported Charlene to PCMH that night, where at the request of her mother she was involuntarily committed to the adolescent psychiatric ward. *Id*. at ¶ 186(g).

---

[7] The first two paragraphs of the 1997 Order are merely prefatory.

<blockquote>
(iii)    That Charlene was committed to the adolescent psychiatric ward for three weeks in February and March 1994, and then again in September 1994. *Id*. at ¶ 186(i).

(iv)    That Best and others at the GPD had given Charlene Johnson and her brother money and gifts prior to Dontae's trial. *Id*. at ¶ 186(j).

(v)    That Best had subjected Charlene Johnson to a polygraph in 1994 to satisfy himself that she was telling the truth, but the results of the polygraph were inconclusive. *Id*. at ¶ 186(o).
</blockquote>

With respect to this evidence relating to Charlene's credibility, District Attorney Clark Everett testified in his deposition that each of these exculpatory facts were significant. In regard to Charlene's mother seeking an involuntary commitment for her at the PCMH adolescent psychiatric ward, the District Attorney testified that this fact was "certainly significant." *Id*. at ¶ 188. In regard to Shrock transporting Charlene to the hospital to be evaluated for an involuntary commitment, the District Attorney admitted in his deposition that if he had known this information, he "would've brought it out" at the trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). *Id*. at ¶ 189. In regard to Charlene's admissions to the adolescent psychiatric ward from February to March 1994, and again in September 1994, the District Attorney admitted that the information was "significant enough" that he would have "at least asked about that at trial." *Id*. at ¶ 190. This impeachment evidence regarding Charlene's credibility was knowingly and/or recklessly suppressed by Defendants prior to Dontae's trial in order to bolster the credibility of her testimony against Dontae.

Defendants then covered up what they had suppressed at trial during Dontae Sharpe's 1997 MAR hearing. At that hearing, Shrock testified that on February 17, 1994, he drove Charlene home after she was evaluated by PCMH and released. This testimony was false. Shrock did not drive Charlene home after she was evaluated and released. Charlene was committed to

the psychiatric ward after she was evaluated that night and was not released for three weeks. Best covered up the truth to give the MAR judge the impression that Charlene was someone whose trial testimony could be trusted. Best falsely confirmed Shrock's false story by testifying that "Officer Shrock told us the same story he testified to today." *Id*. at ¶ 65. Best also falsely implied that Charlene had passed a polygraph test about her story, to bolster her credibility with the MAR judge, when in fact that polygraph was inconclusive.

This coverup of the impeachment evidence that existed at the time of the trial, but was not disclosed by Defendants, further supports the conclusion that the suppression of that evidence was done in bad faith.

### B. Evidence Regarding Melvin's Alcoholism and Memory Loss.

Defendants also concealed from the District Attorney at the time of Sharpe's trial that Melvin had developed a drinking problem several years before the investigation, and that during the investigation she suffered from chronic alcoholism and accompanying memory loss, that she had reported to her supervisor. *Id*. at ¶ 186(k), (l), (m), (n).

Melvin was the lead detective in the case, and she testified from memory at Sharpe's trial. Melvin's admitted chronic memory loss due to her alcoholism was material impeachment evidence that should have been disclosed to the District Attorney and to Sharpe. Regarding Melvin's alcoholism and memory loss, District Attorney Everett admitted that, "Obviously, when you start talking about memory problems, . . . that's an issue, yes, sir." *Id*. at ¶ 191, 192.

Sharpe's Motion for Summary Judgment as to Count VI should therefore be granted.

### V. DEFENDANTS VIOLATED DONTAE SHARPE'S CONSTITUTIONAL RIGHT TO EFFECTIVE ACCESS TO THE COURTS.

In a 1977 case arising from the Fourth Circuit, the Supreme Court held in *Bounds v. Smith*, 430 U.S. 817, 821-822 (1977), that "[i]t is now established beyond doubt that prisoners have a

constitutional right of access to the courts," [8] that this right specifically applies to *prisoners seeking post-conviction relief from their convictions, Id.* at 821, and that the right requires that such access be "adequate, effective and meaningful." *Id.* at 822. Moreover, as the Fourth Circuit noted in *Pollard v. Pollard*, "[t]he denial of meaningful access to the courts is established where a party engages in pre-filing actions *which effectively cover up evidence and actually render any state court remedies ineffective*." *Pollard*, 325 Fed. Appx. 270, 272 (4th Cir. 2009) (emphasis added);

This is precisely what Best's and Shrock's conduct did – it interfered with the right of Plaintiff to have meaningful and effective access to the courts during his MAR hearing to present his claims related to his unconstitutional confinement. Best and Shrock concealed the evidence that impeached the credibility of Johnson's 1994 trial testimony, the very issue being litigated in the 1997 MAR. This violated Plaintiff's well-established right to effective and meaningful access to the courts and caused Dontae Sharpe to spend additional decades in prison for a crime he did not commit. Plaintiff's Motion for Summary Judgment as to Count VII should therefore be granted.

## CONCLUSION

For the reasons set forth above, Plaintiff Montoyae Dontae Sharpe respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment as to Counts I, II, V, VI and VII of the operative Complaint, and grant such other and further relief as the Court may deem just and proper.

---

[8] The opinion in *Bounds* noted that the Court had "recognized that right more than 35 years ago," and described the cases establishing that right from *Ex parte Hull*, 312 U.S. 546 (1941) through *Griffin v. Illinois*, 351 U.S. 12, 20 (1956), *Burns v. Ohio*, 360 U.S. 252, 257 (1959), *Smith v. Bennett*, 365 U.S. 708 (1961), *Douglas v. California*, 372 U.S. 353, 358 (1963), *Johnson v. Avery*, 393 U.S. 483 (1969), *Younger v. Gilmore*, 404 U.S. 15 (1971), *Wolff v. McDonnell*, 418 U.S. 539, 577-580 (1974), and *Ross v. Moffitt*, 417 U.S. 600 (1974). *Bounds*, 430 U.S. at 822-23.

Respectfully submitted this 10th of September, 2024.

/s/ Sonya Pfeiffer
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
Rudolf Widenhouse
225 East Worthington Avenue, Suite 100
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
*ATTORNEYS FOR PLAINTIFF*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO THE CONSTITUTIONAL CLAIMS ALLEGED IN COUNTS I, II, V, VI and VII** using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system.

This 10th day of September, 2024.

/s/ Sonya Pfeiffer

Sonya Pfeiffer