**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**Civil No: 4:21-CV-00185-BO**

| | |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>Plaintiff,<br><br>v.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, and THE CITY OF GREENVILLE, NORTH CAROLINA,<br><br>Defendants. | **PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| MONTOYAE DONTAE SHARPE,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN MELVIN,<br><br>Defendant. | Civil No: 4:22-CV-00088-BO-RJ<br>(Consolidated with 4:21-cv-00185-BO) |

Plaintiff Montoyae Dontae Sharpe ("Sharpe"), by and through undersigned counsel, hereby responds to the Motions for Summary Judgment filed by Defendant Shrock (D.E. 179), Defendant Melvin (D.E. 184), Defendant Best (D.E. 189), and the City of Greenville (D.E. 194) as follows. Plaintiff's citations to the record will be as set forth below.[1]

---

[1] References to Plaintiff's Statement of Facts (D.E. 170) will be cited as "PSF ¶ ____."
References to Plaintiff's Appendix (D.E. 171) will be cited as "Pl. Appx., p. ___:___."
References to Plaintiff's Appendix in response to all Defendants' Motions for Summary Judgment will be cited as "Pl. Resp. Appx., p. ___:___" (Plaintiff's Response Appendix).

## I. INTRODUCTION

The statements of fact submitted to the Court by Defendants Shrock, Melvin, Best, and the City of Greenville (D.E. 180, D.E. 185, D.E. 190, D.E. 195, respectively) contain numerous claims of "undisputed" facts that are plainly in dispute between Plaintiff and Defendants. A close examination of these statements reveals they are primarily a cherry-picked compilation of alleged "facts" that are favorable to Defendants, but which ignore contrary evidence adduced by the parties in discovery. Rather than attempting to identify facts that are truly "undisputed" and "material," a significant number of Defendants' statements contain allegations that are contradicted by other evidence, including their own sworn testimony from depositions and prior proceedings.

Sharpe, in responding to the numbered paragraphs of Defendants' statements of fact, has set forth the evidentiary basis for why particular assertions in those statements are in fact "in dispute." In addition, Sharpe has identified the assertions that are not supported by specific citations or are simply not material to whether Sharpe's claims should be dismissed, even if they are undisputed.[2]

---

References to Plaintiff's Response to Melvin's Statement of Facts will be cited as "Pl. Resp. to Melvin SOF ¶ ____."

References to Plaintiff's Response to Best's, Shrock's, and the City of Greenville's Statement of Facts (D.E 190, 180, 195) will be cited as "Pl. Resp. to Best SOF ¶ ____."

References to Best's, Shrock's, and City of Greenville's Appendix (D.E. 191) will be cited simply as "Best Appx., p. ___:___."

References to Melvin's Appendix (D.E. 201) will be cited as "Melvin Appx., p. ___:___."

[2] Rule 56.1(a)(4) of the Local Rules for the Eastern District of North Carolina requires that "[c]itations shall identify with specificity the relevant page and paragraph or line number of the evidence cited." However, a number of Defendant Best's, Shrock's, and the City of Greenville's allegedly "undisputed facts" lack proper citations to the record, thereby making it difficult to locate the evidence purportedly supporting those facts. Similarly, many of the facts cited by Defendants are not "material" to any of Sharpe's constitutional claims. These defects in what are supposed to be statements of "undisputed material facts" supported by "specific references" to the "relevant page and paragraph or line number" are noted in Sharpe's Responses to Defendants' Statements of Undisputed Facts, attached hereto as Exhibits A and B.

As but one example of Defendants' improper characterization of disputed facts as undisputed facts, Shrock admitted to both the Greenville Police Department in an interview requested by the District Attorney, as well as an interview by a lawyer from the Duke Law School Wrongful Conviction Clinic, that his testimony at Plaintiff's 1997 MAR hearing was false. Shrock's admission that his testimony was false is further established and corroborated by medical and police records produced in discovery. Nonetheless, both Shrock and Best allege that Shrock's testimony at the 1997 MAR hearing constitute "undisputed facts," even though the testimony is demonstrably false and disputed by Shrock's own post-1997 admissions.

## II.     SUMMARY OF THE NATURE OF THE CASE

On July 27, 1995, Sharpe was wrongfully convicted of the murder of George Radcliffe. Sharpe endured more than twenty-five years in prison before his murder conviction was finally overturned on August 22, 2019. After numerous post-conviction proceedings and a multi-year investigation by the Duke Law Wrongful Convictions Clinic, Governor Roy Cooper, a former state prosecutor and North Carolina Attorney General, granted Sharpe a full and unconditional Pardon of Innocence on November 12, 2021. Notwithstanding the Pardon of Innocence, counsel for the Defendants have focused their efforts in this case on attempting to establish Sharpe's guilt.

Sharpe's wrongful conviction and the multiple harms he suffered were the result of the misconduct of Shrock, Best, Melvin, and the City of Greenville. Defendants knowingly used false evidence to secure Sharpe's arrest, charges, and conviction, and in so doing, Defendants deliberately, and in bad faith, concealed material exculpatory and impeachment evidence from the District Attorney. Best and Shrock continued to conceal the exculpatory and impeachment evidence in bad faith in post-conviction proceedings to hide their original misconduct, which extended Sharpe's period of wrongful confinement by decades.

3

On December 20, 2021, Sharpe filed a civil action pursuant to 42 U.S.C. § 1983 against Best, Shrock and the City of Greenville, alleging violations of Sharpe's First, Fourth, and Fourteenth Amendment rights (D.E. 1). The case number for the original action is 4:21-CV-00185-BO. On July 29, 2022, Sharpe filed a separate civil action against Melvin in case number 4:22-CV-88-M. Along with the filing of the Complaint against Melvin, Sharpe filed a Motion to Consolidate Cases under F. R. Civ. P. 42(A) to consolidate the original action and the separate action filed against Melvin (4:22-CV-88-M, D.E. 3). On October 31, 2022, this Court entered an Order consolidating the original case (4:21-CV-00185-BO) and the action against Melvin (4:22-CV-88-M) (see 4:22-CV-88-M, D.E. 20). At the Court's direction, Sharpe filed a Consolidated Complaint (D.E. 53; hereafter, the "Consolidated Complaint") in the original action on November 14, 2022, and Shrock, Best, and the City filed their Answer to the Consolidated Complaint on November 28, 2022. Melvin did not file an Answer or other response to the Consolidated Complaint. Following the conclusion of fact discovery, the compelled deposition of Melvin on April 2 and 4, 2024, the service of expert reports on May 14 and June 28, 2024, and the depositions of experts on June 11, July 15, and July 24, Plaintiff filed a Motion to Amend the Consolidated Complaint on July 26, 2024 (D.E. 163) to conform the pleadings to the evidence adduced in discovery. Given that the Court has not yet ruled on Plaintiff's Motion to Amend Complaint, Plaintiff's Motion for Partial Summary Judgment is based on the claims set forth in the currently operative Consolidated Complaint (D.E. 53).[3]

---

[3] In light of the four motions filed by Defendants, Plaintiff filed a motion to exceed the page limit of thirty pages on September 27, 2024, for his omnibus response. (D.E. 210.) Defendants consented to Plaintiff's motion. (D.E. 210, 211.)

## III.     STATEMENT OF FACTS

Plaintiff incorporates by reference, as if fully set out herein, Plaintiff's Statement of Undisputed Material Facts (D.E. 170) and Plaintiff's Responses to Defendants' Statements of Undisputed Material Facts, attached as Exhibit A (Plaintiff's Response to Melvin's Statements of Facts) and Exhibit B (Plaintiff's Response to Best's, Shrock's, and the City's Statement of Facts).

## IV.     LEGAL ARGUMENT

### A.  BEST'S AND MELVIN'S MOTIONS FOR SUMMARY JUDGMENT AS TO COUNTS I AND II SHOULD BE DENIED, AS THE EVIDENCE SHOWS THAT DEFENDANTS KNOWINGLY AND/OR RECKLESSLY PROCURED AND USED FALSE EVIDENCE TO SECURE A CONVICTION IN VIOLATION OF SHARPE'S WELL-ESTABLISHED DUE PROCESS RIGHTS.

Counts I and II of the operative complaint (D.E. 53) allege that Best and Melvin violated Sharpe's due process rights by procuring and using false evidence—namely, Charlene Johnson's and Beatrice Stokes's witness statements—to arrest, convict, and imprison Sharpe. In support of their motions for summary judgment as to Counts I and II, Best and Melvin argue that summary judgment in their favor is appropriate because there is "no evidence" that they fabricated what they describe as Charlene's "first statement," and that this allegedly "first statement" caused Sharpe's loss of liberty.

The bifurcation of the portions of Charlene's statement is irrelevant. Charlene's April 7, 1994, statement consisted of two paragraphs written four minutes apart. The first paragraph was in response to a question about what Charlene "knew" about the murder, not what she had witnessed. But it matters not whether only one part of the statement was fabricated or concocted by Best. As discussed in detail below, the use of both statements violates due process because the whole of Charlene's statement was known by Best and Melvin to be false. Best and Melvin's motions have no merit and should be denied, and Plaintiff's motion for summary judgment as to Counts I and II against Best and Melvin (D.E. 169 at 1–2) should be granted.

i.   *Contrary To Defendants' Argument, The Undisputed Facts Establish That Best and Melvin Fabricated And Knowingly Used False Evidence.*

Sharpe has provided ample evidence that Best fabricated the second paragraph of Charlene Johnson's April 7, 1994, statement tying Sharpe to Radcliffe's murder, that Melvin knowingly used this false evidence to secure Sharpe's arrest warrant, that this false evidence was introduced at Sharpe's trial, and that Best fabricated Beatrice Stokes's testimony that was used at Sharpe's trial.

Charlene testified during her deposition that Best provided her with information about the facts in the case and told her to insert that into the witness statement she signed at 1:34 pm on April 7, 1994. (D.E. 170, ¶ 90.) Melvin testified that she was present while Charlene wrote her statement, (Pl. Resp. to Melvin SOF ¶ 20), that she did not believe the statement to be true (D.E. 170, ¶ 92), and that she used it to secure Sharpe's arrest even though she didn't believe probable cause existed (D.E. 170, ¶¶ 105, 107–108.) Beatrice Stokes signed a statement—witnessed by three people, including Melvin—that Best paid her to say that Sharpe shot Radcliffe and coached her to corroborate Charlene's trial testimony. Pl. Resp. Appx. C. Melvin testified that Stokes was brought in by Best because Melvin "wasn't buying" Charlene's account and that Best's alleged encounter with Stokes did not happen. Pl. Resp. Melvin SOF ¶ 77.

