# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil No: 4:21-CV-00185-BO**

|  |  |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, and THE CITY OF GREENVILLE, NORTH CAROLINA,<br><br>　　　　　　　Defendants. | **PLAINTIFF'S RESPONSE TO DEFENDANT BEST'S, SHROCK'S, AND THE CITY OF GREENVILLE'S STATEMENT OF UNDISPUTED MATERIAL FACTS<br>AND<br>PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS** |
| MONTOYAE DONTAE SHARPE,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CAROLYN MELVIN,<br><br>　　　　　　　Defendant. | Civil No: 4:22-CV-00088-BO-RJ<br>(Consolidated with 4:21-cv-00185-BO) |

　　　　Plaintiff Montoyae Dontae Sharpe, by and through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(a)(2) of the Local Rules for the Eastern District of North Carolina, respectfully submits this response to Defendant Best's, Shrock's, and the City of Greenville's "Statement of Undisputed Material Facts."

　　　　Best, Shrock, and the City of Greenville each filed its own Statement of Undisputed Material Facts (D.E. 180, 190, 195), but all three statements are identical. Plaintiff has therefore prepared only one response to the three identical statements.

　　　　Plaintiff's Statement of Undisputed Material Facts (D.E. 170) will be cited as "PSF ¶ ____."

Plaintiff's Appendix (D.E. 171) will be cited as "Pl. Appx., p. ___:___."

Plaintiff's Appendix in response to all Defendants' Motions for Summary Judgment will be cited as "Pl. Resp. Appx., p. ___:___" (Plaintiff's Response Appendix).

Best's, Shrock's, and City of Greenville's Appendix (D.E. 191) will be cited simply as "Best Appx., p. ___:___."

Melvin's Appendix (D.E. 201) will be cited as "Melvin Appx., p. ___:____."

Plaintiff responds to Defendants' Statement of Undisputed Material Facts as follows:

1. It is admitted George Radcliffe was murdered on February 11, 1994.

2. It is admitted that Radcliffe's body was found inside his pickup truck.

3. It is admitted that members of the Greenville Police Department ("GPD") came to the scene of the Radcliffe murder and took some investigatory steps.

4. It is admitted that Ofc. Kevin Jones spoke with Tony Johnson and Wilbur Mercer the night of the murder.

5. It is **disputed** that GPD detectives spoke with Alonza Vines the night of the murder.

    **Additional Material Facts:**

    No police reports reflect that a "detective" or any other member of the GPD spoke with Alonzo Vines on the night of the murder. Best Appx. A. It is unclear from the trial transcript the extent to which Vines interacted with any member of the GPD on the night of the murder. Pl. Appx. KK, p. 92:9-13; p. 95:10-11.

6. It is admitted that GPD officers conducted a search "up and down the street" for evidence.

7.     It is **false** that on February 12, 1994, Melvin submitted physical evidence collected from the crime scene to the GPD Property Department. Best Appx. C, p. Sharpe 4929.

8.     It is **disputed** that Melvin attended the autopsy.

**Additional Material Facts:**

Melvin testified in this case that Best attended the autopsy rather than Melvin. Pl. Appx. W, p. 13:5; Pl. Appx. X, p. 89:1-4.

9.     It is admitted that the path of the bullet as described in the autopsy is accurate.

10.     It is admitted that Melvin interviewed Wilbur Mercer at the GPD headquarters on February 14, 1994, and that a written report exists documenting this interview (while missing the last page). It is **disputed** that Mercer claimed he was attempting to obtain drugs for Radcliffe, and it is disputed that Wilber Mercer was a credible source of information about the murder of George Radcliffe.

**Additional Material Facts:**

Mercer's statements, read in conjunction, show that Mercer gave facially inconsistent accounts of his interaction with the victim to the GPD. *Cf.* Best Appx. A, pp. Sharpe 3708-3709 (Mercer's statement on February 11, 1994), and Best Appx. F, pp. Sharpe 3686-3689 (Mercer's statement on February 14, 1994). Melvin considered Mercer the "prime suspect" in the murder after his bloody coat was found in the victim's truck and did not believe his statements to be truthful. Pl. Appx. W, p. 25:23-25 through p. 26:1. Mercer's

desire to protect himself from being charged undermines the credibility of his statements.

11.     It is admitted that Melvin's notes reflect statements that Stewart allegedly made to her on February 14, 1994, three days after the murder, but it is **disputed** that these notes are admissible in evidence at the trial of this case.

**Additional Material Facts:**

Stewart, who lived in the same neighborhood as Dontae Sharpe, could not identify the two black males who she claimed approached Radcliffe's truck. Best Appx. G, p. Sharpe 5028-5029.

12.     **Disputed.**

**Additional Material Facts:**

The document filed by Defendants at Appx. H is not the "Mendenhall Report." It is **false** that Ofc. Mendenhall completed processing the crime scene on February 14, 1994. On February 15, 1994, Melvin filed an Internal Affairs complaint against Mendenhall on the grounds that he "failed to properly process a Major Crime Scene," specifically, George Radcliffe's truck. Pl. Resp. Appx. E, GPD 273. Mendenhall did not process the truck for fingerprints or examine it for evidence until February 15, 1994, after he had been called at home and instructed to do so by his supervisor. *Id*., GPD 270, 271. An Internal Affairs report submitted by Mendenhall on February 15, 1994, shows that on February 15, 1994, Mendenhall was still planning to lay out the victim's clothing to dry. The GPD Internal Affairs investigation concluded that Mendenhall "did not process the victim's

vehicle until he was called at home by his supervisor and told to do so on February 15, 1994." *Id.*, GPD 270. Mendenhall received disciplinary sanction for his misconduct. *Id.* This information was concealed from the District Attorney prior to Sharpe's trial. Pl. Appx. U, p. 161:2-6.

13.     Defendants' statement of fact in paragraph 13 is **false**. Mercer's blood-stained jacket was not entered into evidence. Pl. Appx. KK, p. 151:4-25 through p. 152:1-14.

