IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CONSOLIDATED ACTION

| | | |
|---|---|---|
| MONTOYAE DONTAE SHARP,<br>Plaintiff,<br><br>v.<br><br>DAVID RICKY BEST, *et al.*,<br>Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 4:21-CV-185-BO |
| MONTOYAE DONTAE SHARP,<br>Plaintiff,<br><br>v.<br><br>CAROLYN MELVIN<br>Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 4:22-CV-88-BO |

ORDER

This cause comes before the Court on multiple, cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. The appropriate responses and replies have been filed, or the time for doing so has expired. In this posture, the motions are ripe for disposition and, for the reasons that follow, the Court reserves a decision on qualified immunity and the matter will be set for trial.

BACKGROUND

*Procedural history*

Plaintiff, Sharpe, commenced this action on December 20, 2021, by filing a complaint alleging claims for constitutional violations under 42 U.S.C. § 1983, as well as state law and constitutional claims, arising from his wrongful conviction for the first-degree murder of George Radcliff. [DE 1]. The original complaint alleged claims against the City of Greenville, North Carolina and two members of the Greenville Police Department at the time of Radcliff's murder

and Sharp's conviction, David "Ricky" Best and Jeffrey Shrock. The City of Greenville moved for judgment on the pleadings in its favor on Sharpe's claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). After holding a hearing, the Court denied the City's motion without prejudice to re-raising the issue at the summary judgment stage. [DE 52].

On July 29, 2022, Sharpe filed a related case against Carolyn Melvin, another member of Greenville's police department at the time of Radcliff's murder and Sharpe's conviction, raising the same issues based upon the same set of circumstances and seeking the same relief. [DE 44]. The Court consolidated the two cases for purposes of discovery and motions practice. [DE 51]. Sharpe filed a consolidated complaint pursuant to the Court's order. [DE 53]. Following a lengthy period of discovery and shortly before the dispositive motions filing deadline, Sharpe moved to amend his consolidated complaint. Cross-motions for summary judgment were then filed. The Court held a hearing, after which it permitted Sharpe to file an amended consolidated complaint. [DE 242]. The parties then filed amended cross-motions for summary judgment in order to address the new claims raised in the amended consolidated complaint. [DE 244; DE 254; DE 257; DE 260; DE 263].

*Factual background*

Many of the salient, material facts underpinning the investigation, prosecution, and post-conviction proceedings involving Sharpe and the murder of George Radcliff are in dispute. The following facts appear to be undisputed, unless otherwise indicated. *See, e.g.,* [DE 245; DE 251; DE 253; DE 261; DE 264; DE 278]. George Radcliff was discovered shot to death inside his pickup truck at approximately 9:15 pm on Friday, February 11, 1994, near the intersection of West 6th and Sheppard Streets in Greenville, North Carolina. Greenville Police Department (Greenville PD) officers responded to the scene and took investigatory steps. Specifically, Officer Kevin Jones

2

spoke to witnesses Tony Johnson and Wilber Mercer (also known as Marciana) that night and officers conducted a sweep of the street in order to locate physical evidence. It is disputed whether Greenville PD officers spoke to Alonzo Vines, a claimed witness, the night of the murder.

An autopsy of Radcliff's body determined that a bullet entered Radcliff's upper left arm the travelled across his chest and lodged in his right arm. On February 14, 1994, defendant Carolyn Melvin, a Greenville PD detective, interviewed Wilber Mercer and Martha Stewart at the police station. Melvin's interview notes reflect that Mercer indicated that he was with Radcliff shortly before Radcliff's murder trying to help Radcliff find powder cocaine to purchase, though it was Mercer's intent to rip Radcliff off. Mercer indicated that he had left his jacket in Radcliff's truck, which was discovered there with blood on it after the shooting. The notes from Stewart's interview reflect that Stewart told Melvin that, while she was walking down the street, she saw two black males whistle at Radcliff's truck and then approach the truck; about a minute later, when Stewart was back inside her home, Stewart heard a gunshot.

On February 15, 1994, defendant Ricky Best, a Greenville PD detective, was assigned to the Radcliff investigation. It is disputed whether Melvin or Best acted as the lead or *de facto* lead investigator on the case and made decisions as to which witnesses to interview and which leads to follow. On February 15 and 16, 1994, Melvin requested Crime Stopper Coverage and interviewed Radcliff's wife, Tricia Radcliff. Defendant Jeffrey Shrock, a Greenville PD officer, contends that on or about February 17, 1994, he met Charlene Johnson near the scene of Radcliff's murder and that she later told Shrock that she had witnessed a man named Dontae shoot the victim. The circumstances surrounding Shrock's interactions with Johnson and her statements are hotly contested.