Charlene's and Beatrice's statements are direct evidence of Best's actions to fabricate evidence against Sharpe, and that Melvin knew the evidence was false but nevertheless used it to obtain Sharpe's arrest warrant. This evidence precludes Defendants' motions for summary judgment on this claim. *See Black v. W. Va. State Police*, 696 F. Supp. 3d 236, 248–49 (S.D. W. Va. 2023) (summary judgment inappropriate where plaintiff provided evidence that police fed information to vulnerable witnesses); *Winslow v. Smith*, 696 F.3d 716, 734 (8th Cir. 2012) (reinstating fabrication claim when evidence showed law enforcement "coached" vulnerable individuals "into giving false testimony that fit into the sheriff department's own narrative of

events while ignoring evidence contrary, and potentially fatal, to the department's theory"); *Fulton v. Bartik*, 547 F. Supp. 3d 799, 813 (N.D. Ill. 2021) (relying on *Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012) and acknowledging that a due process false evidence claim "can be supported by allegations that police fed details to witnesses in order to concoct narratives with detailed incriminating evidence"); *Waters v. Town of Ayer*, No. 04-10521-GAO, 2009 WL 10728977, at *15 (D. Mass. Feb. 27, 2009) (relying on *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) and declaring "[a]ssisting vulnerable witnesses in fabricating a story is a clear due process violation"). And though Best and Melvin argue that Charlene's and Beatrice's versions of events are not credible, credibility determinations are not appropriate at the summary-judgment stage. *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015).

Moreover, even if Sharpe had not produced direct evidence that Best invented the statements (which he has), there is ample circumstantial evidence that both officers knew, or reasonably should have known, that Charlene's and Beatrice's statements were false, yet still *used those statements against Sharpe to convict him at trial.* Courts in the Fourth Circuit and around the country have consistently ruled that officers can be held liable for the fabrication of evidence when they *knowingly or recklessly use false witness testimony, even if false statement originates from the witness. See, e.g.*, *Hamric v. Bailey*, 386 F.2d 390, 393–95 (4th Cir. 1967) (condemning the use of misleading testimony from a witness when the government knew the testimony—though originating from the witness—was incorrect); *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Therefore, to defeat Best's and Melvin's motions for summary judgment as to Counts I and II, Sharpe need only provide evidence that creates a reasonable inference that Best and Melvin knowingly, or with reckless disregard for the truth, *used* false evidence that caused Sharpe's

indictment and conviction. *See Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004).[4] This evidence is clearly in the record: As set forth in detail in Plaintiff's Motion for Summary Judgment as to the fabrication claim in Counts I and II, the evidence goes much further than this. The evidence establishes that Best procured, and Best and Melvin used, Charlene Johnson's and Beatrice Stokes's false evidence to secure Plaintiff's indictment and conviction. Plaintiff, not Defendants Best and Melvin, who is entitled to summary judgment on the fabrication claims alleged in Counts I and II. See P's MFSJ, D.E. 169, pp. 1–2.

     *ii.*    *The False Evidence Used By Best And Melvin Caused Sharpe's Loss Of Freedom.*

     In ruling on Best's and Melvin's motion for summary judgment as to Counts I and II, the court must determine whether the facts alleged by Sharpe—viewed in the light most favorable to Sharpe as the nonmoving party—demonstrate that his loss of liberty resulted from the false evidence. *See Washington v. Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005). To do so, a court must ask whether Sharpe's conviction and incarceration were caused by, *or were a reasonably*

---

[4] Courts sometimes state that officers must *know* that the evidence is false to be held liable under the Fourteenth Amendment, though claims that officers used false evidence under the Fourth Amendment need only show that officers knew the evidence was false *or acted in reckless disregard of the truth. See, e.g.*, *Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019). As some courts have observed, however, "[t]here is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution," *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004), and have applied the same standard of knowledge *or* recklessness to claims that officers used false evidence in violation of the Fourteenth Amendment. *See, e.g.*, *Morse v. Fusto*, 804 F.3d 538, 544, 553 (2d Cir. 2015) (upholding liability under the Fourteenth Amendment for state actors who fabricated evidence when jury instructions required that defendants acted knowingly *or with reckless disregard*); *Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990), *overruled on other grounds by County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ("[I]t was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights to knowingly *or recklessly* omit from an arrest affidavit information which, if included, would have vitiated probable cause.").

The facts in this case are more than enough to create a reasonable inference that Best and Melvin actually knew that Charlene and Beatrice's statements were false. *See White v. Smith*, 696 F.3d 740, 754–57 (8th Cir. 2012) (pattern of witnesses adding details to their statements after conversations with police, when combined with evidence that police manufactured close relationships with witnesses, permitted a reasonable jury to infer that police coached and manipulated witnesses into making false statements).

*foreseeable result of*, the false evidence. *See id.* at 283 (emphasis added); *see also Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014) (plaintiff did not show causation when he "failed to plead facts to indicate that [the officer's] fabrication caused his convictions *or that the convictions were the reasonably foreseeable result of the fabrication*" (emphasis added)).

Best and Melvin insist that even if Sharpe can prove they fabricated and used false evidence, they cannot prove that this evidence caused his arrest and conviction. Melvin's argument consists of a single conclusory sentence without citations. Best, on the other hand, asserts that there is "no causation" because there is no evidence that he fabricated the first paragraph of Charlene's April 7, 1994, statement, which "identified Sharpe as the shooter." In short, Best argues that the first paragraph of Charlene's statement alone constituted probable cause for Sharpe's arrest and sufficient proof for his conviction. Thus, Best argues, there is no evidence that Charlene's fabricated second paragraph, or that Charlene's and Beatrice's fabricated testimony at Sharpe's trial, caused Sharpe's loss of freedom.

Best's argument is unsupported and speculative. As explained above, there is ample evidence that Best *knew, or was recklessly indifferent to the fact, Charlene's entire statement was false yet still used it* to secure his indictment and conviction. He is therefore just as liable for the first paragraph of her statement as the second.

Moreover, in light of the evidence introduced at Sharpe's trial, Best and Melvin's argument for summary judgment borders on the ludicrous. Applying Fourth Circuit precedent to the facts of this case, there is no doubt that Charlene's and Beatrice's testimony caused Sharpe's wrongful conviction, or that it was *a reasonably foreseeable result of* the use of the false evidence. Courts in the Fourth Circuit have routinely found that a plaintiff establishes causation when, like here, the false evidence is the primary evidence used against the plaintiff. *Compare Black*, 696 F. Supp. 3d

at 248 (plaintiff established causation when fabricated evidence was the "main evidence" used against him at trial), *with Massey*, 759 F.3d at 355–56 (plaintiff did not establish that fabricated evidence about his hairstyle or a witness's identification caused his conviction when other witness identifications were used at trial). Here, the only evidence directly tying Sharpe to Radcliffe's murder at his trial were Charlene's and Beatrice's false statements.

    *iii.*    *Best And Melvin Are Not Entitled To Qualified Immunity.*

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At bottom, qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) (citation omitted).

In assessing whether an official is entitled to qualified immunity, the court must determine whether: (a) the official violated a statutory or constitutional right; and (b) if so, whether that right was clearly established at the time of the alleged conduct. *Miller v. Prince George's County*, 475 F.3d 621, 626–27 (4th Cir. 2007). The court may address these two questions in whatever order "will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

For a right to be clearly established, it must be "sufficiently clear that a *reasonable* official would understand that what he is doing violates that right." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004). But "'[c]learly established' does not mean that 'the very action in question has previously been held unlawful.'" *Id.* (citation omitted). It only requires that "in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent." *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Accordingly, "a general constitutional rule already

identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As the Fourth Circuit has explained, "the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity." *Dean ex rel. Harness v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020); *see also Hope*, 536 U.S. at 740-741 (2002) (cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established). "We must consider not only specifically adjudicated rights, but also those manifestly included within more general applications of the core constitutional principles invoked." *Dean*, 976 F.3d at 417 (citations omitted). The *Dean* court concluded its analysis with the following:

> [T]his Court has found that "we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense. In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two.

*Id.* at 418 (quoting *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019)).

As to the first prong, it is beyond dispute that "the government 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction' or 'allow it to go uncorrected when it appears,'" *United States v. Chavez*, 894 F.3d 593, 599 (4th Cir. 2018) (quoting *Napue*, 360 U.S. at 269); *accord Washington*, 407 F.3d at 282 (recognizing the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity" (citation omitted)).

This right was clearly established well before 1994, when Charlene's false statement was used to obtain Sharpe's arrest warrant, and in 1995 when Charlene's and Beatrice's false testimony was used to convict Sharpe. *Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"); *Miller*, 386 U.S. at 7 ("More than 30 years ago this Court held that

the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."); *Hamric*, 386 F.2d at 393–94 (recognizing that "the knowing use of false evidence" is barred by due process); *see also Washington*, 407 F.3d at 282 (right "not to be deprived of liberty as a result of the fabrication of evidence" was clearly established in 1983); *Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019) (same); *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3rd Cir. 2014) (explaining that it "has been apparent for decades to all reasonable police officers" that fabricating evidence violates the right to due process).

For the foregoing reasons, Best and Melvin's motions for summary judgment as to the claims in Counts I and II should be denied.

B.  MELVIN'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT III SHOULD BE DENIED, AS THE EVIDENCE ESTABLISHES THAT MELVIN KNOWINGLY AND/OR RECKLESSLY FAILED TO INTERVENE TO PREVENT A VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS.

Melvin argues she is entitled to summary judgment on Count III because (a) "she had no duty to intervene" because "no evidence exists to show [she] observed or had reason to know Detective Best purportedly 'fed' Charlene information," (D.E. 200 at 11), and (b) she is "entitled to qualified immunity as there was no clearly established law preventing her from sitting in an interview room with an eyewitness to a homicide and allowing the witness to provide a handwritten statement about the homicide she witnessed," (*id*. at 12.). Neither argument has merit.

At the outset, Melvin misconstrues the scope of Plaintiff's bystander-liability claim by framing it *merely* as an allegation against her failure "to intervene to prevent Detective Best from allegedly creating Charlene Johnson's statement that implicated Plaintiff in the murder of George Radcliffe." *Id*. at 9. Contrary to Melvin's argument, however, Plaintiff's bystander-liability claim against her is not limited to what happened "in [the] interview room" where Best procured Charlene's statement. *Id*. at 12. Plaintiff also alleges Melvin failed to intervene to prevent Best's

*knowing use* of Charlene's false statement *at trial*. (D.E. 53 ¶ 190.) The evidence adduced in discovery supports the conclusion that Plaintiff's bystander-liability claim, under either theory of liability, should survive summary judgment.

       i.    *The Fourth Circuit Recognizes A Cause Of Action For Failure To Intervene.*

As Melvin herself acknowledges, (D.E. 200 at 9), the Fourth Circuit recognizes a cause of action for failure to intervene, or "bystander liability," as "premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–17 (4th Cir. 2014) (quoting *Randall v. Prince George's County*, 302 F.3d 188, 203 (4th Cir. 2002)).[5] Indeed, "[t]he very essence of bystander liability . . . is premised on an individual's passivity and nonparticipation while another individual violates a person's constitutional rights—not on the bystander actively causing the harm." *Id.* at 419–20 (citing *Randall*, 302 F.3d at 204 n.24 ("The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer.")). In other words, officers cannot stand on the sidelines; rather, in certain situations, they are "obliged to act." *Randall*, 302 F.3d at 204; *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement

---

[5] Notwithstanding *North Carolina ex rel. Hailey v. Westmoreland*, 267 F. Supp. 2d 497, 503 (M.D.N.C. 2003), which misconstrued *Randall* to mean that "bystander liability was not a clearly established legal principle" until 2002, a significant number of other cases continue to rely on *Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir. 1987), as the genesis of "a failure to intervene theory of liability" in the Fourth Circuit. *See Randall*, 302 F.3d at 203 (citing to *Jackson* to support that the Fourth Circuit had already indicated that, under some circumstances, "bystander liability might attach to a law officer"); *Osborne v. Long*, No. 1:11-CV-00070, 2012 WL 851106, at *5 n.4 (S.D. W. Va. Mar. 13, 2012) (citing to *Jackson* as the genesis of "a failure to intervene theory of liability" in the Fourth Circuit); *Masel v. Barrett*, 707 F. Supp. 4, 8 (D.D.C. 1989) (citing to *Jackson* to support that "[o]ther circuits that have addressed the issue have uniformly found a constitutional duty for a police officer . . . to intervene affirmatively to prevent the violation of constitutional rights by another officer"); *Browning v. Snead*, 886 F. Supp. 547, 552 (S.D. W. Va. 1995) (citing to *Jackson* to support that "[a] police officer may not stand by idly while a citizen's constitutional rights are violated by another officer; he has an affirmative duty to intercede on the citizen's behalf").