**Additional Material Facts:**

The trial court transcript shows that the GPD Ofc. Mendenhall was not even aware that he had taken custody of the bloody jacket (p. 151:11-14), had no notes pertaining to the whereabouts of the jacket (p. 151:20-21), and never submitted the jacket for forensic analysis (p. 152:7-8). Furthermore, the evidence indicates that Mendenhall, in addition to his failure to timely process the crime scene (Pl. Resp. Appx. E, GPD 273), was criticized by Melvin for leaving Mercer's bloody jacket in the truck for several days (*Id.*, GPD 277, bottom paragraph).

14.     It is admitted that Best was assigned to the Radcliffe investigation on February 15, 1994. It is **disputed** that Best and Melvin conducted a "canvass" of the neighborhood as that term is commonly understood, and it is further **disputed** that Best and Melvin "could not locate any willing witnesses."

**Additional Material Facts:**

There are no GPD notes or reports in the GPD's investigative file indicating that such a canvass was conducted, nor is there credible evidence that Best

5

and Melvin "could not locate any willing witnesses." While Best alleges in self-serving testimony that he conducted interviews with people in the area regarding the Radcliffe murder, he claims he did not "write up" the interviews because, according to Best, "We don't write up interviews with people that are not affected unless they have some information that will lead us to a suspect or that would be pertinent in the investigation." Pl. Appx. KK, p. 270:8-13. Accordingly, in the absence of notes or reports regarding any such canvass, it is impossible to know whether or to what extent a canvass occurred.

Furthermore, Best and Melvin, in their depositions, offered markedly contrary accounts of their respective roles in the investigation, including which of them was the lead detective in the case responsible for the preparation of field notes and the writing of reports. Incredibly, both of them deny being the lead detective, and both of them blame the other for the investigation's failures.

Best claims that Melvin was the "lead detective" who was responsible for all decisions in the investigation and writing all the reports. *See* Pl. Appx. T, p. 71:3 ("I wasn't the lead detective . . . ."); p. 80:3-5 (Best saying that Melvin, as the lead detective, secured the warrant); p. 92:19-21 (Best alleging that he had no decision-making responsibility in the case); p. 118:13-25 through 119:1-7 (Best claiming that he did not takes notes regarding his communications with Shrock about witness Charlene Johnson because that was the lead detective's responsibility, not his); p. 135:23-25

through 136:1-13 (Best claiming that he did not write a report about his interactions with Charlene Johnson because "I wasn't the lead detective."); p. 127:20-21 (Best claiming he didn't write a report about his communications with Charlene Johnson because "[i]t wasn't up to me, it was Detective Melvin's case.").

Melvin flatly contradicts Best's account. She claims that while she was initially assigned as lead detective, once Best was assigned to the case four days later *he* became the lead detective and assumed the responsibilities of the lead detective. Pl. Appx. W, p. 6:10-19. Melvin alleges that after Best was assigned, she only had a minimal role in the case. D.E. 185 ¶ 25 (claiming that Melvin missed numerous days for health and personal reasons during the investigation); D.E. 200 at 2 ("Given Detective Melvin's absence from work for sick leave, *she had minimal involvement* in the investigation of Radcliffe's murder") (emphasis added). Melvin claims that after Best was assigned to the case, she was "reassigned to another building," was "taking sick leave," and that she "never touched any of the evidence." Pl. Appx. W., p. 8:20-25 through 9:1-3.

15.     It is admitted that on or about February 15, 1994, Melvin filled out a request form for Crime Stopper Coverage.

16.     It is **false** that Melvin interviewed Alonzo Vines on February 14, 1994. Best Appx. I (which reflects a date of February 16, 1994). It is admitted that Melvin wrote notes of what Alonzo Vines allegedly told her *on February 16, 1994*. However, it is **disputed** that these notes are admissible in evidence at the trial of this case. It is also **disputed** that

this was Melvin's *second interview* with Vines. *See* Plaintiff's response in paragraph 5, *supra*.

> **Additional Material Facts:**
>
> Melvin's notes do not reflect the race of the two males Vines allegedly observed standing around Radcliffe's truck, what time the men were observed (*i.e.*, how soon after the truck crashed in the yard), and do not reflect that Vines identified either person. Melvin Appx. B, pp. Sharpe 3690-3691 (filed out of sequence in Melvin's Appendix).

17. It is admitted that on February 16, 1994, Best and Melvin interviewed Trisha Radcliffe.

> **Additional Material Facts:**
>
> Radcliffe provided no evidence regarding the murder of her husband. Best Appx. J.

18. It is **disputed** that before any arrest was made, Melvin "performed surveillance" around the area of the murder, observed Sharpe and Mark Joyner selling drugs, and determined that the area was "Sharpe family territory."

> **Additional Material Facts:**
>
> The allegation that before any arrest was made Melvin performed "surveillance" and observed Plaintiff and Mark Joyner selling drugs is inconsistent with Melvin's trial testimony, which suggests that she did *not* personally observe any known and visible drug transactions. Pl. Appx. KK, p. 277:1-15. When asked how the drugs were sold, Melvin responded: "I'm not too familiar with how or I probably would have arrested them," *id*.,

indicating that she did not actually witness the transactions taking place. Furthermore, Melvin testified under oath in this case that "Dontae Sharpe did not sell drugs on the street," and that the area where Radcliffe was murdered "was not [Sharpe's] area. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

19. **Disputed.**

   **Additional Material Facts:**

   Shrock's entire account of when and how Charlene Johnson came to be a witness in the case against Dontae Sharpe has been proven false by the evidence adduced in discovery. *See* PSF ¶¶ 39 – 82 (showing that Shrock's testimony at the 1997 MAR was false and that Shrock made admissions that his testimony was false, and containing citations to documentary evidence proving Shrock's account to be false). It is undisputed, and Shrock has admitted—once in an interview with the GPD in 2014, and again to the Duke Law Wrongful Conviction Clinic—that Charlene Johnson's purported statement implicating Sharpe in the Radcliffe murder *did not* occur the night Shrock allegedly took Charlene to the hospital on February 17, 1994. PSF, ¶ 63, 64.

20. It is admitted that on February 24, 1994, Melvin interviewed Nathan Farmer.

   **Additional Material Facts:**

   Farmer provided no evidence regarding the murder of Radcliffe. Best Appx. K.