3

On April 7, 1994, almost two months after Radcliff's murder, Melvin and Best interviewed Johnson at the Greenville PD during which Johnson stated that she was in the area and had witnessed Radcliff's murder. Johnson was thirteen years old at the time of Radcliff's murder. Johnson wrote out a statement that day in which she implicated Sharpe and Mark Joyner in the murder, specifically stating that Sharpe was the shooter. Johnson's statement was presented to a magistrate that day and a warrant for Sharpe's arrest was issued. Sharpe's cousin, Mark Joyner, was also arrested in relation to Radcliff's murder. Joyner entered an Alford plea on January 10, 1996, after Sharpe had been convicted of first-degree murder.

Sharpe was questioned by Best and Melvin the night of his arrest. Sharpe indicated he had been with Karsen Robinson and his girlfriend Kizzie Paige on the night of Radcliff's murder and that he owned a .45 caliber gun which had been stolen; Radcliff was murdered with a .45 caliber gun. Sharpe denied any involvement in Radcliff's murder. Neither Melvin nor Best interviewed Sharpe's alibi witnesses.

On the night of Sharpe's arrest, Charlene Johnson was assaulted by five women, including Kizzie Paige. It is disputed whether after the assault Johnson maintained that her statement was true and whether the assault was motivated by Johnson having truthfully or falsely identified Sharpe. Johnson was taken to a safe house in Wilmington after the assault and was later given $500 through the Crime Stopper program. Sharpe was indicted for Radcliff's murder on April 18, 1994. Charlene Johnson submitted to a polygraph the following day, the results of which were inconclusive.

In May 1994, Beatrice Stokes allegedly approached Best and claimed to be an eyewitness to Sharpe's murder of Radcliff. Again, the facts and circumstances surrounding Stokes' statements are in dispute. Best did not write a report memorializing his interaction with Stokes.

Cherry Stokes was Sharpe's trial attorney. The trial took place in July 1995 in Pitt County Superior Court, with Judge Richard Parker presiding. Charlene Johnson testified at the trial and maintained that she had witnessed Sharpe and Mark Joyner murder Radcliff. Beatrice Stokes also testified. Stokes testified that she had seen Sharpe, Marciana, Lisa, Mark Joyner, and Candice or Candy, along with Radcliff, all standing near Radcliff's truck when Sharpe shot Radcliff. Melvin and Best also testified at the trial. The firearm used to kill Radcliff had not been recovered at the time of the trial. After the State rested, Sharpe's counsel moved to strike Charlene Johnson's testimony, which was denied. Sharpe called two witnesses, family members Patricia Ward and Patricia Hicks, as alibi witnesses. The jury returned a unanimous verdict of guilty on the charge of first-degree murder and Sharpe was sentenced to life imprisonment. Sharpe appealed. The Supreme Court affirmed his conviction and sentence. *State v. Sharpe*, 344 N.C. 190 (1996).

Not long after the trial, Charlene Johnson told Cherry Stokes's paralegal that she, Johnson, had not told the truth during the trial. Johnson stated that she had not been there when Radcliff was killed, that Best had given her and her family a lot of gifts, and that Beatrice Stokes also had not told the truth during the trial. Johnson later told Sharpe's appellate attorney's paralegal that everything she had said in the trial was a lie. On September 10, 1996, Johnson signed an affidavit recanting her trial testimony and affirming that she had not witnessed Radcliff's murder. *See* [DE 171-14].

After Johnson recanted her trial testimony, Sharpe filed a Motion for Appropriate Relief (MAR) in which he sought to vacate his conviction. An evidentiary hearing was held on December 11, 1997, and Best, Shrock, and Johnson testified at the hearing. Best and Shrock testified about their interactions with Johnson before and after she gave her statement which implicated Sharpe.

Based upon the evidence presented, the presiding judge was "reasonably well satisfied that Johnson testified truthfully at the trial of [Sharpe]." [DE 172-15 at 7].