13

officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."). The evidence adduced in discovery revealed that Melvin violated her duty when she stood by idly while Best fabricated Charlene Johnson's statement and, later, used the false evidence to wrongfully convict Sharpe at trial.

ii. *Melvin Failed To Intervene To Prevent Best From Fabricating Charlene Johnson's False Statement.*

There is a dispute of material facts as to whether Melvin failed to intervene to prevent Best from fabricating Charlene Johnson's April 7 statement. In fact, Sharpe has marshalled evidence of the following:

- That Melvin was the named lead detective assigned to investigate George Radcliffe's murder (Pl. Appx. W, p. 7:18-21);
- That Best was assigned to assist Melvin (PSF ¶ 33);
- That Best procured a written statement from Charlene Johnson on April 7, 1994, at the GPD's Headquarters, also known as the "Brown Building," (PSF ¶ 87);
- That Charlene Johnson was 14 years old at the time, (PSF ¶ 39);
- That Charlene Johnson testified under oath that Best fabricated at least one portion of her statement, (Pl. Resp. to Best SOF ¶ 25);
- That her fabricated statement included obvious signs of police jargon (e.g., referring to a white man as a "white male"), even though she appeared to have poor literacy skills from the remaining portions of her statement, (PSF ¶¶ 88, 90);
- That Melvin was present at the "Brown Building" when Best fabricated at least one portion of Charlene's statement, (Pl. Resp. to Best SOF ¶¶ 17, 20);
- That Melvin testified under oath that she believed Charlene April 7, 1994, statement was false, (PSF ¶ 92; Pl. Resp. to Best SOF ¶ 22); and
- That Melvin took no remedial action with respect to Best fabrication, (Pl. Appx. W, p. 22:14-25).

From these facts, a jury may reasonably infer Melvin was confronted with Best's illegal acts, possessed the power and opportunity to prevent it, and yet chose not to act. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences

"in the light most favorable to the party opposing the [summary judgment] motion." (citation omitted)); *see also Randall*, 302 F.3d at 203 (4th Cir. 2002) ("[I]f a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly.").

iii. *Melvin Failed To Intervene To Prevent Best From Using False Evidence To Convict Sharpe.*

There is also a dispute of material facts as to whether Melvin failed to intervene to prevent Best's knowing use of Charlene Johnson's false statements at trial. Indeed, Melvin herself testified under oath:

- That Best procured Charlene Johnson's April 7, 1994, statement, (PSF ¶ 87);
- That she believed Charlene's statement was false, (PSF ¶ 92; Pl. Resp. to Best SOF ¶ 22);
- That she believed Wilbur Mercer—not Dontae Sharpe—was the likely perpetrator, (PSF ¶ 32);
- That there was no probable cause to arrest and charge Sharpe for the Radcliffe murder, (PSF ¶ 105);
- That she believed Sharpe was innocent, (Pl. Resp. to Melvin SOF ¶ 37).

Moreover, the evidence established Melvin knew, or reasonably should have known, that Charlene's false statement would be introduced at Mr. Sharpe's criminal trial; and that Charlene's false statement was indeed introduced at Sharpe's criminal trial. (Pl. Appx. KK, p. 252:7-24.)

A jury may reasonably infer from these facts that, even though Melvin believed Charlene Johnson's statement was false, she failed to act upon her concern and prevent the false evidence from being used to convict Sharpe. *See Kifer v. Crow*, No. 3:21-CV-039-DCK, 2023 WL 5192113, at *8 (W.D.N.C. Aug. 11, 2023), *appeal dismissed*, No. 23-1949, 2024 WL 4185944 (4th Cir. June 14, 2024) (plaintiff's failure to intervene claim survived summary judgment where defendants believed a tip was false but "failed to act upon their concerns when they arrived after [plaintiff] was arrested"). Plaintiff is therefore entitled to present his bystander liability claim to a jury.

C.  BEST AND MELVIN'S MOTIONS FOR SUMMARY JUDGMENT AS TO COUNT IV SHOULD
BE DENIED BECAUSE MELVIN'S MISLEADING PRESENTATION OF CHARLENE'S FALSE
STATEMENT TO THE MAGISTRATE CAUSED PLAINTIFF'S PROSECUTION WITHOUT
PROBABLE CAUSE, IN VIOLATION OF PLAINTIFF'S CLEARLY ESTABLISHED FOURTH
AMENDMENT RIGHTS.

It is undisputed that the sole basis for the warrant leading to Sharpe's arrest was Charlene

Johnson's April 7, two-paragraph statement. (PSF ¶ 108; Pl. Appx. T, p. 230:1–3; Pl. Appx. U, p.

202:15–22.) Best claims that he is entitled to summary judgment on Plaintiff's malicious

prosecution claim[6] because "there is no evidence to support any allegation that Charlene's *first*

statement, the statement that implicated Sharpe in Radcliffe's murder, was based on anything but

facts Charlene *knew* about the murder." (D.E. 193 at 9–10 (emphasis added).) Although Best

repeatedly refers to the first paragraph of Charlene's written statement as her "first statement," this

is a mischaracterization. Charlene in fact wrote a single statement consisting of two paragraphs

written four minutes apart, with both on a single sheet of paper. (Best Appx. O.) Charlene's two-

paragraph statement was the only statement she ever made before Sharpe was arrested. Best's

argument that the first paragraph of the statement, standing alone, established probable cause to

initiate criminal proceedings against Sharpe is wrong. Among other things, it is based on a flawed

premise.

i.  *The Permissible Inferences Show That Charlene Provided a Statement That Was Not
Based On Firsthand Knowledge Of The Crime.*

In response to Best's request that Charlene write down "*what you know* about the murder"

(Best SOF ¶ 66), Charlene wrote what she "knew" at that time. Best's argument assumes that what

Charlene "knew" about the murder was based on what she actually "witnessed" on February 11,

_____

[6] In her Motion for Partial Summary Judgment, Melvin does not move for summary judgment on the
malicious prosecution claim against her. (D.E. 184.) Thus, this response addresses the arguments on this
claim made only by Best.

1994, despite the fact that, as discussed more below, her description of the murder was inconsistent with the evidence from the crime scene.

Moreover, under the law, Best is not entitled to the illogical assumption that what Charlene wrote down in her first paragraph was based on what she actually witnessed. On a motion for summary judgment, this Court views "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *T-Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384–385 (4th Cir. 2012) (citations omitted). Plaintiff is entitled to the reasonable inference that when asked what she "knew" about the murder, Charlene responded by writing what "she knew;" *i.e.*, what she had learned about the murder during the almost two months between the date of the murder in her community and April 7, 1994. Of course, what Charlene "knew" about a murder in the community in which she lived, almost two months later, after news media reports and from the neighborhood "grapevine," is not nearly the same as being an eyewitness to it. The inference in favor of Sharpe is borne out by Charlene's deposition testimony that the "first time she became aware of the murder" *was through the news*. (Best Appx. QQ, p. 20:12–21:1; *see also* Pl. Resp. to Best SOF ¶ 66.)

Drawing the inferences allowed in this legal analysis, Best knew, or reasonably should have known, that there was evidence that Charlene's statement *was not based on anything she had actually witnessed.* What Best mischaracterizes as Charlene's "first statement" was also inconsistent with the physical facts, including that the victim's body was found inside his truck in someone's backyard, and was contradicted other eyewitness testimony, such as that by Tony Johnson, who saw the victim's truck speed through the intersection after shots were fired. (PSF ¶ 89; Pl. Resp. to Best SOF ¶ 24.) Best then proceeded to try to "fix" the inconsistencies by telling Charlene what she needed to add in a second paragraph to account for the existence of the truck

17

and the victim's body inside the truck rather than in the street.[7] (PSF ¶ 90; Pl. Resp. to Best SOF ¶ 25.) But that second paragraph also contained inconsistencies with the physical evidence at the crime scene. (PSF ¶ 91 (for example, that the keys were found in the ignition of the truck).)[8] As a result, Melvin did not believe Charlene's statement was truthful. (*Id*. at ¶ 92.)

Best argues that the Court should just take the bare, isolated assertion in the first paragraph of Charlene's statement—namely, that she had seen Sharpe shoot Radcliffe, without more—as sufficient to establish probable cause. (Best Memo., p 11.) This argument ignores the exculpatory circumstances surrounding the statement that show she did not actually witness the murder and draws all inferences in Best's favor on the question of probable cause. As explained above, the law does not allow the inferences that Best desires to make his argument.

ii.    *There Was No Probable Cause To Initiate Criminal Proceedings Against Sharpe Where Best and Melvin Doubted the Reliability of Charlene's Statement.*

The rest of the applicable law governing this claim similarly defeats Best's attempt for a judgment in his favor. Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). This requires a court to "examine *the events leading up to the arrest*, and then decide whether these *historical facts*, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *Harris v. Town of S. Pines*, 110 F.4th 633, 639 (4th Cir. 2024) (emphasis added)

---

[7] Since Best focuses only on the first paragraph of Charlene's statement, he appears to not contest that there is sufficient evidence to survive summary judgment based on the fabrication of the second paragraph, which is grounded in well-established law. *See Estate of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *25 (D. Md. Feb. 10, 2020) ("[F]abricated evidence cannot serve as the basis for probable cause."); *Gilliam v. Sealy*, 932 F.3d 216, 234 (4th Cir. 2019) ("McCollum's confession implicating Brown, if police knew it was coerced or fabricated, did not provide probable cause for Appellants to arrest Brown.").