21.     It is admitted that Best submitted some physical evidence to the SBI. It is **disputed** that the evidence was submitted to the SBI on March 3, 1994. Best Appx. L (which reflects a different date).

22.     It is **disputed** that prior to Sharpe's arrest Best and Melvin spoke with GPD narcotics investigators who confirmed that the area around the murder scene was Sharpe family territory. It is therefore **disputed** that this is material to any claim against Defendants.

**Additional Material Facts:**

At the 1997 MAR hearing, Best testified, "we were told" that the area in which the murder occurred was "Sharpe family area," but he did not specify who allegedly provided this information, to whom this information was allegedly communicated, or when this information was allegedly communicated. Pl. Appx. KK, p. 134:14-25. This statement was first made in December 1997, more than two years after Sharpe's conviction.

There is no evidence in the record that Best or Melvin spoke with GPD narcotics investigators or had any communications with GPD narcotics investigators *prior to Sharpe's arrest*. To the contrary, *Best testified* that Sharpe was not a suspect prior to Charlene Johnson's statement. Pl. Appx. MM, p. 122:1-8 ("No, *we didn't have any information* that Dontae Sharpe was our suspect"). *Melvin testified* that other than Charlene Johnson's written statement, which was given on April 7, 1994, there was *no other evidence that connected Mark Joyner and Dontae Sharpe to the crime*. Pl. Appx. W, p. 22:1-3. Furthermore, Melvin testified in her April 2024

deposition that the area where Radcliffe was murdered "*was not [Sharpe's] area*. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

23.     It is admitted that Best and Melvin brought Charlene to the "Brown Building" on April 7, 1994, and that a police "report" prepared by Melvin recites that Charlene "stated that she was in the area and witnessed the murder." It is **disputed** that this was alleged statement was truthful or accurate.

**Additional Material Facts:**

At the time of the murder, Charlene Johnson was 13 years old. As of April 7, 1994, she had a recent history of significant mental and emotional issues. Pl. Appx. L, p. Sharpe 4763; Pl. Appx. M, Sharpe 4766-4767. In the six months prior to the murder of George Radcliffe, Charlene had been living in and out her mother's house, drinking alcohol "heavily," using drugs, selling drugs, and not going to school. Pl. Appx. L, pp. Sharpe 4763; Pl. Appx. TT, p. Sharpe 4812. Charlene was committed to the Pitt County Memorial Hospital ("PCMH") adolescent psychiatric ward for evaluation and treatment on February 18, 1994, where she remained hospitalized until March 10, 1994. Pl. Appx. M, p. Sharpe 4766.

Following her discharge from the PCMH adolescent psychiatric unit, Charlene ran away from home and was missing for an additional three-week period, from March 14, 1994, to April 5, 1994, just two days before her alleged statement. Pl. Appx. RR, pp. 3303-3326. Thus, for the six-week period prior to Best and Melvin picking up Charlene and obtaining a

statement from her purporting to implicate Sharpe, Charlene had been either hospitalized for psychiatric treatment or was a missing person.

Furthermore, beginning in September 1995, following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. Shortly after Dontae Sharpe was convicted, Charlene Johnson told Kay Lambert, a paralegal for Cherry Stokes, Sharpe's trial attorney, that she (Charlene) had lied at the trial. Pl. Appx. MM, p. 58:9-16. Charlene told Lambert that she (Charlene) "wasn't there" (when the shooting occurred); that Best had given her and her family a lot of gifts; that Best and the GPD gave her money; and that Beatrice Stokes didn't tell the truth either." Pl. Appx. MM, p. 59:15-20. On April 18, 1996, Charlene told Tina Lyda, the secretary and legal assistant for Sharpe's appellate lawyer, "Everything I said on the stand was a lie." Pl. Appx. P, Pitt Co. 203-211 (see Pitt Co. 207). Charlene told Lyda that she had not even been at the scene of the murder. *Id.* (see Pitt Co. 209). On September 10, 1996, Charlene signed an affidavit reiterating that her trial testimony had been a lie and that she had not witnessed George Radcliffe's murder. *Id.*, Pitt Co. 203-211. Charlene has been adamant and steadfast in her recantation since that time. Pl. Appx. OO, GPD 135-181 (2014 GPD Interview with Charlene Johnson); Pl. Appx. QQ, p. 8:1-7; Pl. Appx. V, p. 121:19-25. Melvin herself did not believe at the time that Charlene's written statement was truthful. Pl. Appx. W, p. 34:16-

17 (Best knew that Melvin did not believe Charlene's account); Pl. Appx. X, p. 58:3-9 (admitting that the information provided by Charlene "wasn't adding up").

24.    It is admitted that there is a statement in Charlene Johnson's handwriting dated April 7, 1994, that reflects a time of 1:30 pm. It is **disputed** that this statement was accurate or truthful. It is further **disputed** that Charlene's statement was "corroborated" by the statements of Alonzo Vines and Martha Stewart. It is further **disputed** that her statement was corroborated by Wilbur Mercer, who gave conflicting accounts of his interaction with Radcliffe to the GPD. See Plaintiff's response to paragraph 9, *supra*.

**Additional Material Facts:**

The evidence from the scene was that Radcliffe's dead body was found in his truck in a vacant lot. Best Appx. A, p. Sharpe 3708. Tony Johnson, an eyewitness at the scene, testified that the truck sped through the intersection after shots were fired, *id.*, and Alonzo Vines stated in an interview that the truck wrecked in his backyard and made a loud noise. Best Appx. I. The police report of the incident stated that the truck was facing southwest, with "fresh tracks" showing the path that the truck had taken westerly across the vacant lot. Pl. Appx. A, p. Sharpe 4995. (Best Appx. A is missing the second page of the incident report.) The first paragraph of Charlene's statement was facially inconsistent with the physical evidence from the scene and indicated that Charlene *had not* actually witnessed the murder.