Sharpe contends that, while she investigated Radcliff's murder, Melvin suffered from alcoholism, memory loss, and Grave's disease, none of which was disclosed to the district attorney or defense counsel. Melvin disputes that she had memory problems or that the Greenville PD was aware of her alcoholism. At the time she was investigating Radcliff's murder, Melvin believed Mercer, or Marciana, to be the prime suspect. After leaving the Greenville PD, Melvin became a private investigator and was hired by Sharpe's family. While investigating Sharpe's conviction, Beatrice Stokes provided Melvin, in the presence of two Greenville City Councilmembers, with a recantation of her trial testimony. *See* [DE 217-3]. Stokes indicated that she had not seen Sharpe shoot Radcliff, that Best had promised she would be paid for her trial testimony, and that Best had told her what other people had said about the case. Best has since stated that Melvin paid her or offered to pay her to recant her trial testimony.

Additional litigation challenging Sharpe's conviction followed the denial of his MAR in 1997, culminating with the vacatur of his conviction on August 22, 2019, in Pitt County Superior Court. On November 12, 2021, the Governor of North Carolina issued a full and unconditional pardon of innocence to Sharpe.

## DISCUSSION

### *Summary judgment standard*

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met,

the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

When deciding cross-motions for summary judgment, a court considers each motion separately and resolves all factual disputes and competing inferences in the light most favorable to the opposing party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

### Section 1983 claims, qualified immunity

The three individual defendants have raised the defense of qualified immunity as to the § 1983 claims against them in their individual capacities. Because qualified immunity provides immunity from suit, and therefore a trial, the Court considers this issue first. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they

7

can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). A clearly established right requires existing precedent which places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that a case on point is not required). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) (court must "take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims."). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). The determination of whether a right is clearly established is a legal question always answerable at summary judgment, but where there are issues of fact with respect to the officer's conduct or its reasonableness, summary judgment is inappropriate. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal quotation, alteration, and citation omitted) ("a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial.").

First, the Court determines that the rights Sharpe alleges to have been violated were clearly established. Sharpe alleges that defendants Best and Melvin knowingly or recklessly used false evidence in obtaining his arrest and conviction (Counts I and II); that defendant Melvin failed to intervene, resulting in the denial of fair criminal proceedings (Count III); that Best and Melvin arrested Sharpe and instituted criminal charges without probable cause (Count IV); that Best and Melvin failed to investigate (Count V); that Best and Shrock concealed exculpatory and impeachment evidence (Count VI); that Best and Shrock knowingly and/or recklessly used false evidence in denying Sharpe due process and access to courts (Count VII); that Best deprived Sharpe of due process and access to the courts (Count VIII); and that Best in bad faith destroyed evidence (Count IX).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations and citation omitted); *see also Iko*, 535 F.3d at 238. In making this determination, a court must identify the specific rights the plaintiff alleges were violated at a high level of particularity. *Garrett v. Clarke*, 74 F.4th 579, 588 (4th Cir. 2023). However, a court considers both rights that have been specifically adjudicated as well as "those manifestly included within more general applications of the core constitutional principles invoked." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Wall v. Wade*, 741 F.3d 492, 503 (4th Cir. 2014)). Additionally, the right need not be defined "in accordance with the very actions in question." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022) (cleaned up, citation omitted).

The rights that Sharpe alleges to have been violated sound in core, constitutional principles. It was clearly established in 1994 that arresting a suspect without probable cause violated a clearly

established right. *See Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019). A conviction based on the use of falsified evidence violates the Fourteenth Amendment, as does the government's failure to correct such false evidence when it appears. *United States v. Chavez*, 894 F.3d 593, 599 (4th Cir. 2018) (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)). Moreover, the bad faith suppression of exculpatory evidence by police officers amounts to a due process violation, as does the failure to adequately investigate the crime, if that failure was done in bad faith in order to shield other wrongful acts. *Gilliam*, 932 F.3d at 241.

If Sharpe's version of the facts are taken as true, [DE 245], and if the Court ignores contrary factual claims, after Shrock informed Best about Charlene Johnson having information about Radcliff's murder, Best instructed Johnson about what to say in her written statement in which she admitted to witnessing Radcliff's murder by Sharpe. Best and Melvin then made no effort to corroborate Johnson's statement or confront her regarding the inconsistencies between her statement and the physical evidence, and Sharpe was arrested less than three hours after Johnson completed her statement. Melvin presented Johnson's statement to the magistrate even though she believed it to be false. Best and Melvin then failed to conduct any investigation into Johnson's psychiatric illness or her treatment and did not interview any of Sharpe's alibi witnesses, nor did Best disclose the number of payments and gifts that he gave to Johnson after she provided her statement, which included food and money to the extent that Johnson began referring to Best as "Daddy Ricky."