[8] Plaintiff's argument that the inconsistencies in Charlene's second paragraph necessarily preclude the possibility that some of the information in the second paragraph was provided by Best is defeated by reason and common sense, and is addressed with the probability that Best informed Charlene of the facts necessary to account for the truck and the location of the body.

18

(quoting *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018)). In this holistic examination of the totality of the events, it is well understood that "independent exculpatory evidence or substantial evidence of [a] witness's own unreliability that is known by the arresting officers" can make it so probable cause does not exist. *United States v. Beckham*, 325 F. Supp. 2d 678, 688 (E.D. Va. 2004) (quoting *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000)); *see also English v. Clarke,* 90 F.4th 636, 646 (4th Cir. 2024) (in determining whether probable cause supports an arrest, court must consider if there was something "to suggest that law enforcement should have been on notice that [the witness's information] might be unreliable or untrue").

Based upon the information known to Melvin, which was also known to Best, Melvin did not believe Charlene's statement was truthful. (PSF ¶ 92.) The reasonable inference that follows is that Best also had sufficient information to doubt that Charlene's statement was accurate and truthful.[9] (Pl. Resp. to Best SOF ¶ 23; Pl. Appx. W, p. 34:16-17 (Best knew that Melvin did not believe Charlene's account); Pl. Appx. X, p. 58:3-9 (Melvin admitting that the information provided by Charlene "wasn't adding up").) *See Humbert v. Mayor of Balt. City*, 866 F.3d 546, 562 (4th Cir. 2017) (holding "any reasonable officer in the Officers' position would have doubted the reliability of the victim's initial response to [plaintiff's] photo and attributed it, at least in part, to [a fellow officer's] actions" in influencing the victim).

In fact, Best testified that, because he allegedly wanted to "make sure" Charlene was telling the truth, he carried her to the SBI for a polygraph—*but only after Sharpe had already been*

_____

[9] It is the dubious nature of Charlene's statement, and an admission by the lead investigator that she *did not believe* Charlene, that distinguishes this matter from *English*, 90 F.4th 636, a case upon which Best extensively relies at pp. 10–11 of his Memorandum. First, in *English*, there was no reason to doubt that the victim of the sexual assault provided firsthand knowledge. Indeed, "the evidence in this case consists of the victim's repeated identifications of someone whom she knew." *English*, 90 F.4th at 648. Next, "[t]he victim's identifications were specific and relatively certain, and there is nothing to suggest that law enforcement should have been on notice that they might be unreliable or untrue." *Id*. at 646.

19

*indicted for first degree murder.* (Pl. Appx. MM, p.123:4-9 (Best stating he was skeptical of Charlene's account); 126:14-15 (Best stating that Charlene's polygraph was after Sharpe's arrest).) Although the results of that polygraph were inconclusive, Best did not question Charlene further, or interview Sharpe's alibi witnesses. He simply pushed ahead with the prosecution.

From all of these facts and inferences, Best's motion for summary judgment on the malicious prosecution claim, on the ground that there was probable cause to charge Sharpe based on the first paragraph of Charlene's April 7 statement, should be denied.

     iii.   *Best Melvin are Not Entitled to Qualified Immunity, As No Reasonable Officer Would Have Believed There Was Probable Cause.*

Finally, Best's argument that he is entitled to qualified immunity is meritless. "There can be no reasonable dispute that it was clearly established in 1983 that an arrest in the absence of probable cause was a violation of an individual's Fourth Amendment rights." *Gilliam v. Sealy,* 932 F.3d 216, 235 (4th Cir. 2019). Furthermore, Best's motion for summary judgment is not supported by *Torchinsky v. Siwinski*, 942 F.2d 257, 260–61 (4th Cir. 1991). Based on *Torchinsky*, Best contends that regardless of whether there was probable cause to arrest Sharpe, he is entitled to qualified immunity on the malicious prosecution claim by the "magistrate's determination of probable cause" when issuing the warrant. (Best Memo., pp. 12–13.) In other words, Best argues that the warrant issued by the magistrate establishes that Best "acted with objective reasonableness necessary to entitle him to qualified immunity." *Torchinsky*, 942 F.2d at 260.

However, "the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately, 'or with reckless disregard for the truth' makes material false statements or omits material facts." *Miller v. Prince George's County,* 475 F.3d 621, 631 (4th Cir. 2007) (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)). Accordingly, "a reasonable officer cannot believe a warrant is supported by probable cause if the

magistrate is misled by [stated or omitted facts] that the officer knows or should know are false [or would negate probable cause]." *Humbert*, 866 F.3d at 562 (alteration in original) (quoting *Smith v. Reddy*, 101 F.3d 351, 355 (4th Cir. 1996)); *see also Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014) (police officers do not get protection from "intervening acts of other participants in the criminal justice system" when they have "lied to or misled" those participants).

Again, it is undisputed that the magistrate only considered Charlene's statement when issuing the warrant. (PSF ¶ 108; Pl. Appx. T, p. 230:1–3; Pl. Appx. U, p. 202:15–22.) But, in this presentation of the statement to the magistrate, Melvin did not share with the magistrate that Charlene's statement was inconsistent with the evidence at the crime scene; was therefore most likely based on what she had heard in the neighborhood and seen on the news, rather than what she had actually witnessed; or that as a result of those inconsistencies, Melvin did not believe that probable cause existed to charge Dontae Sharpe with the murder of George Radcliffe. (PSF ¶¶ 93, 105; *see also* Pl. Resp. to Best SOF ¶ 26.) Based on this authority, any argument for summary judgment on the malicious prosecution claim based on qualified immunity should be rejected.

### D. DEFENDANTS BEST AND MELVIN'S MOTIONS FOR SUMMARY JUDGMENT AS TO COUNT V SHOULD BE DENIED AS THEY CONDUCTED A WOEFULLY INADEQUATE INVESTIGATION OF CHARLENE'S FALSE STATEMENT AND CONCEALED EVIDENCE OF THEIR OWN MISCONDUCT IN CREATING THAT EVIDENCE.

Plaintiff alleges a violation of his constitutional right to due process as a result of Defendants' intentional and reckless failure to conduct *any i*nvestigation of Charlene Johnson's April 7 statement, coupled with allegations that Defendants, in bad faith, suppressed exculpatory evidence to conceal their own misconduct. (*See* Pl. Memo. at 17–21 (D.E. 178).)

Best and Melvin agree that Sharpe was not a suspect before Charlene made her statement on April 7. (PSF ¶ 83.) Even though Charlene's statement was replete with claims that were inconsistent with the physical evidence, (*id*. at ¶¶ 85–91), and although Melvin herself did not

believe the statement to be accurate or truthful, (*id*. at ¶ 92), Defendants closed their eyes to what was obvious. Their failure to even attempt to interview the alibi witnesses whose names were provided by Sharpe and his codefendant, Mark Joyner, as soon as they were arrested, is further proof of their intent and recklessness. Best and Melvin were willfully blind and they consciously avoided the truth in order to "solve" the case.

Moreover, this claim cannot be separated from the claim that Defendants violated Sharpe's due process rights by procuring and recklessly using false evidence in the form of the statement of Charlene Johnson and the testimony of Beatrice Stokes. Melvin stood by and ignored what Best was doing, and then used the fruits of Best's misconduct to obtain an arrest warrant falsely charging Sharpe with the Radcliffe murder, although she did not believe Johnson's statement was true. (*See* D.E. 178, pp. 21–22.)

Nor was there any exigent circumstance that excused their failure to investigate. The murder had occurred two months earlier. Dontae Sharpe and Mark Joyner lived in Greenville. There was no information that they would flee, or that they were destroying evidence. In short, there was ample time for Melvin and Best to not only ask further questions of Charlene to probe the veracity of her statement, but also time to simply question Sharpe and Joyner before arresting them, to then investigate their alibis, and review Charlene's statement in light of all the evidence then available, including the exculpatory evidence, before making a decision to arrest Dontae Sharpe. None of this was done.

Instead, Melvin and Best sought an arrest warrant less than three hours after obtaining Charlene's statement (PSF ¶ 98), then ignored the alibi and other evidence Sharpe and Joyner provided. In a case where no investigative steps had been taken for months, there was simply no

urgency to make a hasty arrest without taking the most basic investigative steps that could have—and should have—been taken after Charlene Johnson provided her statement.

The rational inference (indeed, the most likely inference) from Defendants' conduct is that they *consciously chose* not to investigate Charlene's April 7 statement because they had helped to create it, did not want to expose its falsity, and intended to use it to falsely accuse Sharpe with the murder—which is exactly what they did.

After Best and Melvin chose not to investigate the credibility of Charlene Johnson's April 7 statement despite its obvious conflicts with the physical evidence, and then chose not to investigate the alibi evidence provided by Dontae Sharpe and Mark Joyner, which would have established the lack of any probable cause to arrest Sharpe, they concealed material impeachment evidence from the District Attorney before trial and then again before the 1997 MAR. The actions of Best, Melvin, and Shrock in concealing this impeachment evidence was done for the bad-faith purpose of hiding the fact that they did not have probable cause to arrest and indict Sharpe.

Best's assertion that "we do not know all the steps Best and Melvin took as the original files have been lost in flooding" lacks any evidentiary support and is in direct conflict with all other evidence that does exist in this case. (Pl. Resp. to Best SOF ¶ 42; Pl. Appx. U, p. 88:5-14.) Best's further assertion that Charlene's statement provided probable cause "based on her own information" is a circular statement of no import. Dontae Sharpe was not a suspect prior to April 7. *Id.* at ¶ 83. No investigation was done after Charlene Johnson's statement on April 7. (*Id.* at ¶ 37, 94-100.)

Melvin and Best's mischaracterize Count V as a complaint that the investigation was simply "sloppy," that it was not the investigation "Plaintiff desired," and that probable cause existed to arrest Plaintiff. Defendants ignore the overwhelming absence of *any investigation at all*

into Charlene Johnson's questionable statement and Dontae Sharpe's alibi evidence, and the plain reality that nothing other than Charlene Johnson's false statement was used to obtain the arrest warrant for Plaintiff. Defendants also fail to account for Plaintiff's allegations that Defendants' failure to investigate was done in bad faith for the purpose of concealing their misconduct in the fabrication of Charlene's statement inculpating Sharpe, which bad faith was evidenced by the false testimony of Shrock and Best in Sharpe's 1997 MAR. *See* PSF ¶¶ 54–65.

Therefore, Defendants' argument for summary judgment on Count V fails as a matter of law.

   i.   *Due Process Requires A Fair Investigation That Seeks Justice.*

There can be no dispute that:

> Law enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly as illustrated by the Brady line of cases requiring the state to disclose exculpatory evidence to the defense. Although charged with investigating and prosecuting the accused with "earnestness and vigor," officers must be faithful to the overriding interest that "justice shall be done."

*Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001) (citing *United States v. Agurs*, 427 U.S. 97, 110–11 (1976), *overruled on other grounds*, *United States v. Bagley,* 473 U.S. 667 (1985)).