In Charlene's first written paragraph, she made no mention of a truck, which was the salient fact observed by other eyewitnesses, and recites only that

Sharpe pushed Radcliffe after Radcliffe lacked the money to buy drugs and then shot him. The statement failed to account for Radcliffe's body in the truck, the movement of the truck into the vacant lot, and the truck crashing through a stop sign and a fence and then coming to a stop. Additionally, Charlene's first statement says she was at "the stop sign" on 14th Street, whereas the truck had traveled west on 6th Street and come to rest at the corner of Shepherd and 6th Street. Pl. Appx. A, p. Sharpe 4995. Furthermore, Radcliffe's wallet contained $53.00. Melvin Appx. B, p. Sharpe 3703 (third paragraph), contradicting Charlene's statement that Radcliffe only had $18.00. Charlene's first written statement therefore contradicted, rather than corroborated, the physical evidence in the case.

Beginning in September 1995 following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.*

25.     It is admitted that there is a statement in Charlene Johnson's handwriting dated April 7, 1994, that reflects a time of 1:34 pm. It is **disputed** that this statement was accurate or truthful.

**Additional Material Facts:**

See Plaintiff's responses in paragraph 23 and 24, *supra.* Charlene testified in her deposition in this case that Best told her what to write for the second part of her statement. Pl. Appx. V, p. 40:14-20; p. 90:7-18. She also gave

testimony to this effect during the 1997 MAR hearing. Pl. Appx. MM, p. 14:15-18. Charlene's testimony indicates that Best provided the information contained in the second paragraph of her written statement to account for the truck and the location of Radcliffe's body in the truck.

This second portion statement of Charlene's statement also contains information that contradicted the physical evidence at the scene. For example, the keys to the truck were found in the ignition (not thrown away). Melvin Appx. B, p. Sharpe 3703, unnumbered ¶ 2. No gun was found during the crime scene search. Pl. Appx. Z, p. 88:9-19. It is an issue of fact whether these facts were provided to Charlene by Best, but it is undisputed that they were inconsistent with the physical evidence at the scene.

26.　　It is admitted that Melvin presented Charlene Johnson's statement of April 7, 1994, to Magistrate K. Hall, and that based on that statement Magistrate Hall issued an arrest warrant for Dontae Sharpe, charging him with the murder of George Radcliffe.

**Additional Material Facts:**

When she presented this evidence to Magistrate Hall, Carolyn Melvin did not believe Charlene Johnson's statement was true, and did not believe Dontae Sharpe was responsible for the murder of George Radcliffe. Pl. Appx. W, p. 21:7-25 through 22:1-13; p. 34:16-17; Pl. Appx. X, p. 16:23-25 through p. 17:1-11.

27.　　It is admitted that Mark Joyner was arrested in relation to the Radcliffe murder. It is **disputed** that Joyner was an accessory to the murder.

**Additional Material Facts:**

Joyner entered an Alford plea on January 10, 1996, months after Sharpe's conviction. Pl. Resp. Appx. F, Depo. Ex. 178, pp. Sharpe 5062-5063. He explicitly refused to admit that he was guilty of this offense, and Plaintiff therefore disputes any suggestion that Joyner's plea was an admission.

28. It is admitted that Best made handwritten notes of a statement Plaintiff made denying any involvement in the Radcliffe murder and providing evidence of an alibi during the time of the murder.

**Additional Material Facts:**

Neither Best nor Melvin attempted to interview these alibi witnesses. PSF ¶ 110.

29. It is admitted that Kizzy Paige and four other women assaulted Charlene Johnson *after Plaintiff was wrongfully arrested*. It is **disputed** that this is material to any claim against Defendants.

**Additional Material Facts:**

At the hospital, in response to a question from medical staff, Charlene stated that she was assaulted for "lies told in the past." Pl. Resp. Appx. G, 2014 MAR, p. 36 ¶ 143. The women arrested for assaulting Charlene all separately claimed that they had attacked her for "lying" about Sharpe and Joyner. *Id*. at p. 37, ¶ 145.

30. It is **disputed** that Sharon Sharpe said to Charlene, "word is you're the one who told on Dontae." The document relied upon by Defendants for this assertion in Best Appx. S does not support this assertion. Furthermore, instead of citing to the page and lines

to which the assertion of fact pertains, Defendants merely cite to three deposition pages without any line references.

31.     It is **disputed** that Charlene told her mother while at the hospital that Plaintiff had "shot the white man." The affidavit signed by GPD Ofc. Connie Elks does not support this proposition. Furthermore, the Elks Affidavit does not contain evidence supporting Defendants' other allegations of fact in this paragraph regarding Charlene's injuries.

**Additional Material Facts:**

Melvin testified in this case that Charlene's mother was not even aware that Charlene was a witness in a murder case. Pl. Appx. W, p. 65:23-25 through p. 66:1.

32.     It is admitted that Best testified during the 1997 MAR that he had attended interviews of two of the women who assaulted Charlene.

**Additional Material Facts:**

Best provided false testimony during the 1997 MAR confirming Shrock's false account of how Charlene came to be a witness in the case. *See* PSF ¶¶ 56-65 (showing that Shrock's testimony at the 1997 MAR was false; that Shrock later admitted its falsity; and that Best endorsed Shrock's false account in sworn testimony), calling into question the truthfulness of his remaining testimony.

33.     It is admitted that Best testified during the 1997 MAR that he had driven Charlene to Wilmington, North Carolina, following the assault. The date this occurred is not contained in the source cited by Defendants in their appendix.

**Additional Material Facts:**

Despite being in a car with Charlene for the entire trip, Best did not take notes of what he discussed with Charlene in the car, nor did he write a report about it. Pl. Appx. T, p. 184:17-25 through 185:1.

34. It is admitted that more than a month after Sharpe was arrested, Lisa Evans wrote a letter to Plaintiff's mother. It is **disputed** that this document is admissible in evidence at the trial of this case.

**Additional Material Facts:**

The unauthenticated letter purportedly from Lisa Evans also states: (a) "I know that Donta [*sic*] nor Mark had anything to do with a murder" (Best Appx. U, Sharpe 3833); (b) that Lisa Evans was drinking and high on Thursday morning to the point that she had "never felt that bad before" (*id.* at Sharpe 3836); (c) that the police talked to Charlene Johnson because they thought Charlene had information about the murder, but in fact Charlene did not (*id.* at Sharpe 3834); (d) that the police found out that Charlene was a runaway (*id.*); and (e) that she (Lisa) avoided the police because she was "dirty and drunk" (*id.* at Sharpe 3837).