About a month later, Best told the district attorney that he had additional information about Radcliff's murder from Beatrice Stokes. Without memorializing his meeting in any notes, Best contends that he met with Stokes, and she told him that she, too, had witnessed Radcliff's murder. At the time, Best was a drug addict and was facing criminal charges, and Sharpe contends that

10

Best provided information about the murder to Stokes after Best offered to pay her for her testimony. None of this was revealed to the district attorney. During Sharpe's 1997 MAR hearing, Best did not reveal that he had coached Johnson in making her statement, or that her polygraph results were inconclusive, or that he had similarly coached Stokes.

Shrock became involved in the Radcliff murder investigation when he presented Johnson to Best as a witness. Shrock was familiar with Johnson, who was then thirteen years old, as he had transported Johnson to a psychiatric facility on February 17, 1994. Although Shrock later testified at Sharpe's 1997 MAR hearing that that same evening Johnson was released and he drove her home, and that she had told him then that she had witnessed Radcliff's murder, Johnson was in fact held for evaluation and treatment for three weeks. Shrock admitted in 2014 that his testimony on this point was false. Information about Johnson's commitment to a psychiatric facility was not provided to the district attorney.

Sharpe contends that, despite knowing about his efforts from 1997 forward to overturn his conviction, neither Best nor Shrock came forward to reveal any of the foregoing. Moreover, Sharpe contends that the evidence demonstrates that Best engaged in bad faith attempts to interfere with Sharpe's postconviction efforts, including the destruction of the physical evidence from the trial in 2004.

The Court determines that, based upon Sharpe's version of the facts, the constitutional rights he alleges were violated were clearly established. However, the evidentiary record on summary judgment precludes a finding at this stage on whether constitutional violations actually occurred. As noted above, material facts are hotly disputed in this case, beginning with whether the lead detective responsible for the case was Melvin or Best and whether Best coached Johnson into making her statement, which she later recanted. Stokes also recanted her trial testimony, when

Melvin was acting as a private investigator, but later withdrew that recantation. There is evidence which would suggest that it was Melvin who bribed Stokes into recanting, while other evidence suggests that Best convinced Stokes to withdraw her recantation. Best has filed an affidavit stating that he was unaware of any of Sharpe's post-conviction efforts between 1998 and 2012, and further that when approached in 2012 by the Duke Wrongful Conviction Clinic he declined to be interviewed. In response, Sharpe has proffered evidence that Best was involved in Sharpe's post-conviction proceedings and that he was, in fact, interviewed by the Duke Wrongful Conviction Clinic in 2012 at the United States Courthouse at Greenville.

A finder of fact is required to wade through the evidence in this case and determine what actually occurred. Only then will the Court be in a position to make a final decision on qualified immunity. In light of the foregoing, Sharpe's motion for summary judgment on Counts I, II, V, VI, and VII is denied. Defendants' motions for summary judgment as to the § 1983 claims are denied.

### Section 1983 claims, Monell liability

Under *Monell*, a local government can be held liable under 42 U.S.C. § 1983 for its unconstitutional policies. 436 U.S. at 690-94. Municipal liability only results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Municipal liability is not available under the theory of respondeat superior. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that

12

> is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations omitted).

Sharpe contends that the City of Greenville is liable based upon its failure to train its police officers and failure to implement policies designed to prevent constitutional violations. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). And, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But in *Canton*, the Supreme Court "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 63. In other words, "the so-called *Canton* exception," *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), would apply where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 at 390. Importantly, a finding that a particular officer was not satisfactorily trained or that he could have had more or better training is not sufficient to impose liability on the municipality. *Id.* at 390-91.