Courts in this jurisdiction have uniformly recognized this fundamental principle of due process. *See Gilliam v. Sealey*, 932 F.3d 216, 240–41 (4th Cir. 2019) (recognizing a due process claim stemming from failure to investigate and suppression of evidence); *Shaw v. Town of Mint Hill*, No. 3:23-cv-624, 2024 WL 2162891, at *7 (W.D.N.C. May 14, 2024); *Howard v. City of Durham*, 487 F. Supp. 3d 377, 426 (M.D.N.C. Sep. 16, 2020) (denying the defendant's motion for summary judgment on an inadequate-investigation claim and recognizing "a due process claim for failure to perform an adequate investigation if an officer takes bad faith actions to shield his

wrongful acts"); *Kline v. Cleveland County*, No. 1:19-CV-00197, 2020 WL 1692348, at *12 (W.D.N.C. Apr. 7, 2020) (acknowledging that intentionally or recklessly ignoring exculpatory information during an investigation is "an arbitrary and oppressive exercise of power amounting to a substantive due process violation" and denying defendant's motion to dismiss plaintiff's substantive due process claim alleging government employees "intentionally declined to review [exculpatory] information" and thereby failed "to conduct a prompt, fair, and thorough investigation); *Humbert v. O'Malley*, No. WDQ-11-0440, 2014 WL 1266673, at *13 (D. Md., Mar. 25, 2014) (under the Fourteenth Amendment, "[p]olice officers may be liable under § 1983 for deliberate or reckless failures to investigate readily available exculpatory evidence" (citations omitted)); s*ee also Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012) ("[A] due process right against a reckless investigation was clearly established in 1986."). Put another way, where state officials "have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Wilson*, 260 F.3d at 956.

As it relates to the assertion that Charlene's statement created probable cause by the sheer fact it was made, it is well understood that "substantial evidence of [a] witness's own unreliability that is known by the arresting officers" can make it so probable cause does not exist. *United States v. Beckham*, 325 F. Supp. 2d 678, 688 (E.D. Va. 2004) (quoting *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000)). Moreover, if the information upon which an officer initiates an investigation "would lead a reasonable officer to be suspicious, *the officer should conduct further investigation before making an arrest.*" *Id.* at 688 (emphasis added) (quotation omitted); *see also English v. Clarke,* 90 F.4th 636, 646 (in determining whether probable cause supports an arrest, court must consider if there is something "to suggest that law enforcement should have been on notice that [a witness's information] might be unreliable or untrue")*.*

ii.     *Best And Melvin Had Ample Time To Conduct An Investigation of Charlene's Unreliable Statement.*

Melvin and Best knew or should have known the statement from Charlene was not reliable. She had just turned 14 years old at the time, being 13 as of the date of the murder. (PSF ¶ 39.) She had been engaging in extreme and reckless behavior, such as running out in front of police cars. (*Id*. at ¶ 50.) She had recently been located by the police after three weeks in an adolescent psychiatric ward and three weeks on the streets as a runaway, during which time she was drinking heavily and using drugs. (*Id*. at ¶¶ 42, 59, 77).

Beyond this, her written statement not only conflicted with the physical evidence at the scene but demonstrated that Charlene did not actually witness the murder. (D.E. 170, ¶¶ 39-55, 57, 59, 61, 69, 76-82.) The evidence from the scene was that Radcliffe's dead body was found in his truck in a vacant lot. (Best Appx. A, p. Sharpe 3708.) Tony Johnson, an eyewitness at the scene, testified that the truck sped through the intersection after shots were fired, (*id.*), and Alonzo Vines stated in an interview that the truck wrecked in his backyard and made a loud noise. (Best Appx. I.) The police report of the incident stated that the truck was facing southwest, with "fresh tracks" showing the path that the truck had taken westerly across the vacant lot. (Pl. Appx. A, p. Sharpe 4995 (Best Appx. A is missing the second page of the incident report).) In Charlene's first written paragraph, she made no mention of a truck, which was the salient fact observed by other eyewitnesses, and recites only that Sharpe pushed Radcliffe after Radcliffe lacked the money to buy drugs and then shot him. The statement failed to account for Radcliffe's body in the truck, the movement of the truck into the vacant lot, and the truck crashing through a stop sign and a fence and then coming to a stop. Additionally, Charlene's first statement says she was at "the stop sign" on 14th Street, whereas the truck had traveled west on 6th Street and come to rest at the corner of Shepherd and 6th Street. (Pl. Appx. A, p. Sharpe 4995.) Furthermore, Radcliffe's wallet contained

$53.00, (Melvin Appx. B, p. Sharpe 3703 (third paragraph)), contradicting Charlene's statement that Radcliffe only had $18.00. Charlene's first written statement therefore contradicted, rather than corroborated, the physical evidence in the case and indicated that Charlene *had not* actually witnessed the murder.

Charlene's statement also contained allegations that strain credulity about how the truck got into its final resting position, with either Plaintiff or his co-Defendant sitting on top of a dead body and directing the truck into a patch of grass where it came to rest. (PSF at ¶¶ 88-91.) Melvin herself has testified in this case that she did not believe Charlene's account. (*Id.* at ¶ 92.) Despite this, neither she nor Best confronted Charlene regarding the inconsistencies between her statements and the physical evidence at the scene, (*id.* at ¶¶ 94, 95), nor did they even ask her about these inconsistencies. (*Id.* at ¶¶ 96-97, 100.) Nor was any investigation done by Best or Melvin as to Charlene's history of psychiatric illnesses, her treatment and evaluation in the adolescent psychiatric ward at PCMH, or her history of drug and alcohol use. (*Id.* at ¶ 104.)

To nonetheless take Charlene's statement and use it as the sole basis upon which to arrest Plaintiff, then to ignore evidence provided by Plaintiff, on a case where there is simply no time pressure to close, is the essence of deliberate indifference. "[L]iability for deliberate indifference . . . rests upon the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

Here, when Melvin and Best had ample time to investigate Charlene's statement and Plaintiff's alibi, yet chose not to, the outcome is plain: they had the ability "to make unhurried judgments with time to deliberate." *Dean v. McKinney,* 976 F.3d 407, 415 (4th Cir. 2020). In

choosing not to investigate, they acted precisely in the manner the law has determined to be deliberately indifferent. *Id*. at 416. And once Best and Melvin arrested and indicted Sharpe for the Radcliffe murder on the basis of Charlene's fictitious statement, it became necessary for them, and Shrock in a later proceeding, to conceal the impeachment evidence that undermined the credibility of her statement. *See Gilliam*, 932 F.3d at 241; *see also Shaw*, 2024 WL 2162891, at *7 ("A Fourteenth Amendment due process claim for bad faith failure to investigate will lie if an officer takes bad faith actions to shield his wrongful acts, including fabricating testimony and failing to disclose exculpatory evidence." (citations omitted)).

Melvin and Best's motion for summary judgment as to Count V should be denied, and Plaintiff's motion for summary judgment as to that claim should be granted.[10]

iii.    *Best and Melvin Were On Notice That Their Conduct Violated Mr. Sharpe's Rights By Well-Understood Supreme Court Authority.*

The due process right to a fair investigation was clearly established when Best and Melvin were in charge of investigating George Radcliffe's murder. Supreme Court jurisprudence concerning a defendant's due process protection against a reckless investigation was clearly established as of 1986. In *Waybright v. Frederick County*, the Fourth Circuit explained "the Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less." 528 F.3d 199, 205 (4th Cir. 2008) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). In that decision from more than six decades ago, the Supreme Court recognized a "general requirement that States in their prosecutions respect certain decencies of civilized conduct." *Rochin*, 342 U.S. at 173.

---

[10] A more complete discussion of why Defendants' conduct in April 1994 violated Dontae Sharpe's constitutional right to due process, and resulted in him spending twenty-five years in prison for a crime he did not commit, is set forth in D.E. 178, pp. 17-21.

Furthermore, "[d]ue process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Id*. (citation omitted). Additionally, the Court of Appeals for the Eighth Circuit has also recognized that "[p]ursuant to *Wilson* . . . a due process right against a reckless investigation was clearly established in 1986." *Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012); *see also Leverette v. Bell*, 247 F.3d 160, 168 (4th Cir. 2001) (recognizing that courts should look to "sister circuits' decisions" in conducting qualified immunity analysis).

E.    BEST'S AND SHROCK'S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIMS IN COUNTS VI AND VII SHOULD BE DENIED.

In seeking summary judgment on Plaintiff's Count VI, Best and Shrock assert facts unsupported by *any* evidence in this case, and even add new "facts" in their memorandum that are not included in their Statement of Undisputed Facts. As Plaintiff has made plain in his Memorandum in Support of Motion for Summary Judgment as to Count VI, (D.E. 178, pp. 22–26), and his Statement of Undisputed Facts, (D.E. 170), there is no dispute that material exculpatory and impeachment evidence was suppressed by Best and Shrock. The record is devoid of any rebuttal evidence. In the face of this reality, Best and Shrock cite to immaterial facts or facts that are unquestionably not in dispute and label them disputed, or simply manufacture other "facts" that do not exist. This Court therefore should rely upon the "facts" put forth by Defendants Best and Shrock. By way of only two examples:

Best claims in his memorandum that District Attorney Clark Everett subpoenaed Charlene Johnson's medical records, and that Plaintiff's defense lawyer, Cherry Stokes, would have received the records because of Stokes's representation of unrelated party Lisa Evans. (D.E. 193 at 19.) Best then suggests "all Cherry Stokes had to do was look in his attorney box at the Courthouse." (*Id.* at

20.) All of this is demonstrably false. The facts, supported by documents exchanged during discovery and deposition testimony, are this: The subpoena referenced by Defendants and issued by the District Attorney only sought documents from April 7, 1994, onwards. It did not seek documents for her February involuntary commitment to the adolescent psychiatric ward. (Pl. Resp. to Best SOF ¶ 45.) Moreover, Cherry Stokes did not represent Lisa Evans. (*Id*. at ¶ 34.)

Shrock asserts "there is a mountain of evidence that medical records related to Charlene's psychiatric stay were received by the District Attorney's Office and disclosed to defense counsel and the court." (D.E. 188 at 9.) He concludes: "Therefore, Cherry Stokes had possession of Charlene's medical treatment records, or was at least aware of them, but declined to use the information in trial." (*Id*. at 11.) This allegation is unsupported by any evidence whatsoever: no documentation exists to support this claim, no deposition testimony supports this claim, there is not even an inference to support this claim. This assertion is simply a fabrication. As noted in Plaintiff's Statement of Undisputed Facts, former District Attorney Everett testified under oath in his depositions he was not aware of Charlene's hospitalizations in February and March 1994 nor in September 1994. (PSF ¶¶ 188, 189, 190.) Best and Shrock concoct undisputed facts because the actual undisputed facts adduced in discovery lead to the inevitable conclusion that Best and Shrock's Motions for Summary Judgment on this Count must be denied, and Plaintiff's Motion for Summary Judgment on this Count must be granted.