Additionally, contrary to the assertion that Cherry Stokes was Lisa Evans's attorney, District Attorney Clark Everett stated in his deposition: "I don't think [Cherry Stokes] was the lawyer for [Lisa Evans] in those cases." Pl. Appx. U, p. 46:23-25 through 47:1-3. Cherry Stokes stated, "I have no idea" when asked if Lisa Evans was one of his clients. Pl. Resp. Appx. H, Stokes Depo., p. 60:5-7. Most tellingly, the Judgment and Commitment for Lisa

Evans from the case in question lists "Joseph Dupree" as Evans's attorney, not Cherry Stokes. Pl. Resp. Appx. I (Lisa Evans Judgment and Commitment).

35.     It is admitted that Charlene received the $500.00 Crime Stoppers Award even though she did not qualify for it.

**Additional Material Facts:**

Best used his influence with Crime Stoppers to ensure that Charlene received a Crime Stoppers award of $500.00 even though she had not called Crime Stoppers and did not qualify for the award. Pl. Appx. T, p. 281:18-25 through p. 282:1-4; Pl. Appx. MM, p. 124:23-25; p. 138: 13-25.

36.     It is admitted that Plaintiff was indicted on April 18, 1994. It is **disputed** that this indictment was based on truthful evidence.

37.     It is admitted that a polygraph was administered to Charlene Johnson on April 19, 1994, the day after Plaintiff was indicted.

**Additional Material Facts:**

The results of that polygraph were inconclusive with regard to the truthfulness of Johnson's April 7, 1994, statements. Pl. Appx. T, p. 309:19-25 through p. 310:1-2 (Best admitting that the polygraph was inconclusive).

38.     It is **disputed** that the encounter between Best and Stokes occurred in the manner described. Best's entire account of his interaction with Beatrice Stokes and how she came to be a witness in the case has been called into question.

**Additional Material Facts:**

Best wrote no notes or reports about the alleged interaction, PSF ¶¶ 125, 126, despite knowing that "all interviews" should go into a lead detective's report. *Id.* at ¶ 127. The District Attorney testified in his deposition that he was not aware of another case where Best had not written a report about a witness who he claimed was an eyewitness to a murder. *Id.* at ¶ 131. Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen*. *Id.* at ¶ 132. Melvin also testified that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2. Melvin, who was initially assigned as the lead detective, and who Best claims was the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4. Furthermore, in a sworn affidavit witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it. Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63, lines 6–23; Pl. Appx. U, p. 274, lines 19–25; p. 275, lines 1–5; Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749.

39.     It is **disputed** that Best submitted a .45-caliber pistol to the SBI on May 16, 1994. The document cited by Defendants as evidence for this proposition does not support this assertion.

40.     It is admitted that on August 29, 1994, after he was indicted and at his attorney's request, Plaintiff was administered a polygraph related to the murder.  It is **disputed** that the polygraph indicated deception about Plaintiff's involvement in the murder, and it is disputed that the result of this polygraph is a material fact as to any claim against Defendants.

41.     It is **disputed** that after Sharpe's arrest Best attempted to contact multiple witnesses, including Wilbur Mercer, Tony Johnson, and Martha Stewart, but was unsuccessful.

> **Additional Material Facts:**
>
> No police reports provide evidence of any such efforts. Furthermore, the source cited by Defendants for this fact does not mention Tony Johnson or Martha Stewart.

42.     It is **disputed** that in 2014, GPD Office Jeff Baxter discovered that the District Attorney's file from the murder investigation was destroyed due to flooding.

> **Additional Material Facts:**
>
> District Attorney Clark Everett testified in his deposition that the District Attorney's file on Sharpe was moved because of a hurricane *but was later found*. Pl. Appx. U, p. 88:5-14.

43.     It is disputed that Robert Cherry was Plaintiff's attorney at trial. Cherry Stokes was Plaintiff's trial attorney.

44.     It is **disputed** that Plaintiff's mother told Cherry Stokes that Charlene had provided information to the GPD implicating him in the murder. The deposition cited by Defendants for this assertion does not support this assertion.

45.     It is **disputed** that in May of 1994, the Pitt County District Attorney's Office obtained Charlene's medical records that indicated she had received mental health treatment and been committed at the Pitt County Hospital's adolescent psych unit in March of 1994.

**Additional Material Facts:**

The subpoena sent to Pitt County Memorial Hospital by the District Attorney only sought Charlene Johnson's medical records *between the dates of April 7, 1994, and May 17, 1994,* as reflected on the Subpoena (Pl. Resp. Appx. J, Dep. Ex. 76, p. Sharpe 14163), and would not have produced medical records showing the extent and duration of Charlene's psychiatric treatment prior to that time. The District Attorney testified in his deposition that he was not aware that involuntary commitment papers were taken out on Charlene the night that Shrock took her to the hospital. Pl. Appx. U, p. 142:4-8. The District Attorney was also not aware that Charlene was admitted to the adolescent psychiatric ward for three weeks in February and March 1994 and then again in September 1994. *Id*., p. 143:21-25 through 144:1-8. Therefore, any suggestion that the District Attorney was aware of Charlene's significant medical history and prolonged periods of treatment for mental and emotional illness is false.

46.     **Disputed**.

**Additional Material Facts:**

The medical records referred to would not have included any records from Charlene's three-week stay at PCMH adolescent psychiatric in February

and March 1994 because the Subpoena issued by the District Attorney only sought documents from April 7, 1994, forward. See Plaintiff's response to paragraph 45, *supra.*

47.     It is admitted that Cherry Stokes stated in his deposition that he "remembered" Don Hicks, but that he had not "thought of him in years." Pl. Resp. Appx. H, Cherry Stokes Depo., p. 56:13-15.

48.     It is **disputed** that Greg Duke filed a Ritchie Motion "in response to" the disclosure.

**Additional Material Facts:**

When asked by counsel for Defendants whether Greg Duke "recognized the reference in those medical documents to . . . a psychiatric stay and filed the Richie motion," District Attorney Everett stated, "*I don't know what caused him to file the motion.*" Pl. Appx. U, p. 43:14-22. Defendants did not obtain testimony from Greg Duke on this issue and have no evidence to support the assertion Mr. Duke filed the motion *in response to* the disclosure from the District Attorney's office.