The City of Greenville has proffered evidence that in 1994 and after, the Greenville Police Department had written policies regarding investigations, exculpatory and impeachment evidence, the use of confidential informants, and witness interviews, which were based on the policies of larger North Carolina police departments. [DE 269-3] Hardy Aff. ¶ 4. The Greenville PD rewrote and updated its polices beginning in 1994 as a part of seeking accreditation from the Commission

13

on Accreditation for Law Enforcement Agencies (CALEA), but the policies which were in place prior to the accreditation process were substantially similar to those used to seek accreditation. *Id.* ¶ 5. While no copy of the Greenville PD's policy manual which was used in 1994 has been located, the City has nonetheless provided evidence that policies were in place and did exist during the investigation into the murder of George Radcliff. *See* [DE 269-3] Hardy Aff.; Bass Aff.; Forrest Aff.

Former Chief of Police Hinman, who served as Chief of the Greenville PD in 1994, has testified that, when he arrived at the department in 1991, he immediately began the process of seeking CALEA certification, but he did not recall what policies were in place when he arrived. [DE 217-12] Hinman Depo. at 21-22; 48. Hinman's affidavit does not create a genuine issue of material fact as to whether there were policies in place in 1994, however, as he has testified that he *does not recall* what policies were in place, while the affidavits proffered by the City demonstrate that policies were, in fact, in place.

Where a plaintiff seeks to hold a municipality liable based on a single incident theory, the existence of an applicable policy, which the plaintiff has not demonstrated was deficient except by relying on the single incident, defeats the plaintiff's *Monell* claim. *Estate of Jones*, 961 F.3d at 672. That Sharpe argues that the evidence shows that Best and Melvin were unaware of the Greenville PD's policies amounts essentially to an argument that a particular officer or officers needed more or better training. For example, Best testified that in 1994 there was a policy and procedures book that he believes was in the supervisor's office, though he did not recall ever reading what was in the book. [DE 201-5] Best Depo. at 104-105. But that is insufficient to impose liability on the City. "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones*, 961 F.3d at 672. That one or more of the City's officers failed to follow its policies during

14

a single incident "could not have put the City on earlier notice of the need to better train its officers . . .." *Id.*; *see also Semple v. City of Moundsville*, 195 F.3d 708, 713 (4th Cir. 1999).

In the operative complaint, Sharpe alleges that the constitutional violations which he contends occurred were a result of the "decades long failure of the Chiefs of the Greenville Police Department to adequately train and supervise patrol officers . . . and felony investigators . . .." [DE 243 at 69]. Importantly, however, Sharpe does not proceed under a pattern or practice theory of liability, but a single incident failure to train theory, which has never been found to apply by the Supreme Court or the Fourth Circuit. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [] prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. Sharpe has simply failed to create a genuine issue of material fact as to whether this is the appropriate case to send a *Canton* exception claim to the jury.

The City is therefore entitled to summary judgment in its favor on the *Monell* claim in Count X. Counts VIII and IX of the operative complaint are also alleged against the City. While the allegations are primarily against "defendants," generally, they concern Sharpe's claims that his due process and access to courts rights were violated following the denial of his 1997 MAR and that the City of Greenville and Best engaged in the bad-faith destruction of evidence in 2004. In his opposition to the motion for summary judgment, Sharpe contends that Counts VIII and IX are the "direct result of the claims detailed in Count X, *i.e.*, the City's failure to adopt necessary policies and properly train, supervise, and discipline its officers to avoid . . . constitutional violations . . .." [DE 277 at 24-25]. Because the Court has determined that the City is entitled to summary judgment on Count X, it determines that the City is further entitled to summary judgment on Counts VIII and IX.

15

*State law claims*

Sharpe alleges the following state common law claims against defendants: wrongful imprisonment and civil conspiracy against Melvin, Best, and Shrock in their individual capacities (Count XI); and gross and reckless negligence against Melvin and Best in their individual capacities and the City of Greenville (Count XII).

A civil conspiracy under North Carolina law requires a plaintiff to demonstrate "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do an lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. Univ. of N. Carolina at Chapel Hill*, 96 N.C. App. 124, 139 (1989). Sharpe has failed to create a genuine issue of material fact as to whether Melvin, Shrock, and/or Best had an agreement to wrongfully imprison him. Defendants are entitled to summary judgment on Count XI.