The uncontradicted facts, supported by documents and deposition testimony, are as follows:

i.   *Impeachment Evidence Regarding Charlene Johnson.*

Defendants concealed from the District Attorney, Plaintiff, and the Court the following facts relating to the credibility of Charlene's statements to Defendants:

- That Charlene Johnson had first been noticed by Shrock on February 17, 1994, after she ran in front of his patrol car and cursed at him, and that she appeared to be on drugs at that time. (D.E 170, ¶ 186(d), (e).)

- That at the request of her mother, Shrock transported Charlene to PCMH that night, where at the request of her mother she was involuntarily committed to the adolescent psychiatric ward. (*Id.* ¶ 186(g).)

- That Charlene was committed to the adolescent psychiatric ward for three weeks in February and March 1994, and then again in September 1994. (*Id.* ¶ 186(i).)

- That Best and others at the GPD had given Charlene Johnson and her brother money and gifts prior to Dontae's trial. (*Id.* ¶ 186(j).)

- That Best had subjected Charlene Johnson to a polygraph in 1994 to satisfy himself that she was telling the truth, but the results of the polygraph were inconclusive. (*Id.* ¶ 186(o).)

District Attorney Clark Everett testified in his deposition that each of these exculpatory facts were significant for evaluating Charlene's credibility, and said that Charlene's mother seeking an involuntary commitment for her at the PCMH adolescent psychiatric ward was "certainly significant." (*Id.* at ¶188.) With respect to Shrock transporting Charlene to the hospital to be evaluated for an involuntary commitment, the District Attorney admitted in his deposition that if he had known this information, he "would've brought it out" at the trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). (*Id.* at ¶ 189.) And as to Charlene's admissions to the adolescent psychiatric ward from February to March 1994, and again in September 1994, the District Attorney admitted that the information was "significant enough" that he would have "at least asked about that at trial." (*Id.* at ¶ 190.) This impeachment evidence regarding Charlene's credibility was knowingly and/or recklessly suppressed by Defendants prior to Dontae's trial in order to bolster the credibility of her testimony against Dontae.

The same conduct occurred again in 1997 when Dontae Sharpe filed a Motion for Appropriate Relief ("MAR") seeking to vacate his conviction based upon the false testimony of Charlene Johnson at his trial. (*Id.* ¶ 165.) Prior to that hearing, as a matter of his habit and custom, District Attorney Clark Everett met with Best and Shrock to determine what they knew about the

issues raised in the MAR. (*Id.* ¶ 167.) As a result, District Attorney Everett called Best and Shrock as state's witnesses at the MAR. He therefore was able to present the following false evidence to the judge presiding at the hearing:

- To "satisfy himself" of the accuracy of Charlene's April 7, 1994, statement, Best "scheduled a polygraph at the State Bureau of Investigation office." (Id. ¶ 170.)
- That Best "wanted to make sure her statement was the truth. We didn't want to put the wrong person in jail. [W]e actually carried her to the State Bureau of Investigation Officer [sic] here in Greenville where she was administered separate tests." (Id.)

This evidence was false. The results of the polygraph did *not* confirm that Charlene had told the truth. (*Id.* ¶ 170.) Furthermore, the polygraph was not administered until after Sharpe had already been indicted. (*Id.* ¶ 171.) Had the District Attorney known the truth, he would not have elicited this false evidence.

Similarly, District Attorney Everett decided to call Shrock as a witness at the hearing, and provided the Court with information that on the night Shrock took Charlene to PCMH to be evaluated, Charlene became "level-headed" when they arrived at the hospital, that Charlene was released from PCMH the same night, and that Shrock then took her home. (*Id.* ¶ 174.)

All of this information was false. The true facts were that on that same night, Charlene was brought to the PCMH Adolescent Psychiatric Ward for an involuntary commitment and was admitted for evaluation and treatment for a period of *nearly three weeks*, from February 18, 1994, to March 10, 1994. (*Id.* ¶ 175.)

The presiding judge was also provided with this additional evidence: that Charlene told Shrock that same night (February 17, 1994) at the hospital that a person named "Dontae" had committed the Radcliffe murder. ( *Id.* ¶ 176.) This was also false. As Shrock subsequently admitted to GPD Det. Groccia during a 2014 reinvestigation:

> It wasn't that night when she told me. Um, she told it was one day that I stopped by her house and uh, and I mean just was talkin' to her about this,

> that and the other and it just popped in my head well shit, let me ask her and
> see if she's heard anything through the grapevine about that.

(*Id*. ¶ 64.) Critically, Best corroborated Shrock's false account regarding how Charlene first came to be a witness in the case by falsely claiming Shrock's account was accurate. (*Id*. ¶ 65.) Once again, had the District Attorney known this was false, he would not have called Shrock or Best to testify at the MAR hearing.

In short, the evidence establishes that as a result of Best and Shrock providing false information to District Attorney Everett *prior to* the hearing, *Everett elicited false evidence* regarding Charlene Johnson's testimony from them *during the MAR hearing*. In addition, as a result of Best and Shrock concealing material impeachment information about Charlene Johnson's credibility from District Attorney Everett prior to the hearing, Everett failed to disclose this material impeachment evidence to Sharpe's counsel or to the presiding judge at the MAR hearing. (*Id.* ¶¶ 186-192.)

The true facts regarding Shrock's interactions with Charlene were concealed from the District Attorney. (*Id*. ¶ 186.) They were therefore not disclosed to Sharpe's counsel nor to the Court. Based upon the false evidence the District Attorney was told before the hearing, he provided the Court with false information regarding the circumstances of Charlene Johnson's statement. Based upon Best and Shrock's concealment of the evidence impeaching the credibility of Charlene Johnson, the judge presiding at the MAR hearing made the following factual finding: "The undersigned is reasonably well satisfied that Johnson testified truthfully at the trial of the Defendant . . . ." (*Id*. ¶ 177.) Based upon this factual finding, the presiding judge denied Sharpe's MAR. (*Id*.) As a result, Dontae Sharpe spent an additional 21 years in prison for a crime he did not commit.

ii.    *Evidence Regarding Melvin's Alcoholism and Memory Loss.*

Defendants also concealed from the District Attorney at the time of Sharpe's trial that Melvin had developed a drinking problem several years before the investigation, that during the investigation she suffered from chronic alcoholism and accompanying memory loss, and that she had reported her alcoholism to her supervisor. (*Id*. at ¶ 186(k–n).) Melvin was the lead detective in the case, and she claimed to be testifying from memory at Sharpe's trial. Melvin's admitted chronic memory loss due to her alcoholism was material impeachment evidence that should have been disclosed to the District Attorney and to Sharpe. Regarding Melvin's alcoholism and memory loss, District Attorney Everett admitted that, "Obviously, when you start talking about memory problems, . . . that's an issue, yes, sir." (*Id*. ¶¶ 191–92.)

Law enforcement officers have a duty to turn over to the prosecutor any material evidence that is favorable to a criminal defendant. *Barbee v. Warden*, 331 F.2d 842, 846–47 (4th Cir. 1964). This includes evidence that tends to impeach a government witness. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021). This obligation to turn over favorable evidence to the District Attorney applies "to any officer who has knowledge of the exculpatory and impeachment evidence." *Johnson v. Balt. Police Dep't*, No. ELH-19-0698, 2022 WL 9976525, at *44 (D. Md., Oct. 14, 2022) (citing *Owens v. Balt. City State Atty's Office*, 767 F.3d 379, 397–98 (4th Cir. 2014)).

A claim for the suppression of exculpatory evidence requires that the plaintiff establish (1) that the evidence at issue was materially favorable to him; (2) that the officers suppressed the evidence in bad faith; and (3) that prejudice ensued. *Owens*, 767 F.3d. at 396–97; *Blankenship*, 19 F.4th at 692. As described above, Plaintiff has established through discovery in this matter each of the three prongs required to prove Best and Shrock violated his

Constitutional right to due process by failing to disclose exculpatory and impeachment evidence that undermined the credibility of Charlene Johnson's trial testimony. For a full discussion of the law, Plaintiff respectfully refers the court to his Memorandum in Support of Motion for Summary Judgment. (D.E. 178, pp. 22–26.)

Best and Shrock argue that testimonial immunity shields them from liability for false testimony in Sharpe's 1997 MAR. In doing so, Best and Shrock misapprehend Plaintiff's claim. Plaintiff is not seeking to impose civil liability on Best and Shrock for their false testimony. Nowhere in the operative complaint does Plaintiff make such an assertion. Instead, Count VII of Plaintiff's Complaint alleges that *prior to* Sharpe's 1997 MAR hearing, Shrock and Best provided false and fabricated evidence to the District Attorney, including that Best provided false evidence regarding the results of Charlene's polygraph test; that Charlene told Shrock on the night he took her to the hospital (February 17, 1994) that she saw Sharpe shoot Radcliffe; that she became "level-headed," was released the same night, and that Shrock drove her home. (D.E. 53 ¶¶ 231–236.) Plaintiff also alleges that Best and Shrock withheld and suppressed exculpatory evidence from the District Attorney prior to the 1997 MAR hearing. *See Armstrong v. Ashley*, 60 F.4th 262, 275 (5th Cir. 2023) (pre-trial evidence of fabrication independent from preparing and delivering testimony is not immunized by later testimony); *cf. Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993) ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial."). Accordingly, testimonial immunity is not relevant to Plaintiff's claim and does not shield Best and Shrock from liability.

Best's and Melvin's obligation to turn over exculpatory information to the district attorney was clearly established at the time of the investigation in 1994, the trial in 1995, and

the MAR hearing in 1997. "[A] police officer's failure to disclose exculpatory evidence to a prosecutor violates a defendant's due process rights." *Owens*, 767 F.3d at 396 (citing *Barbee*, 331 F.2d at 846–47). This bedrock principle of due process was "clearly established in 1988." *Id.* at 401. (*See also* D.E. 221 at 20.) Accordingly, Best and Shrock were "clearly on notice of the impermissibility of their conduct" in 1994, 1995 and 1997. *Owens*, 767 F.3d at 401.

For these reasons, Best and Shrock's Motions for Summary Judgment as to Count VI and VII should be denied, and Sharpe's Motion for Summary Judgment as to Counts VI and VII should therefore be granted.

F. DEFENDANT CITY'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S *MONELL* CLAIM IN COUNT VIII SHOULD BE DENIED.

Sharpe's *Monell* claim alleges that the City of Greenville failed to adopt necessary policies and to properly train, supervise, and discipline its officers to avoid the very constitutional violations at issue in his case. (D.E. 53 ¶¶ 250-267.) In turn, the City argues that "no genuine issue of material fact exists" because Sharpe allegedly did not produce "any evidence" that (a) "the City failed to train its officers as a result of deliberate indifference or was on notice of a training deficiency," and (b) "officer training was the moving force behind the alleged constitutional violations." (D.E. 199 at 2.) In support of its argument for summary judgment, the City notes that the defendants completed Basic Law Enforcement Training ("BLET") and some "advanced level courses." (*Id.* at 10–11.) Curiously, the City proffers no evidence as to the substance of such courses nor provides detail about GPD's own policies and procedures, or lack thereof.

Indeed, the City ignores evidence that the Greenville Police Department lacked any policies regarding criminal investigations during the period of February 1994 through April 1994; that Defendants were not adequately trained, disciplined, and/or supervised on critical issues prior to or during that time; that the failure to have adequate policies regarding criminal investigations and

the failure to adequately train, supervise, or discipline Defendants manifested deliberate indifference on the part of the City to the foreseeable consequences of these failures; and that these failures were in fact the "moving force" behind the constitutional violations committed by these Defendants.

iii.     *There is Evidence that the Greenville Police Did Not Have Adequate Policies on Important Issues, and that Defendants Did Not Receive Adequate Training on these Issues.*

The evidence in this case establishes, at a minimum, the following facts about the policies of the Greenville Police Department in 1994, and the failure of the Greenville Police Department to conduct adequate training on critical issues related to felony investigations:

- Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, seven months after the arrest of Dontae Sharpe, (Pl. Resp. Appx. L, Hinman Depo, T. p. 30:13–25 through 31:1–4);

- Defendant Shrock testified "there was no actual training on the policy and procedure manual," (Pl. Appx. Y, Deposition Transcript Jeffery Shrock 83:15–16);

- Defendant Shrock testified he received no "in-service training" while at GPD, (Pl. Appx. Y, Deposition Transcript Jeffery Shrock 80:8–10);

- Best testified he did not know where the GPD policy and procedure manual was located, he did not know what was in the manual, he did not read the manual, and he never had a copy of the policy and procedures manual, (Best Best Appx. GG, Deposition Transcript Best 104:9–25; 105:2–3 (never saw); 105:15–16 (didn't read); 106:3–5 (never had a copy));

- Best testified he was not aware of any GPD requirements to document interviews in any way in 1994, (Best Appx. GG, Deposition Transcript Best 52:1–9);

- Best received no training from GPD regarding notetaking, (PSF ¶ 181);

- Best received no specialized training from GPD regarding homicide investigations, (Best Appx. JJ, Blum Report at 3);

- Melvin was instructed to receive training on Death Investigations, Interview and Interrogations, and Homicide Investigations between 1992 and 1995, (PSF ¶ 179);

- Despite these instructions, Melvin received no specialized training from GPD regarding the above, (PSF ¶ 180);

- Melvin testified that any standards for report writing were not followed, (Pl. Appx. W, Deposition Transcript Carolyn Melvin 4/2/2024 14:18–15:1); and

- Melvin testified that officers of color, like herself, were not provided training opportunities at the GPD from at least 1989, (Pl. Appx. W, Deposition Transcript Carolyn Melvin 4/2/2024 44:12–24).

Thus, contrary to Defendant City's argument, there is clearly evidence that the City failed to have policies on important issues, failed to require that officers read and understand whatever policies or customs existed, and failed to train officers on important topics related to felony investigations generally and homicide investigations in particular. Indeed, Plaintiff's police practices expert opined that:

- "Defendant City of Greenville failed to enact basic law enforcement policies and procedures prior to February 1994 and failed to adequately train and supervise its officers in a manner that deviated substantially from generally accepted police practices, policies, procedures and customs regarding the training and supervision of officers," (Pl. Resp. Appx. N, Robert Pusins Expert Report at 3);

- "[T]he GPD failed to properly establish reasonable policies and procedures or adequate training and supervision in the critical area of documenting and memorializing investigative actions," (*Id*. at 45–46);

- "[I]f the City, through the GPD, failed to provide reasonable policies and procedures and training on those policies and procedures to members, including Shrock, Best, and Melvin, that such a failure was unreasonable and a fundamental deviation from, and inconsistent with generally accepted police practices regarding the need to provide written policies and procedures, and training on such policies and procedures, to members of the of a law enforcement agency," (*Id*. at 46); and

- "[T]he GPD failed to provide adequate formal training to Melvin for the tasks and responsibilities of her assignment, including training on Interview and Interrogation, Death Investigation, and Homicide Investigation, as recommended and acknowledged in her performance evaluations, and that such a failure was unreasonable and a fundamental deviation from, and inconsistent with generally accepted police practices regarding the need to provide formal training for the tasks that detectives, especially major crimes and homicide detectives, perform in the course of their duties and responsibilities." (*Id*. at 46–47).

iv. *GPD's Failure to Have Policies on Important Issues, to Require that Defendants read and Understand Whatever Policies or Customs Existed, and to Train Defendants on Important Topics Related to Felony Investigations in General, and Homicide Investigation in Particular, Was the Result of Deliberate Indifference to the Obvious Consequences of Failures.*

In this case, the *Monell* claim against the City is premised on GPD's deliberate indifference to the rights of its citizens, as evidenced by its failure to adopt policies on important topics and to

train detectives on important topics related to homicide investigations. *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Whether a failure to train, supervise, and/or discipline on certain topics can show deliberate indifference to the kind of constitutional violations Plaintiff alleges occurred in this case is a fact-based determination that a jury must make. As the non-moving party, Plaintiff is entitled to all reasonable inferences in his favor. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." (citation omitted)).

> a.  <u>The Evidence is Sufficient to Allow a Reasonable Jury to Conclude the City was Deliberately Indifferent Based on the Single-Incident Theory.</u>

In *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989), the Supreme Court explained that a municipality that fails to adequately train its police officers may be deliberately indifferent to potential constitutional violations, even without a pattern of such violations, when the risk of violations because of the lack of training is obvious:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.

The Supreme Court has provided the following guidance as to what kinds of facts can show deliberate indifference:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390, n.10.

Subsequent caselaw is clear that a city can be liable for a "single incident" of failing to train, supervise, and/or discipline its officers. For example, a city has been held liable for failing to train School Resource Officers on constitutional issues related to juveniles, even if the plaintiff provided only one example of a School Resource Officer violating a juvenile's constitutional rights. *A.G. v. Fattaleh*, 614 F. Supp. 3d 204, 230–32 (W.D.N.C. 2022) (denying city's motion for summary judgment); *see also McCadden v. City of Flint*, No. 18-12377, 2019 WL 1584548, at *4–5 (E.D. Mich. 2019) (denying city's motion to dismiss). In both cases, the student whose rights were violated had disabilities, and the courts explained that the cities were deliberately indifferent by failing to train the officers because "Constitutional violations were statistically a highly probable consequence of interactions between special needs children and officers." *Fattaleh*, 614 F. Supp. 3d at 231 (citing *McCadden*, 2019 WL 1584548 at *5).

Similarly, the Sixth Circuit found that a city could be held liable for failing to train its officers on *Brady* violations after just one instance of such a violation because "[t]he obligation to turn over exculpatory materials is a significant constitutional component of police duties with obvious consequences for criminal defendants." *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

Perhaps most relevant to this case is *Vineyard v. County of Murray*, 990 F.2d 1207, 1211–12 (11th Cir. 1993), in which the Eleventh Circuit upheld a jury verdict finding a county liable for inadequate policies surrounding training, supervision, and discipline of its police officers after officers brutally beat a plaintiff during his arrest. The evidence in that case revealed that the police department had no policies and procedures manual, had no policy for logging complaints against officers, and that the officers involved in the plaintiff's arrest had made no arrest report. The jury found the county liable for failing to train, supervise, and discipline its police officers based on

these deficient policies despite the plaintiff's beating being the sole incident of constitutional violations, and the Eleventh Circuit held that substantial evidence supported that finding.

Sharpe's case is analogous to the examples of deliberate indifference set forth in the cases identified above: that is, constitutional violations are a "highly probable consequence" of a police department that had no policies regarding criminal investigations—or if it had, offered no training on, access to, or enforcement of those policies—and did not train its homicide detectives on homicide investigations, witness interrogation, and notetaking. *See Fattaleh*, 614 F. Supp. 3d at 231. It is a "moral certainty" that homicide detectives will, *inter alia*, collect and test evidence, interrogate witnesses, write police reports, arrest suspects, and gather evidence, both inculpatory and exculpatory. *Id.* It is also a moral certainty that they will interface with prosecutors. The constitutional violations alleged here—inadequate investigation, the use of fabricated evidence, the failure to disclose exculpatory evidence, or the failure to intervene—stem from the Defendants' failure to properly complete the tasks listed above. Thus, much like in *Vineyard*, a jury could find that the need for *a* departmental policy on how to conduct criminal homicide investigations, that addresses the issues that commonly arise in such investigations and the constitutional limits thereof, is "so obvious" that the failure to have such a policy or adequate training constitutes deliberate indifference to the arrestees' constitutional rights. *City of Canton*, 489 U.S. at 390 n.10.

The City's reliance on several cases in which courts did not apply the single-incident failure to train theory of liability is misplaced. In *Connick*, for example, the Supreme Court determined that the City could not be held liable for failing to train *prosecutors* on *Brady* obligations because, unlike for police officers, the failure to train prosecutors would not obviously result in constitutional obligations because the prosecutors have already received training on the requirements of *Brady* in law school and through their ethical obligations. 563 U.S. at 64–67. In

*Bryan County*, the Court ruled that a claim that a police department had inadequate hiring practices could not rely on the single-incident theory because hiring practices were not sufficiently analogous to the failure-to-train example in *City of Canton*. But the problems with the *Monell* claims cited by the courts in those cases are not present here: Sharpe challenges the complete failure to train *police officers* on basic investigative skills, which is directly what the Court considered in *City of Canton*.[11]

> b. Evidence that Officers Received Basic Training Does Not Preclude Liability When Specific Training is Absent.

Defendants erroneously believe that, because Melvin and Best completed BLET and some "advanced courses," the City is automatically insulated from liability. The Supreme Court, however, has highlighted the need for police departments to offer *specific* training to officers in certain circumstances. *See Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) ("The likelihood that the situation will recur and the predictability that an officer lacking *specific* tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." (emphasis added)); *see also, e.g., Fattaleh*, 614 F. Supp. 3d at 229 (plaintiff's failure to train claim,

---

[11] The remaining cases that the City cites to are similarly inapplicable to this case. In *Estate of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), the Fourth Circuit explained that the single-incident theory cannot apply when officers violated an aggression policy because the City *did have an aggression policy*, and the plaintiff could not say how it was deficient. Here, Sharpe provides evidence that the City lacked any policies, and that the officers lacked specific training, at the time of the constitutional violations. In *Howard v. City of Durham*, 487 F. Supp. 3d 377, 440 (M.D.N.C. 2020), the court determined that the plaintiff could not rely on a single incident to prove that the city *condoned a custom* of constitutional violations. The issue was not whether it was obvious that a city's failure to train its officers would result in the constitutional violation that occurred. In *Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 865–66 (D. Md. 2017), the court *allowed* a *Monell* claim based on the single-incident theory to survive a motion to dismiss. And in *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000), the Fourth Circuit appears to have overlooked *City of Canton* by stating the Supreme Court does not allow the single-incident theory and citing to a case decided before *City of Canton*.

based on a single-incident liability theory, survived summary judgment even though defendant officer had basic law enforcement training, use of force training, and shadowing experience, and even though the police department had "standard operating procedures in place that governed proper use and application of force").

The City's list of Best and Melvin's other trainings, without detail about the substance and value of those trainings, does not show that the City was not deliberately indifferent. In a homicide investigation such as the one conducted by Defendants Best and Melvin, *specific* training includes, at the very least, training on how to interview citizens, how to recognize the red flags indicating possible deception, how to confirm the information they provide, what should be recorded in field notes, what should be contained in reports to supervisors and prosecutors, and what is required to comply with due process obligations such as recording and providing exculpatory and impeachment evidence to the District Attorney. (*See* Pl. Resp. Appx. N, Robert Pusins Expert Report, pp. 31–32.) There is no evidence in the record that defendants were trained on any of these aspects of a serious homicide investigation—in fact, as explained above, the evidence is to the contrary.

Moreover, the City's argument that it could not have been deliberately indifferent because it received CALEA certification in 1995—the year *after* the constitutional violations—has no bearing on this case. The record is devoid of evidence that the city improved its training in 1994 in order to receive CALEA certification the following year. Indeed, Sergeant Bonner testified that Greenville had not adopted any CALEA policies prior to September 1994. (Pl. Resp. Appx. M, Depo. Bonner 36:21–24.) And the record shows that Melvin was instructed to receive training on Death Investigations, Interview and Interrogations, and Homicide Investigations between 1992 and 1995, yet she received no such training—and continued working on homicide investigations—

despite the Greenville Police Departments supposed focus on being part of the top 1% law enforcement agencies. (PSF ¶¶ 179–180.) There is nothing in the record to support the City's hypothesis that a certification received a full year after the events in this case somehow protect it from liability for its failure to adopt policies or to train, supervise, and discipline officers prior to April 1994.

In any event, training is ineffective and inadequate absent a concomitant departmental policy (a) requiring that officers comply with this training and read and become familiar with any relevant policies and procedures, (b) ensuring that supervisors are enforcing the policies and procedures and (c) disciplining officers and detectives those who do not follow those procedures. As police practices expert Robert Pusins, a long-time homicide investigator testified in his deposition:

> [P]olicies tell police officers what they should be doing and what's expected of them. Policies are ineffective unless you have training on those policies. Training is ineffective unless you have supervision of the officers to ensure that they are following the training to follow the policies. And the last thing is consequences, there has to be some sort of discipline . . . . Because without discipline, [] someone can violate the policy and not worry about [it]. Without supervision, someone can violate the policy and nobody knows about it. Without a policy, without training you don't know even what the policies are. So it all goes together. Policies, training, supervision, discipline, accountability.

(Pl. Resp. Appx. O, Depo. Robert Pusins, 61:6–62:3.)

> v. *The GPD's Failure to Have Policies on Important Issues and Train Defendants on Important Topics Related to Felony Investigations was the Moving Force Behind the Constitutional Violations Committed by Defendants in this Case.*

The final issue to be addressed in Defendants' motion for summary judgment on Plaintiff's *Monell* claim is whether there is evidence that the failures of the Greenville Police Department described above were the "moving force" behind the constitutional violations committed by Defendants in this case. *Spell v. McDaniel*, 834 F.2d 1380, 1386–87 (4th Cir. 1987) (citing *Polk*

*County v. Dodson*, 454 U.S. 312, 326 (1981)). In evaluating this, the plaintiff is entitled to all reasonable inferences from the facts and circumstances. *Scott*, 550 U.S. at 378 ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." (citation omitted)).

In a claim based on the single-incident theory, the same "predictability that an officer lacking [specific training] will violate citizens' rights" supports "an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. of Cnty. Com'rs of Bryan Cnty.*, 520 U.S. at 409–10. It is certainly a reasonable inference that the lack of training on critical issues caused the constitutional violations at issue in this case. *See Fattaleh*, 614 F. Supp. 3d at 232 (holding summary judgment inappropriate after concluding city was deliberately indifferent to a failure to train, without separate discussion of causation).

But in any event, as explained above, whether it is plainly obvious that a police department with no policies, and whose detectives on a homicide investigation lacked training on notetaking, interrogations, and investigating homicides, would result in detectives fabricating inculpatory evidence and concealing exculpatory evidence is a question for the jury in this case.

G. DEFENDANTS BEST AND SHROCK ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF THE STATE CLAIMS AGAINST THEM.

vi. *Count IX*

Count IX of the Complaint alleges that Best, Melvin, and Shrock engaged in wrongful acts and omissions in April 1994 that resulted in Sharpe's unlawful arrest and conviction and his wrongful imprisonment. (D.E 53, ¶¶ 269–280.) Although Best and Shrock each move for summary judgment as to Count IX, Melvin does not.

In his motion for summary judgment as to Count IX, Best argues that

> Sharpe has not forecast any evidence that there was an agreement *between Best and Shrock* that resulted in Sharpe's incarceration. In fact, *Best and*

*Shrock* both contend that they had very little contact with each other outside of the initial conversation about Charlene; not nearly enough contact to be considered conspiratorial.

(D.E. 193 at 23.) But the gravamen of a conspiracy is not "contact" between two parties, but an "agreement," which can be explicit *or implied by the conduct of the parties*. "[A]n agreement or understanding for the purposes of conspiracy may be inferred from the conduct of the parties." *State v. Merrill*, 138 N.C. App. 215, 220, 530 S.E.2d 608, 612 (2000).

Plaintiff respectfully submits that Best's Statement of Undisputed Material Facts does not support his motion for summary judgment with regard to Plaintiff's claim that he conspired with Defendant Shrock. Indeed, Best's conduct in 1997, confirming Shrock's false testimony about his interactions with Johnson and Best, in 1994, (D.E. 170, ¶¶ 165–178), is circumstantial evidence of their prior agreement. Moreover, whether Best conspired with Shrock is a factual issue for the jury to decide. In any event, Best has not moved for summary judgment as to the *individual* False Imprisonment claim against him in Count IX, or as to the acting in concert and conspiracy claims in Count IX *relating to Melvin*. Nor has Melvin moved for summary judgment as to Count IX.

Finally, Best (but not Melvin) claims that he is entitled to public official immunity as to Count IX. But Plaintiff has alleged that Best's conduct in April 1994 was reckless and malicious, and that public official immunity therefore does not apply. This is a factual issue that must be resolved by the jury. *See Bartley v. City of High Point*, 381 N.C. 287, 299, 873 S.E.2d 525, 536 (2022) (acknowledging that issue of whether officer's actions "manifested a reckless indifference to Mr. Bartley's rights and were so reckless or manifestly indifferent to the consequences" as to constitute malice to defeat public official immunity, "is a factual one that is typically reserved for a jury"). For the above reasons, Best's motion for summary judgment as to Count IX should be denied.

*vii.*    *Count X*

Count X of the Complaint alleges that Best and Melvin's conduct in April 1994 was gross, reckless and malicious, and resulted in Mr. Sharpe's unlawful arrest, conviction and wrongful imprisonment. (D.E 53, ¶¶ 282–294.) Best, *but not Melvin*, moves for summary judgment as to Count X, claiming that "Charlene testified that her first statement was based on her own eyewitness accounts and Sharpe has not forecast any evidence proving otherwise." (D.E. 193 at 23.) This is false.

In his Statement of Undisputed Material Facts, which was served upon Best *before* he submitted his Memorandum in Support of Motion for Summary Judgment, Plaintiff detailed substantial evidence that it was Best's conduct that caused Johnson to make certain false statements, and that Best knowingly and/or recklessly used these false statements to obtain Sharpe's arrest, indictment and conviction. (D.E. 170, ¶¶ 83–100.)

Best (but not Melvin) also claims, without citing any cases, that Sharpe cannot prove that Best breached any duty owed to Sharpe as a police officer or that any duty Best allegedly breached caused Sharpe's arrest and incarceration. However, these are contested factual issues that must be resolved by the jury.

Finally, Best (but not Melvin) claims that he is entitled to public official immunity as to Count X. But Plaintiff has alleged that Best's conduct in April 1994 was reckless and malicious, and that public official immunity therefore does not apply. (D.E. 53 at 55; *see also* D.E. 170, ¶¶ 83–100.) This is a factual issue that must be resolved by the jury. For the above reasons, Best's motion for summary judgement as to Count X should be denied.

*viii.*    *Count XI*

Count XI of the Complaint alleges that Best and Shrock were, at a minimum, negligent (a) in their actions causing the fabrication of false witness statements by Charlene Johnson and

47

Beatrice Stokes, (b) in their failure to disclose Charlene's psychiatric hospitalizations, (c) in their false and deceptive statements to the District Attorney prior to Mr. Sharpe's trial in 1995 and his MAR hearing in 1997, and (d) in their false testimony to the court at Mr. Sharpe's trial in 1995 and his MAR hearing in 1997. It further alleges that their conduct thereby caused Mr. Sharpe to suffer various injuries. (D.E 53, ¶¶ 296–306.)

Best (but not Shrock) moves for summary judgment as to Plaintiff's claim in Count XI because there is "no evidence to support Sharpe's allegation that Best gave fast [*sic*] statements to prosecutors or false testimony to the court at any time. (D.E. 193 at 23.) This is false.

In his Statement of Undisputed Material Facts, which was served upon Best *before* he submitted his Memorandum in Support of Motion for Summary Judgment, Plaintiff detailed substantial evidence that Best gave false statements to prosecutors and false testimony to the court in connection with Sharpe's 1997 MAR hearing, and that this caused Superior Court Judge Duke to deny Sharpe's 1997 MAR, resulting in decades of additional wrongful imprisonment. (D.E. 170, ¶¶ 165–178.)

Best (but not Shrock) also claims, without citing any cases, that Sharpe cannot prove that Best breached any duty owed to Sharpe as a police officer or that any duty Best allegedly breached caused Sharpe's arrest and incarceration. (D.E. 193 at 23.) However, these are contested factual issues that must be resolved by the jury.

Finally, Best and Shrock both claim that they are entitled to public official immunity as to Count XI. (D.E. 193 at 24–25.) But Plaintiff has alleged that Best and Shrock's conduct in 1997 was reckless and malicious, and that public official immunity therefore does not apply. (D.E. 53 at 58; *see also* PSF ¶¶ 165–178.) This is a factual issue that must be resolved by the jury.

For the above reasons, Best's motion for summary judgement as to Count XI should be denied.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendants' Motions for Summary Judgment be denied in their entirety.

This the 3rd day of October 2024.

/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
Pfeiffer Rudolf
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.2(f)(3) as well as Plaintiff's pending Motion to Exceed Page Limits (D.E. 210) and Supplement to Motion to Exceed Page Limits (D.E. 211), counsel for Plaintiff certifies that the foregoing Omnibus Response is 16,754 words and 49 pages, including headings, footnotes, citations, and quotations, and is in compliance with the extension requested and consented to by Defendants.


<u>/s/ David S. Rudolf</u>
David S. Rudolf

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system.

This 3rd day of October, 2024.

/s/ David S. Rudolf
David S. Rudolf