49.     The trial court record of this case is in writing and speaks for itself. Plaintiff disputes any portion of Defendants' assertions of fact that are inconsistent with the trial record. It is **disputed** that these alleged facts are material to any claims against Defendants.

50.     It is admitted that Cherry Stokes filed a motion in the trial court in which he stated that he had retained an investigator named Johnny Rose who had made diligent efforts to locate Charlene Johnson prior to trial. It is **disputed** that these facts are material to any claims against Defendants.

51.    **Disputed**.

**Additional Material Facts:**

During her testimony during the 1997 MAR, Charlene disputed Everett's account that she had told him she was scared of being beaten up, saying instead that she was "scared to tell a lie." Pl. Appx. MM, p. 38:6-14.

52.    **Disputed.** See Plaintiff's response to paragraph 51, *supra*.

53.    Admitted.

54.    Admitted.

55.    It is admitted that Charlene testified that she was "cut up one night, and I had went to hospital [*sic*] . . . and the police brought me there and they started talking to me." Pl. Appx. KK, p. 46:22.  It is **disputed** that this is material to any claim against defendants.

56.    It is admitted that Charlene testified in the trial of Sharpe and that her testimony, which is in writing, speaks for itself. It is **disputed** that Defendants' characterization of Charlene's testimony is accurate, and it is further **disputed** that Charlene "stated that the Victim may have been turned when shot."

**Additional Material Facts:**

Defendants' statement of facts asserts that "Charlene maintained her entire five-hundred question testimony." [*sic*] While the precise meaning of this is not clear, to the extent it characterizes Charlene's testimony as consistent throughout, such a characterization is **disputed** by Plaintiff and by the transcript of Charlene's trial testimony. Charlene's testimony was rife with inconsistencies, equivocations, and outright guesses. *See* Pl. Appx. KK, p.

56:2-4 (Charlene testifying that the gun was held "probably like that," but that "I don't really know. I'm guessing right now"); p. 58:4 (testifying that Radcliffe "was probably standing right there"); p. 62:5-6 (testifying that Radcliffe's head was "like halfway in the passenger side, I guess"); p. 63:23-24 (testifying, when asked who got in the truck with Radcliffe, "I guess one of them"); p. 64:12-14 (when asked how Sharpe or Joyner got into the truck on top of Radcliffe, testifying, "They probably sat on him"); p. 72:7-10 (when asked if Sharpe and Joyner were running together, testifying, "one probably was running down the other street"), and other equivocations indicative of deception.

With respect to the relative positions of Sharpe and Radcliffe, Sharpe's counsel asked Charlene about this issue 12 times. In answer to the first ten questions on this issue, Charlene stated the men were "face to face" and confirmed that there was "no doubt in [her] mind." The eleventh time counsel for Sharpe asked the question, Charlene stated, "I don't know if the white man turnt. I don't know if it was straight up or not." Then, in response to the follow-up question by Sharpe's counsel, "Your best recollection, you believe they were face to face?", Charlene responded, "Yes, I do." Pl. Appx. KK, pp. 56:18-25 through 57:1-16; p. 69:12-5; p. 73:5-21.

Beginning in September 1995 following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court

testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.*

57.    It is admitted that Beatrice Stokes testified in the trial of Sharpe and that her testimony, which is reflected in a certified transcript, speaks for itself. It is **disputed** that Stokes testimony about witnessing the murder was true and accurate.

**Additional Material Facts:**

Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen. Id.* at ¶ 132. Melvin also testified that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2.  Melvin, who was named as the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4.

Furthermore, in a written statement witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it.  Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63:6–23; Pl. Appx. U, p. 274:19 through 275:1–5; Pl. Resp. Appx. C,  Depo. Ex. 86, Sharpe 3747, 3749. Finally, Melvin alleged that Best "paid, threatened, or otherwise pressured" two state's witnesses, including Charlene Johnson. Pl. Resp. Appx. K, Pitt DA Copies 2325.

Accordingly, the subject matter of the testimony given by Beatrice Stokes is a matter of dispute.

58. It is admitted that Melvin testified in the trial of Sharpe and that her testimony, which is reflected in a certified transcript, speaks for itself.

**Additional Material Facts:**

Melvin testified under oath in this case that "Dontae Sharpe did not sell drugs on the street," and that the area where Radcliffe was murdered "was not [Sharpe's] area. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

59. Admitted.

60. It is admitted that Sharpe called Ward and Hick as alibi witnesses at his trial. It is **disputed** that Defendants' characterization that this was "in contrast" to what Sharpe said to Melvin and Best during his interview is accurate.

61. It is admitted that the jury convicted Sharpe. It is **disputed** that he was in fact guilty.

**Additional Material Facts:**

Sharpe's conviction was subsequently vacated after a multi-year investigation by the Duke Law School Wrongful Conviction Clinic that uncovered misconduct on the part of Shrock, Best, and Melvin. He subsequently received a Pardon of Innocence from Governor Roy Cooper. (D.E. 154-B).

62. Admitted.

63.　Admitted. It is **disputed** that this is material to any claim against Defendants.

64.　Admitted.

65.　 It is admitted that when Charlene was asked by Melvin's counsel whether, when Charlene wrote "the statement," anybody else was in the room, Charlene stated, "There was nobody in the room with me."

**Additional Material Facts:**

During the same deposition, Charlene testified that Best kept standing there while she was writing and that, "coming back he told me stuff and I finished the rest of it." Best Appx. V, p. 90:11-14. Charlene further testified that Best "was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id.* at 94:11-20. She also testified that in the second half of her statement, she just wrote down what he told her. *Id*. at 40:18-24.

66.　 It is admitted that Best asked Charlene to write down what she "knew" about the murder. It is **disputed** that what she *knew* about the murder almost two months later is material, as opposed to what she actually *witnessed* at the time of the murder.

**Additional Material Facts:**

Charlene Johnson testified at her deposition that the "first time she became aware of the murder" was *through the news*. Best Appx. V, p. 20:12 through 21:1.

67.　Admitted.

**Additional Material Facts:**

Charlene testified that after she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. She stated: "He was telling me things. What to write." *Id*. at 40:4-7.

68.    It is admitted that Best was aware of the importance of documenting anything relevant to an investigation, although the page and line citation provided by Defendants does not establish that fact.

**Additional Material Facts:**

Best did not document any of his interactions with the two alleged eyewitnesses, Charlene Johnson and Beatrice Stokes. PSF ¶¶ 125, 126; Pl. Appx. T, p. 127:4-21; p. 136:12-17.

69.    It is admitted that Best expected all relevant evidence to be memorialized in a report, although the page and line citation provided by Defendants does not establish that fact.

**Additional Material Facts:**

Best did not document any of his interactions with the two alleged eyewitnesses, Charlene Johnson and Beatrice Stokes. PSF ¶¶ 125, 126; Pl. Appx. T, p. 127:4-21; p. 136:12-17.

70.    Admitted.

71.    It is **disputed** that at the time of this investigation, the City had a written policy which it enforced. It is further disputed that the page and line citation provided by Defendant says that any policy was enforced.

**Additional Material Facts:**

Best testified in his deposition that there was "a book," but that he did not know what was in "the book"; he did not know who had "the book," but guessed that it was "with the supervisor"; that in fact he "never saw" the book; that he "didn't read the book"; and that he "never had a copy." Best Appx. GG, p. 104:9-25; 105:2-3 (never saw); 105:15-16 (didn't read); 106:3-5 (never had a copy). In the deposition of former GPD Chief Charles E. Hinman, Hinman testified that there was no policy or procedure manual when he came to the GPD in 1991. Pl. Resp. Appx. L, Hinman Depo., p. 21:20-23, and that prior to the enactment of a written policy on criminal investigations effective November 18, 1994, there was no other policy for criminal investigations. *Id.* at p. 30:13-25 through 31:1-4.

72. It is **disputed** that Best testified that Shrock informed him that a female witness claimed that she had *witnessed* Dontae Sharpe kill the victim. Best testified that a woman had *told him she knew* who had killed the white man, and that it was Dontae Sharpe. Best Appx. GG, p. 118:8-9. *See also* Plaintiff's response to paragraph 66, *supra*. Furthermore, Defendants' characterization that Best testified Shrock said he had driven the woman to the hospital *because* she was acting strange is disputed. Best Appx. GG, p. 118:11-12.

Additional Material Facts:

Shrock has admitted—once in an interview with the GPD in 2014 conducted at the request of the District Attorney, and again to the Duke Law Wrongful Conviction Clinic—that Charlene Johnson's purported statement implicating Sharpe in the Radcliffe murder *did not* occur the night Shrock

allegedly took Charlene to the hospital on February 17, 1994. Plaintiff's Statement of Facts, ¶ 63, 64. Paragraph 72 simply repeats the false story Shrock testified to during Plaintiff's 1997 MAR hearing.

73.    It is admitted that Best *testified* that Charlene's mother had consented to Best and Melvin bringing Charlene to the GPD headquarters. It is **disputed** that this is true, or that it is material to any of the claims made by Plaintiff.

**Additional Material Facts:**

Best did not talk to Charlene's mother when he and Melvin went to her house on April 7, 1990, to bring her to GPD headquarters. Best Appx. GG, p.125:13-16.

74.    It is admitted that Best *testified* to this at his deposition. It is **disputed** that what Charlene Johnson allegedly told Best and Melvin was true and accurate. It is further **disputed** that Charlene "provided the correct location of the murder."

**Additional Material Facts:**

Beginning in September 1995, following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.* With respect to the location of the murder, Charlene wrote in her statement that she was on 14th Street. Nowhere in her statement does she describe the location of the murder. Additionally, Charlene's written statement was given two months after the murder, during which time news of the murder had been on television and

newspapers. Charlene testified at her deposition that the "first time she became aware of the murder" was through the news. Best Appx. V, p. 20:12 through 21:1.

75.     It is admitted that Best *testified* to this at his deposition.  It is **disputed** that Best's testimony was true and accurate. During her deposition, Charlene Johnson testified that Best *told her what to write*. After she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. "He was telling me things. What to write." *Id*. at p. 40:4-7. "I just wrote down whatever was on that piece of paper."  *Id*. at 40:18-24. "He was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id*. at p. 94:11-20.

76.     **Disputed.** Defendant does not cite to any specific page or line in support of this paragraph.

**Additional Material Facts:**

During her deposition, Charlene Johnson testified that Defendant Best *told her what to write*. After she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. "He was telling me things. What to write." *Id*. at p. 40:4-7. "I just wrote down whatever was on that piece of paper."  *Id*. at 40:18-24. "He was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id*. at p. 94:11-20.

77.     Defendant does not cite to any specific page or line in support of this alleged fact, and it is **disputed** that what Stokes allegedly told Best was true and accurate.

**Additional Material Facts:**

Best wrote no notes or reports about the alleged interaction, PSF ¶¶ 125, 126, despite knowing that "all interviews" should go into a lead detective's report. *Id.* at ¶ 127. The District Attorney testified in his deposition that he was not aware of another case where Best had not written a report about a witness who he claimed was an eyewitness to a murder. *Id*. at ¶ 131. Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen*. *Id*. at ¶ 132, and that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2. Melvin, who was assigned to be the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4.

Furthermore, in a sworn affidavit witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it. Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63, lines 6–23; Pl. Appx. U, p. 274:19 through 275:1–5; Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Defendant Melvin has alleged that Best "paid, threatened, or otherwise pressured" two state's witnesses, including Beatrice Stokes. Pitt DA Copies 2325.

78.   It is admitted that Melvin testified during her deposition that in 1994 Charlene Johnson was adamant that she saw Dontae Sharpe kill George Radcliffe. It is **disputed** that what Charlene was saying in 1994 was true and accurate.

> **Additional Material Facts:**
>
> Melvin testified that she did not believe at the time that Charlene's written statement was truthful. Pl. Appx. W, p. 34:14-17; Pl. Appx. X, p. 58:3-9 (admitting that the information provided by Charlene "wasn't adding up"). Melvin testified that in 1994 she was "trying to encourage Charlene to tell the truth and confirm that what she was saying wasn't true" because it that was "important to me." Best Appx. HH, p. 73:11 through 74:14.

79.   **Disputed**. The citation provided by Defendants (Best Appx. HH, p. 115:21-116:7) does not support this allegedly uncontested fact. Melvin testified that *Best and Charlene* "were always together in the room." Best Appx. HH, p. 115:21-24. It is also **disputed** that this is material to any of the claims made by Plaintiff.

80.   It is admitted that Melvin testified to this. It is **disputed** that this is material to any of the claims made by Plaintiff.

81.   **Disputed.** Defendants do not supply any specific page and line in Shrock's deposition in support of this assertion. Shrock testified at his deposition that he did not remember taking Charlene to the hospital. Best Appx. II, pp. 99:20-21; 132:10-11; 133:7-8.

82.   It is admitted that Shrock testified at the MAR hearing in 1997 that he verbally relayed to Best that Charlene had identified a man named "Dondy" or Dontae (but not Dontae Sharpe). It is **disputed** that this testimony was true.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false. PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

83.     Admitted.

84.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false. PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

85.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false. PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

86.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false. PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

87.    It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false. PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

88.    It is **disputed** that "Shrock did not speak to the District Attorney before the 1997 hearing." District Attorney Clark Everett testified as his deposition that it was his normal practice to meet with witnesses he intended to call to discuss their potential testimony. PSF ¶ 168; Pl. Appx. T, p. 237;4-16; Pl. Appx. U, p. 69:14–19; Pl. Appx. Y, p. 106:23-25.

89.    It is admitted that every person applying to be a police officer in North Carolina, including in Greenville, North Carolina, is required to take the Basic Law Enforcement Training (BLET) course before starting as a patrol officer. It is **disputed** that the BLET course addresses "all aspects of policing."

**Additional Material Facts**:

The BLET course is an entry level course *designed for patrol officers*. As Defendants' 30(b)(6) witness testified "BLET gives a fundamental

understanding for most officers as to basic laws and procedures ***that are regarded universal through wherever they become employed***." Pl. Resp. Appx. M, Bonner Depo., p. 72:2-4 (emphasis added). By its very title, Basic Law Enforcement Training does not address specialized topics applicable to detectives, such as the use of informants, the evaluation of witness statements, or the investigation of alibi evidence, among other topics relevant to the investigation of the Radcliffe murder. *Id.* at 86:1-4.

90.　Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

91.　Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

92.　It is **disputed** that Melvin "attended a number of advanced investigation courses while employed by the GPD. Melvin testified that the only specialized course she took while employed at the GPD was rape investigation. "The rest of them were the basic certifications." Pl. Appx. X, p. 119:12-17.

**Additional Material Facts:**

As reflected in Melvin's final evaluation report before leaving the GPD in November 1994, Melvin "has never been afforded any formal training" in interviewing and interrogation," nor had Melvin had any "formal training related to homicide investigation." PSF ¶¶ 26, 27; Pl. Appx. CC, pp. 503, 507, 512, 519.

93.　It is admitted that Jon Blum's expert report stated that Melvin had attended these courses.

**Additional Material Facts:**

Between 1992 and 1995, Melvin's yearly evaluations recommended that she receive training in interviewing and interrogation, and/or other training in homicide investigations. Defendant Melvin did not receive this training prior to Charlene Johnson's April 7, 1994, statement. PSF ¶¶ 179-180; Pl. Appx. CC, pp. GPD 503, 507, 512, 519.

94.    Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

95.    It is admitted that Jon Blum's expert report stated that Best had attended these courses.

**Additional Material Facts:**

Best received no training from the GPD regarding note taking. PSF ¶ 181; Pl. Appx. T, p. 47:1-3.

96.    It is admitted that Best completed training over his time employed by the GPD and received certificates for completing various training courses. However, Defendant's characterizations that the training was "extensive," that Best received "many" certificates, and that the training courses were "comprehensive," are opinions, not facts.

97.    Admitted.

**Additional Material Facts:**

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42 – Criminal Investigations – was approved by him to send to CALEA as part

of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

98.    It is admitted that Jon Blum's expert report stated that the GPD earned CALEA accreditation in 1995, and that this was accomplished by less than 1% of law enforcement agencies in the US.  It is **disputed** that this is material to the claims in Plaintiff's complaint regarding GPD policies in effect *at the time of the Radcliffe investigation in 1994.*

>   **Additional Material Facts:**
>
>   Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42 – Criminal Investigations – was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

99.    It is admitted that Hardy, Bass, and Forrest submitted affidavits making these statements. It is **disputed** that these statements are material to the claims in Plaintiff's complaint regarding GPD policies in effect *at the time of the Radcliffe investigation in 1994.*

>   **Additional Material Facts:**
>
>   Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42 – Criminal Investigations – was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

100.   It is admitted that Hardy, Bass, and Forrest submitted affidavits making these statements. It is **disputed** that these statements are accurate.

   **Additional Material Facts:**

   These affidavits were drafted after the deposition of Sgt. William Bonner, the designated 30(b)(6) witness, to address Bonner's failure to identify any policies regarding Investigations, Impeachment Evidence, Exculpatory Evidence, Confidential Informants, Investigation Assignments, Investigation Supervision, Witness Interviews, or Investigator Training in existence before 1995.

   Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42 – Criminal Investigations – was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo. pp. 35-37.

101.   Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

102.   Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

103.   Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

104.  It is admitted that Robert Pusins testified that *he* had not personally identified any other case in which the GPD failed to enact policies or procedures for training its officers. It is **disputed** that this established that there were no other such cases.

**Additional Material Facts:**

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42 – Criminal Investigations – was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Himan Depo., pp. 35:1 through 37:25.

Respectfully submitted, this 3rd day of October, 2024.

<div style="margin-left:40%">

/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
Pfeiffer Rudolf
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
ATTORNEYS FOR PLAINTIFF

</div>

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system.

This 3rd day of October, 2024.

/s/ David S. Rudolf
David S. Rudolf