Melvin and Best raise public officer immunity for Sharpe's gross and reckless negligence claim. Public officer immunity shields public officers from liability for individual capacity claims unless their actions are "corrupt, malicious or outside the scope of his official duties." *Estate of Burgess ex. rel. Burgess v. Hamrick*, 206 N.C. App. 268, 276 (2010). A malicious act is one which is done wantonly and contrary to the duty of the actor and which is intended to be injurious. *Wilcox v. City of Asheville*, 222 N.C. App. 285, 289 (2012). The intent to injure may be constructive and demonstrated by actions "so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent." *Id.* (cleaned up, citation omitted). North Carolina "presumes 'that public officials will discharge their duties in good faith and exercise their powers in accord with

16

the spirit and purpose of the law.'" *Doe v. City of Charlotte*, 273 N.C. App. 10, 24 (2020) (citation omitted).

"Generally, where an officer defendant is entitled to qualified immunity for a Section 1983 claim, the officer is likewise entitled to public official immunity on derivative state law claims." *Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 585 (W.D.N.C. 2022). Because the Court has denied qualified immunity at this stage on the § 1983 claims, it will also deny public officer immunity on Count XII as to Best and Melvin, leaving a final determination as to whether they are entitled to immunity for after a jury has determined the facts.

The City of Greenville has also raised an immunity defense to Count XII. The City of Greenville has purchased liability insurance, and thus has waived any governmental immunity as to Count XII to the extent of its liability insurance. *Meinck v. City of Gastonia*, 263 N.C. App. 414, 417 (2019). The City has failed, in its reply, to rebut Sharpe's argument that its purchase of insurance waives its immunity, nor has it argued that this action is excluded from coverage. *See* [DE 283]. The City has failed to carry its burden at the summary judgment stage on this claim, and its motion for summary judgment as to Count XII is denied.

*State Constitution claims*

Finally, Sharpe raises claims under North Carolina's Constitution in the alternative to the foregoing claims (Counts XIII – XIX). It is well established that a plaintiff may not maintain a claim under the North Carolina Constitution when adequate remedies at law exist. *Corum v. Univ. of N.C.,* 330 N.C. 761, 781-82 (1992). The "term adequate . . . is not used to mean potentially successful." t

*Craig ex rel. Craig v. New Hanover Bd. of Educ.*, 185 N.C. App. 651, 656 (2007), *rev'd on other grounds sub nom. Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334 (2009). Rather, it means "'available, existing, applicable remedy.'" *Id.* (citation omitted). Accordingly, claims under the North Carolina Constitution are limited to when a plaintiff has "no other remedy." *Corum*, 330 N.C. at 783.

As Sharpe has other remedies, his claims under the North Carolina Constitution are dismissed.

## CONCLUSION

Accordingly, for the foregoing reasons, Melvin's motion for summary judgment as to plaintiff's amended complaint [DE 254] is GRANTED IN PART and DENIED IN PART; Best's motion for summary judgment as to plaintiff's amended complaint [DE 257] is GRANTED IN PART and DENIED IN PART; Shrock's motion for summary judgment as to plaintiff's amended complaint [DE 260] is GRANTED IN PART and DENIED IN PART; and the City of Greenville's motion for summary judgment as to plaintiff's amended complaint [DE 263] is GRANTED IN PART and DENIED IN PART. Summary judgment in favor of the City of Greenville is entered as to Counts VIII, IX, and X but denied as to Count XII. Summary judgment in favor of Melvin, Best, and Shrock is entered at to Count XI. Counts XIII – XIX of the amended complaint are DISMISSED.

The Court expressly reserves a ruling on qualified and public officer immunity as to Counts I – IX and XII. Once the jury determines the facts through the use of special interrogatories, the Court will make a final decision as to whether the individual defendants are entitled to qualified immunity on plaintiff's § 1983 claims and public officer immunity on plaintiff's remaining state

law claim. Plaintiff's motion for summary judgment on Counts I, II, V, VI, and VII [DE 244] is DENIED.

The motions for summary judgment regarding the first consolidated complaint, [DE 169; DE 179; DE 184; DE 189; DE 194] are DENIED AS MOOT. Melvin's motion to amend/correct appendix [DE 201] does not appear to contain any request for relief and is therefore DENIED. Plaintiff's motion to strike [DE 236] is DENIED AS MOOT.

The clerk is DIRECTED to refer this matter to United States Magistrate Judge Numbers for pretrial conference. A jury trial will commence during the Court's March 2025 term, with a specific date and time to be set by separate notice. The claims against Melvin will remain consolidated with the claims against Best, Shrock, and the City for purposes of the trial. A court-hosted settlement conference prior to trial shall be set upon request of any party.

SO ORDERED, this **10** day of February 2025.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE