# EXHIBIT C

| | | |
|---|---|---|
| RAYMOND TARLTON, as guardian ad litem for | ) | |
| HENRY LEE MCCOLLUM, and J. DUANE | ) | |
| GILLIAM, as guardian of the estate of LEON | ) | |
| BROWN, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| KENNETH SEALEY,[1] both individually and in his | ) | |
| official capacity as the Sheriff of Robeson County, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

This cause comes before the Court on motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as well as plaintiffs' motion for sanctions. A hearing on the dispositive motions was held before the undersigned on January 23, 2018, at Raleigh, North Carolina. The motions have been fully briefed and are in this posture ripe for ruling. For the reasons that follow, defendants' motions for summary judgment are granted in part and denied in part and plaintiffs' motions for summary judgment and for sanctions are denied.

## PROCEDURAL HISTORY

Henry McCollum and Leon Brown instituted this action against Robeson County, Kenneth Snead, Joel Locklear, the Town of Red Springs, Kenneth Sealey, Larry Floyd, Paul Canady for the Estate of Luther Haggins, and Leroy Allen on August 31, 2015. [DE 1]. Their amended complaint alleges four claims arising under 42 U.S.C. § 1983: false arrest, malicious prosecution, deprivation

---

[1] The Court has amended the caption to reflect the settlement with the Town of Red Springs defendants.

of due process, and municipal liability for custom, usages, practices, procedures, and policies as a result of which McCollum's and Brown's[2] constitutional rights were violated. McCollum and Brown seek a declaratory judgment that defendants have violated their rights as provided by the United States Constitution, an award of compensatory and punitive damages, and attorneys' fees. [DE 70].

A guardian was appointed to represent the interests of Leon Brown on March 14, 2016 [DE 66]; a substitute guardian was appointed on May 31, 2016. [DE 85]. On May 27, 2016, the Court denied a motion to dismiss by Snead and Allen and granted a motion to dismiss filed by defendant Robeson County. [DE 83 & 84]. On December 12, 2016, Robert E. Price, Administrator C.T.A. of the Estate of Joel Locklear was substituted as a party for defendant Locklear. [DE 116]. A guardian ad litem was appointed to represent the interests of Henry McCollum on May 10, 2017. [DE 204]. On December 18, 2017, the Court approved a settlement between plaintiffs and the Town of Red Springs, Larry Floyd, and Paul Canady, Administrator C.T.A. of the Estate of Luther Haggins. [DE 253].

## FACTUAL BACKGROUND

The following is comprised of the undisputed facts upon which all parties rely in their motions for summary judgment. [DE 127-1; 165; 178; 183; 185-1].

Eleven-year old Sabrina Buie went missing on the night of Saturday, September 24, 1983, in the Town of Red Springs in Robeson County, North Carolina. Her parents filed a missing persons report with the Red Springs Police Department on Sunday, September 25, 1983. James Shaw discovered Sabrina Buie's body on Monday afternoon, September 26, 1983, in a soybean field near a convenience store in Red Springs. Miss Buie's body was found naked from the waist

---

[2] Henry McCollum will be hereinafter referred to as Henry McCollum or McCollum. Leon Brown will be hereinafter referred to as Leon Brown or Brown.

Case 5:15-cv-00451-BO   Document 306   Filed 03/27/18   Page 2 of 30

down with her bra pushed up over the back of her head. Her panties and a stick were down her throat, and she had been sexually assaulted.

The Red Springs Police Department requested that the North Carolina State Bureau of Investigation (SBI) participate in the murder investigation. Defendant Leroy Allen, then a resident SBI agent in Robeson County, was dispatched to process the crime scene. The Sheriff of Robeson County assigned defendants Detective Joel Garth Locklear and Detective Kenneth Sealey to provide additional support to the SBI. Defendants SBI Agent Kenneth Snead and Detective Sealey,[3] were dispatched to canvass the neighborhood for witnesses. Defendant Locklear also participated in the investigation by canvassing the area near where Sabrina Buie's body was discovered, as did other law enforcement agents.

On September 27, 1983, while canvassing the neighborhood for witnesses, Locklear spoke to plaintiff Henry McCollum outside of McCollum's home at 104 Malpass Avenue. McCollum denied any knowledge of the disappearance of Miss Buie. At the time, McCollum was staying with his mother, Mamie Brown, and his half-siblings Leon and Geraldine Brown; McCollum was visiting from New Jersey. At approximately 6:20 p.m. on September 28, 1983, Agent Snead and Detective Sealey interviewed Ethel Furmage, then seventeen years-old, at her residence. Miss Furmage stated that she had heard at school that McCollum (referred to as Buddy by those who knew him) had something to do with Miss Buie's murder. That evening, Snead, Sealey, and Agent Allen traveled to McCollum's home to interview him, arriving at approximately 9:10 p.m. McCollum agreed to ride with the officers to the Red Springs police station. After arriving at the police station, McCollum was fingerprinted and taken to the office of Red Springs Police Chief Luther Haggins for questioning.

---

[3] Sealey is now the Sheriff of Robeson County.

Case 5:15-cv-00451-BO   Document 326   Filed 03/27/18   Page 3 of 30

A Miranda waiver form bearing McCollum's signature reflects the time of 10:26 p.m. on September 28th. At 2:10 a.m. on September 29, 1983, McCollum signed a handwritten confession which was drafted by Agent Snead and witnessed by Sealey and Chief Haggins. [DE 147-29]; [DE 146-11] Snead Dep. at 50. The confession details that McCollum along with Darrell Suber, Louis Moore, Chris (last name unknown) and Leon Brown walked down the road toward the little red house with Miss Buie at approximately 9:30 p.m. on Saturday September 24th. After Suber and Chris left and returned from the convenience store with a six pack of beer, Suber, Chris, McCollum, Moore, and Brown discussed raping Buie as she had not agreed to have sex with them voluntarily. Moore then left, and the remaining men and Miss Buie walked to the woods at the edge of a field where they drank beer. McCollum grabbed Miss Buie's right arm and Brown grabbed her left arm and then men proceeded to rape Miss Buie; McCollum stated he was the third in the group to rape Miss Buie and that Brown was the last. The confession recounts that Suber then stated that they had to do something so that she would not tell the police, and that Chris then picked up a stick and tied Miss Buie's pink panties to the stick and choked Miss Buie to death. McCollum and Brown held Miss Buie down while she was being choked and Suber was cutting Miss Buie with a knife. After they believed Miss Buie to be dead, the men dragged her body to the edge of the woods toward a ditch. Suber had blood on his brown corduroy jacket and gray Nike tennis shoes with a burgundy seal, and Chris had blood on his sneakers, which were New Yorkers. Suber and Chris were smoking Newport cigarettes in the woods. *Id.* Henry McCollum's intelligence quotient has been scored as low as 56.

After signing the transcribed confession, McCollum was placed under arrest for the rape and murder of Miss Buie. While McCollum was being questioned, his mother Mamie Brown and brother Leon Brown had gone to the Red Springs police station. At approximately 2:00 a.m. on

4

September 29th, Brown was asked by law enforcement to step into a room and talk with them, which he did. Brown, then fifteen years-old, signed a form entitled "Juvenile Rights Warning" at 2:24 a.m. [DE 148-35]. Brown was interviewed by Detective Locklear and Red Springs Police Chief Haggins. Leon Brown signed a confession that was reduced to writing by Detective Locklear. Leon Brown's confession implicated Darrell Suber and Chris Brown, but differed in aspects from McCollum's confession. For example, Brown's confession makes no mention of Louis Moore's involvement nor does it reference a stick as being used to force Miss Buie's underwear down her throat. Following his confession, Leon Brown was arrested for the rape and murder of Sabrina Buie; juvenile petitions charging Brown with delinquency related to rape and murder were filed on September 29, 1983. [DE 161-13]. Leon Brown's intelligence quotient has been scored consistently in the mid-50s range.

On September 30, 1983, McCollum made an on-camera statement to a television reporter that he had "just held her down. That's it." [DE 161-19] Barnes Aff. ¶ 6. McCollum and Brown were indicted by a grand jury on January 3, 1984, on charges of first degree murder and rape. [DE 161-16]. They were tried together in Robeson County Superior Court in October 1984. The prosecutor was District Attorney Joe Freeman Britt, McCollum was represented by Earl Strickland, and Brown was represented by Robert Johnson. [DE 140-1] 1984 Trial Tr. at 1. McCollum and Brown both moved to suppress their confessions and their motions were denied. The trial court held that both McCollum and Brown had voluntarily gone to the Red Springs police station and that before each was questioned he had knowingly and intelligently waived his rights. [DE 142-3] 1984 Trial Tr. at 1346-51]. The trial court held that the statements of McCollum and Brown were made freely, voluntarily, and knowingly without duress, coercion, or inducement. *Id.*

Case 5:15-cv-00451-BO Document 326-3 Filed 03/27/25 Page 5 of 30

McCollum and Brown both testified at trial, each was convicted of first degree murder and rape, and each was sentenced to death.

On appeal, the North Carolina Supreme Court reversed and remanded for a new trial, finding error in the trial court's jury instructions. *State v. McCollum*, 321 N.C. 557 (1988). McCollum and Brown were retried separately in adjacent counties. McCollum was retried in Cumberland County in November 1991. On July 31, 1991, the Cumberland County Superior Court denied McCollum's motion to suppress his confession, specifically concluding that none of McCollum's constitutional rights were violated by his arrest, detention, interrogation, or statement, that his statement was made freely and voluntarily, that McCollum was in full understanding of his constitutional rights and that he waived those rights freely, knowingly, and intelligently. [DE 161-31]. During his opening and closing statements, and with the consent of McCollum, McCollum's attorney argued to the jury to that McCollum was present for the rape and murder of Miss Buie and asked the jury to return a verdict of second degree murder. The jury returned a verdict of guilty on the charges of first degree murder and rape, and McCollum was again sentenced to death. [DE 141-1] 1991 Trial Tr. at 1597-98; 1632-33; 2058-2065]. The North Carolina Supreme Court affirmed McCollum's conviction and sentence. *State v. McCollum*, 334 N.C. 208 (1993). The United States Supreme Court denied McCollum's petition for writ of certiorari. *McCollum v. North Carolina*, 512 U.S. 1254 (1994).

In June 1992 Brown was retried in Bladen County Superior Court. Brown's motion to suppress his confession was denied, the court concluding that Brown knowingly, intelligently, and voluntarily waived his rights, that none of his rights under the North Carolina or United States Constitution had been violated, and that his statement was voluntary and not the result of any coercion, pressure, or intimidation. [DE 166-3]. The trial court later granted a defense motion to

6

dismiss the first degree murder charge, finding that Brown had withdrawn from a conspiracy to commit murder, and the jury found Brown guilty of first degree rape. [DE 146-1] 1992 Trial Tr. at 288]. Brown was sentenced to life imprisonment. *Id.* at 310. Brown's conviction and sentence were affirmed on appeal both in the North Carolina Court of Appeals and the North Carolina Supreme Court. *State v. Brown*, 112 N.C. App. 390 (1993); *State v. Brown*, 339 N.C. 606 (1995). Brown did not file a petition for writ of certiorari to the United States Supreme Court.

In 2009, Brown sought assistance from the North Carolina Innocence Inquiry Commission (NCIIC). The NCIIC accepted Brown's case and began its investigation, which included DNA testing of physical evidence found at the scene of the crime. A Newport-brand cigarette butt found near other evidence was found to contain DNA which matched that of Roscoe Artis. Roscoe Artis is currently serving a life sentence, commuted from death, following his conviction in Robeson County for the first degree murder and rape of Joann Brockman. *See State v. Artis*, 325 N.C. 278 (1990), *cert. granted, judgment vacated,* 494 U.S. 1023 (1990); *see also State v. Artis*, 329 N.C. 679, 680 (1991). Artis was arrested on October 22, 1983, the same day Ms. Brockman went missing and her body was discovered, and tried in August 1984. [DE 129-1]. Defendants Allen and Locklear testified for the state in Artis' trial, Locklear having participated in the arrest and investigation of Artis and Allen having conducted testing on a blood sample taken from Artis. *See* [DE 129-1;132-1] Artis Trial Tr. at 618-620; 707-711.

Other than Miss Buie, the DNA tested on other items of physical evidence found at the crime scene did not match any known person, including McCollum and Brown. Although McCollum had not filed a claim with the NCIIC, the Commission expanded its investigation to include McCollum. Following a hearing held September 2, 2014, on motions for appropriate relief (MAR) filed by McCollum and Brown, at which the investigator from the NCIIC, Ms. Sharon

Stellato was the sole witness, the Robeson County Superior Court granted the motions and vacated McCollum and Brown's convictions. [DE 154-7; 155-7]. The State did not contest that the newly-discovered DNA evidence was favorable to McCollum and Brown and conceded that McCollum and Brown had satisfied the requirements of N.C. Gen. Stat. § 15A-270 (c)(2), which governs the relief available to petitioners who come forward with favorable DNA evidence post-conviction. The MAR court held that, "especially when considered together with the rest of the results of the [NCIIC]'s investigation," the favorable DNA evidence "tend[s] to establish Henry McCollum's and Leon Brown's innocence of crime for which they were convicted and sentenced . . .." [DE 155-7 at 3-4]. The MAR court ordered the vacatur of their convictions and sentences as imposed in Robeson, Cumberland, and Bladen Counties, dismissed with prejudice all charges in the cases, or order their immediate release. *Id.* On June 5, 2015, McCollum and Brown were issued full pardons of innocence by Governor Pat McCrory. [DE 147-14].

DISCUSSION

I.    Motions for Summary Judgment

The parties have moved for entry of summary judgment or partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the

8

inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

The Court considers first the motions for summary judgment by the two remaining sets of defendants and the affirmative defenses raised therein.

A. *Collateral Estoppel*

Both the SBI defendants, Allen and Snead, and the Robeson County Sheriff's Office defendants, Sealey and Locklear, have raised the defense of collateral estoppel or res judicata. Specifically, defendants contend that collateral estoppel prevents plaintiffs from re-litigating here whether probable cause existed to support their arrests and whether their confessions were voluntary. Defendants argue that plaintiffs' convictions, though later vacated, conclusively establish that probable cause existed and that the state court judges' rulings on the plaintiffs' motions to suppress their confessions conclusively establish that their confessions were voluntary.

> The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. . . . Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. . . . As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.

9

*Allen v. McCurry*, 449 U.S. 90, 94 (1980) (internal citations omitted). The doctrines of res judicata and collateral estoppel apply to § 1983 actions, and federal courts must afford preclusive effect to issues which have been decided by state courts when the courts of that state would do so. *Id.* at 95-96 (citing 28 U.S.C. § 1738); *see also Davenport v. N. Carolina Dep't of Transp.*, 3 F.3d 89, 92 (4th Cir. 1993) (federal court considering § 1983 action to give res judicata effect to a state court judgment and to apply the law of the rendering state to determine whether and to what extent the state court judgment should be given preclusive effect).

> In order to assert collateral estoppel under North Carolina law, a party must show that the issue in question was identical to an issue actually litigated and necessary to the judgment, that the prior action resulted in a final judgment on the merits, and that the present parties are the same as, or in privity with, the parties to the earlier action. North Carolina courts have abandoned the final requirement of "mutuality of estoppel" for the defensive use of collateral estoppel, so long as the party seeking to reopen the issue "had a full and fair opportunity to litigate" the matter in the previous action.

*Sartin v. Macik*, 535 F.3d 284, 287–88 (4th Cir. 2008) (citing *Thomas M. McInnis & Assocs., Inc. v. Hall*, 318 N.C. 421, 349 S.E. 2d 552,557, 560 (1986)).

Although identical issues which were necessary to the judgment were actually litigated by the North Carolina courts, the Court holds that the doctrines of collateral estoppel and res judicata are inapplicable here.

A movant may recover damages for an allegedly unconstitutional conviction or imprisonment by proceeding with causes of action under 42 U.S.C. § 1983 where the conviction or sentence has been, *inter alia*, expunged by executive order or declared invalid by an appropriate state tribunal. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). This is because where, as here, the prior conviction has been vacated or overturned, concerns regarding finality and consistency are no longer at issue. McCollum's and Brown's convictions and sentences, as imposed at both their first and second trials, were vacated by the North Carolina Superior Court in its MAR opinion.

[DE 155-7]. To vacate means to nullify or cancel, make void, or invalidate. Black's Law Dictionary (10th ed. 2014). Accordingly, it is a "bedrock principle of preclusion law" that a judgment that has been reversed or vacated cannot form the basis of a preclusion defense. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1372 (Fed. Cir. 2013); *see also S.C. Nat. Bank v. Atl. States Bankcard Ass'n, Inc.*, 896 F.2d 1421, 1430 (4th Cir. 1990).

In asserting their collateral estoppel defenses, the defendants rely on cases in which North Carolina courts have applied a rule which provides that, in civil actions for malicious prosecution, "absent a showing that the conviction in District Court was procured by fraud or other unfair means, the conviction conclusively establishes the existence of probable cause, even though plaintiff was acquitted in Superior Court." *Falkner v. Almon*, 22 N.C. App. 643, 645 (1974); *see also Myrick v. Cooley*, 91 N.C. App. 209, 213 (1988). The North Carolina Supreme Court has noted specifically that a prior conviction, even if reversed on appeal, is conclusive evidence of probable cause for the arrest. *Priddy v. Cook's United Dep't Store*, 17 N.C. App. 322, 324 (1973) (citing *Moore v. Winfield*, 207 N.C. 767, 770 (1935)).

Plaintiffs' convictions have not been reversed on appeal, however, they have been vacated by the superior court on a motion for appropriate relief. The majority of cases relied upon by defendants concern convictions in state district court with a different outcome in superior court; the facts of this case are markedly distinguishable. Further, even if this rule were to apply to this case, plaintiffs here have proffered evidence that fraud or other unfair means infected their arrests and prosecutions. *See, e.g., Simpson v. Sears, Roebuck & Co.*, 231 N.C. App. 412, 416 (2013) (allegations that conviction was based on false, fabricated, and fraudulent "confession" sufficient to show that conviction should not conclusively establish probable cause).

11

Whether or not the MAR court's vacatur is sufficient to undo the preclusive effect of plaintiffs' convictions, however, of critical importance in this case is that McCollum's and Brown's convictions were not merely overturned or vacated based on a legal error; instead, both men have been granted full pardons of innocence by the Governor of North Carolina. The North Carolina Constitution grants the governor "the exclusive prerogative to issue pardons." *State v. Clifton*, 125 N.C. App. 471, 481 (1997) (citing N.C. Const. art. III, § 5(6)). "The effects of a pardon are well settled in law: as far as the State is concerned, they destroy and entirely efface the previous offence; it is as if it had never been committed." *State v. Keith*, 63 N.C. 140, 143 (1869); *see also* N.C. Gen. Stat. § 15A-149 (persons who have been granted pardons of innocence are permitted to seek expungement from all official records any entries related to that person's apprehension, charge, or trial).

Defendants have provided the Court with no basis on which to hold that prior rulings of the North Carolina state courts would continue to hold preclusive effect after a governor's pardon of innocence entirely effaced a plaintiff's previous offenses. Indeed, pardon decisions are confined to the executive and are traditionally not the business of the courts. *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981); *Bacon v. Lee*, 353 N.C. 696, 704 (2001); *see also United States v. Surratt*, 855 F.3d 218, 219 (4th Cir. 2017) (President's commutation of sentence "closes the judicial door" absent some constitutional infirmity in the commutation order). To allow the opinions of the state judiciary to continue to be determinative of the voluntariness of plaintiff's confessions or the existence of probable cause would improperly intrude into the province of the executive to determine and grant a pardon of innocence. Defendants have cited no case, applying either North Carolina or the federal common law, which would support such a result. Accordingly, defendants' motion for summary judgment on the basis of collateral estoppel is denied.

12

B. *Absolute Immunity*

Both sets of defendants correctly argue that "a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony," and this immunity further extends to any witness testifying before a grand jury. *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012); *see also Briscoe v. Lattue*, 460 U.S. 325, 332-33 (1983). This absolute testimonial immunity applies to both lay and police-officer witnesses. *Rehberg*, 566 U.S. at 367. Accordingly, defendants' motions for summary judgment with respect to any claims based solely on defendants' alleged perjured testimony at trial are granted.

C. *Qualified Immunity*

The privilege of qualified immunity protects government officials from liability so long as they could reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court recognized a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Judges are permitted to exercise their discretion, however, in regard to which of the two prongs should be addressed first in light of the facts and circumstances of the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A plaintiff bears the burden to show that the constitutional violation occurred, while defendants bear the burden on the second inquiry, whether the right was clearly established. *Henry*, 501 F.3d at 377-378. Whether qualified immunity applies is ordinarily decided at summary

13

judgment; the question of whether a constitutional right was clearly established is always a legal question which can be decided at summary judgment, but "a genuine question of material fact 'regarding whether the conduct allegedly violative of the right actually occurred' must be reserved for trial." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal alteration and citation omitted).

### i. *The rights plaintiffs allege were violated were clearly established*

Plaintiffs have alleged claims for false arrest, malicious prosecution, and deprivation of due process against defendants in the individual capacties. Whether a right was clearly established is a case specific inquiry, and the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "In determining whether a right is clearly established, [a court] may rely upon cases of controlling authority in the jurisdiction in question, or a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir. 2001) (citation omitted).

It was clearly established in 1983 that an arrest in the absence of probable cause was a violation of an individual's Fourth Amendment right to be free from unreasonable search and seizure. *See Merch. v. Bauer*, 677 F.3d 656, 666 (4th Cir. 2012) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). It was further clear to a reasonable officer that a coerced confession could not form the basis of probable cause for an arrest. *Ashcraft v. State of Tenn.*, 322 U.S. 143, 155 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession.").

14

Plaintiffs' due process claims arise in part out of defendants' alleged withholding of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *Brady*, on its face, applies to the prosecutor's duty to disclose exculpatory evidence to the defense, and "[i]n *Barbee*, decided a year after *Brady*, [the Fourth Circuit] held that '[t]he police are also part of the prosecution,' and thus, they too violate the Constitution if and when they suppress exculpatory evidence." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 399 (4th Cir. 2014) (quoting *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964)).

The Court finds defendants' reliance on the vacated opinion in *Jean v. Collins*, 155 F.3d 701, 709 (1998) (*Jean* I) (en banc) *cert. granted, judgment vacated,* 526 U.S. 1142 (1999), to be misplaced. In *Jean I*, the court held that, in 1982, it was not clear that "police had a duty grounded in federal law to turn over the evidence at issue to a prosecutor." *Id.* However, in the subsequent en banc opinion, court noted that the cases *are* clear that when police intentionally withhold or destroy evidence, or otherwise act in bad faith, their actions violate the due process rights of a criminal defendant. In *Jean* II, the court of appeals noted that

> the concept of constitutional deprivation articulated in both *Daniels* and *Youngblood* requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. This is what is meant by "bad faith." And that must be established on the basis of evidence, including among other things the nature of the withheld material, that would negate any negligent or innocent explanation for the actions on the part of the police.

*Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) (*Jean* II) (citing *Daniels v. Williams*, 474 U.S. 327 (1986) and *Arizona v. Youngblood*, 488 U.S. 51 (1988)). Thus, to the extent the duty of police to turn over exculpatory evidence to the prosecutor was not plain in 1983, a reasonable officer would have been aware that the intentional, bad faith withholding of evidence, would violate the Constitution. *See also Trulock v. Freeh*, 275 F.3d 391, 409 (4th Cir. 2001) ("qualified

15

immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.").

As to plaintiffs' due process claims arising out of the fabrication of evidence or use of false evidence, "the violation of [the] constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer. . . . was clearly established in 1983, when the events relevant to this litigation took place." *Washington v. Wilmore*, 407 F.3d 274, 283–84 (4th Cir. 2005) (citing *Miller v. Pate,* 386 U.S. 1, 7 (1967)). While there is no Constitutional duty on law enforcement to investigate independently every claim of innocence or conduct an error-free investigation, *Baker v. McCollan*, 443 U.S. 137, 146 (1979), it has long been established that when law enforcement acts in reckless disregard of the truth and makes a false statement or material omission that is necessary to a finding of probable cause, the resulting seizure will be determined to be unreasonable. *Franks v. Delaware*, 438 U.S. 154, 156 (1978); *see also Miller v. Prince George's Cty., MD*, 475 F.3d 621, 627 (4th Cir. 2007). Finally, "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . .." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

ii. *Genuine issues of material fact exist as to whether plaintiffs' constitutional rights were violated*

Plaintiffs' claims rest on three theories. The first concerns the absence of probable cause for arrest and the manufacture of probable cause by coercing or fabricating plaintiffs' confessions. Plaintiffs' claims for relief which arise from this first theory, § 1983 false arrest and § 1983 malicious prosecution, are properly examined as claims founded on the Fourth Amendment. *See Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (noting "there is no such thing as a '§ 1983 malicious prosecution' claim."); *Gantt v. Whitaker*, 57 Fed. App'x 141 (4th Cir. 2002)

16

(unpublished). Plaintiffs do not appear to dispute that if probable cause existed at the time of their arrests, their § 1983 claims for false arrest and malicious prosecution fail.

a) *Fourth Amendment claims and probable cause*

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996). Probable cause is a result of a practical, common-sense consideration of all of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017). Probable cause "requires more than a bare suspicion" but less than evidence sufficient to convict. *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). Only those facts and circumstances known to the officer at the time of the arrest are to be considered when determining whether probable causes existed. *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003).

The parties offer drastically different versions of the events surrounding the confessions given by McCollum and Brown. Defendants Snead and Sealey have stated that after they picked up McCollum at his house shortly after 9:00 p.m. on September 28, 1983, and brought him back to the Red Springs police station, they took McCollum's finger prints and escorted him to Chief Haggins' office at about 9:30 p.m. Snead's and Sealey's recollections of when McCollum received his *Miranda* warning differ, but the *Miranda* form reflects that McCollum was advised of his rights at 10:20 p.m. [DE 147-28]; [DE 146-11] Snead Dep. at 42-43 (*Miranda* waiver signed prior to questioning); Sealey Dep. at 132-133 (*Miranda* waiver signed after McCollum admits to holding Miss Buie down). Sealey testified that he asked few if any questions of McCollum during the interview, and that Snead took the lead. Sealey Dep. at 136-37. Agent Allen, who had processed

17

the crime scene, was also present during McCollum's interview, but he sat behind McCollum and only shook his head a couple of times. Snead Dep. at 83-84.

After what Sealey thought might have been five or ten minutes of questioning, and Snead recalls to be anywhere from twenty to forty-five minutes, McCollum admitted to them that "I just held her down." [DE 146-11] Snead Dep. at 27-48; [DE 139-5] Sealey Dep. at 103-132. Sealey testified at his deposition that he thought McCollum was about to have a seizure just before he admitted to them that he had held Miss Buie down. Sealey Dep. at 132. Snead testified at his deposition that McCollum was extremely calm and never denied having anything to do with the crime, but that almost from the beginning of the interview McCollum repeatedly stated that he did not kill her, and after ten or fifteen minutes McCollum stated that he had just held her down. Snead Dep. at 45-47. In his deposition, Snead stated that he talked with McCollum until about 1:50 a.m., that McCollum confessed, that Snead wrote out McCollum's statement, and that McCollum then confronted Leon Brown and Darrell Suber, who were at the police station, telling them that he had told the truth and that he [McCollum] wanted them to also tell the truth about killing Miss Buie. Snead Dep. at 50; 96-97. Snead testified that McCollum then asked Chief Haggins if he could go home, and Snead informed McCollum that things had changed and asked Chief Haggins to arrest McCollum for murder. Snead Dep. at 50.

McCollum's description of his interview by Snead, Sealey, and Allen bears no resemblance to the above. McCollum has testified at his deposition that the men questioning him got into his face, hollered at him, that they threatened him, told him that he [McCollum] had killed that girl and that he should admit it, that McCollum repeatedly denied being involved, and that Sealey threatened McCollum with the gas chamber if he did not talk. [DE 144-3] McCollum Dep. at 148-151. McCollum testified that the law enforcement officers told him to sign a paper that said if he

18

could help them in the case as a witness they would let him go home, and that McCollum signed the paper but did not read it and it was not read to him. McCollum Dep. at 154. McCollum denies that he confessed to the rape and murder of Sabrina Buie. McCollum Dep. at 159-160; [DE 147-29] (McCollum's handwritten statement).

Leon Brown came to the police station with his and McCollum's mother, Mamie Brown, at about 11:00 p.m. on September 28, 1983, after McCollum had already been taken to the police station for questioning. [DE 142-2] 1984 Trial Tr. at 1198. Brown testified at the 1984 trial that he could hear his brother McCollum crying when he arrived at the police station. [DE 142-3] 1984 Trial Tr. at 1669. At approximately 2:30 a.m., while Brown was waiting in an area with drink and snack machines with L.P. Sinclair, Detective Locklear and Agent Allen took Brown to an interrogation room and administered a juvenile rights warning; the form indicates that Brown was then fifteen years old and had completed the seventh grade. [DE 148-35]; [DE 146-13] Brown Dep. at 35. Brown has testified that after he circled "no" on a scrap of paper given to him by the officers, which he stated was supposed to indicate that he could not help them, the officers began to hammer him, calling him racial epithets and stating that he [Brown] had committed the crime or that he knew something about it. Brown Dep. at 41-42. Brown stated that he denied any knowledge of the crime and that he was innocent. Brown Dep. at 42. Brown testified at his deposition that he was not read his rights or asked if he wanted an attorney, and that he was told that if he signed another piece of paper he could go home. Brown Dep. at 45; 51-52. While Brown was being questioned, his mother Mamie Brown was knocking on the door asking to see him but was refused entry; Brown also asked to see his mother but his request was denied. Brown Dep. at 69-70.

Agent Allen testified at his deposition that he read Brown his juvenile rights, including the right to have a parent present, and that Brown stated that he understood each right as recited and that he wished to answer questions without a lawyer or a parent or guardian present. [DE 139-4] Allen Dep. at 135. Allen stated that he did not recall Brown asking to speak with his mother or Brown's mother asking to see Brown. Allen Dep. at 135. Snead testified at his deposition that does not know why Leon Brown was taken to an interview room and that he witnessed Brown's rights form but was not in the room when Brown gave his statement. [DE 146-11] Snead Dep. at 92; 104; 110. At the 1984 trial, Detective Locklear testified that he took Brown's statement, [DE 161-12] (Brown's handwritten statement), that he was "quite alert of mind and very precise in what he wanted to stay to me," that he made Brown no promises, did not threaten him, and was attentive to his comforts. [DE 142-2] 1984 Trial Tr. at 1183. Brown testified at his 1984 trial that Locklear did not advise him of his rights, that Brown asked for his mother when an officer grabbed Brown's arm and told him what he'd better do, and that Brown was told he would be taken to the gas chamber if he did not sign the rights waiver. [DE 142-3] 1984 Trial Tr. at 1659-1663. At his deposition, Brown testified that he did not say the things that are written in his statement, and that an officer just sat and wrote it and told Brown to sign it, and that Brown, after being read his statement, told the officer that it was not true. [DE 146-13] Brown Dep. at 58.

Defendants contend that plaintiffs' confessions clearly establish a basis for probable cause upon which to arrest plaintiffs. Plaintiffs contend, and have presented evidence that, their confessions are fabricated, were coerced, or are otherwise infirm, and that clearly the coercion was known to defendants. Plaintiffs' proffered deposition testimony is sufficient to create a genuine issue of material fact as to the veracity of their confessions, as "all that is required [to survive a motion for summary judgment] is that sufficient evidence supporting the claimed factual dispute

20

be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial," *Anderson*, 477 U.S. at 249; *see also Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (testimony that is based on personal knowledge or firsthand experience can be evidence of a disputed fact). Such genuine dispute precludes a ruling on qualified immunity as the Court cannot, in the absence of fact-finding, determine whether probable cause existed to arrest plaintiffs. *See, e.g.*, *Niemann v. Whalen*, 911 F. Supp. 656, 668 (S.D.N.Y. 1996) (whether defendants coerced plaintiff's confession is "material to resolving the issue of probable cause.").

b) *Due Process and fabrication of evidence, failure to disclose, and failure to investigate*

Plaintiffs' second theory of liability rests on their assertion that defendants, in order to shield their wrongful acts related to the coerced or fabricated confessions of plaintiffs, deliberately and in bad faith failed to investigate other leads and withheld exculpatory evidence from the prosecution and defense, namely the similarities between the rape and murder of Sabrina Buie and rapes and murders committed by a known individual in the Red Springs area, Roscoe Artis, the statements of Mary McLean Richards that she witnessed Roscoe Artis attacking Sabrina Buie, and the failure to investigate and alleged coerced testimony of L.P. Sinclair. Plaintiffs argue that the foregoing violated their rights under the Due Process Clause of the Fourteenth Amendment. The Fourth Circuit has "recognized a due process 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'" *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (internal quotation and citation omitted). A plaintiff alleging a claim for violation of due process based on fabricated evidence must demonstrate that law enforcement fabricated evidence and that that fabrication resulted in the deprivation of the plaintiff's liberty. *Washington*, 407 F.3d at 282. However, the failure to investigate other leads, if determined to be negligent or even grossly negligent, does not violate due process. *Wilson v.*

21

*Lawrence Cnty.*, 260 F.3d 946, 955 (8th Cir. 2001) (citing *Daniels v. Williams*, 474 U.S. 327, 334 (1986)).

The record provides the following evidence which relates to plaintiffs' due process claim. According to an SBI report expert, Darrell Suber, who was implicated by both McCollum and Brown, was interviewed by law enforcement on September 29, 1983. Suber submitted to a polygraph, the results of which were inconclusive. [DE 148-29]. Suber later refused a second polygraph. [DE 148-26]. However, he was excluded as a suspect based on his alibi and interviews with others which supported his claimed whereabouts. [DE 150-3]. Christopher Brown, a/k/a Chris Brown or "Inzar", who was also implicated by both McCollum and Brown in their confessions, was interviewed at the Red Springs police station on September 29, 1983, between 4:00 a.m. and 6:00 a.m. [DE 148-26]; [DE 149-2 at 43-45]. Chris Brown was interviewed by SBI Agent Lee Sampson and defendant Sealey after he waived his rights, and he informed them that he had stayed with his grandmother the night that Sabrina Buie had disappeared. Chris Brown also submitted to two polygraph examinations, the results of which were inconclusive. *Id.* On October 6, 1983, Chris Brown was interviewed again at the Cumberland County Sheriff's Office by Agent Sampson and SBI Agent Van Parker. [DE 149-2 at 45]. During that interview Chris Brown stated that he had stayed at his grandmother's house on Friday, September 23rd not Saturday, September 24th, that he had been with McCollum, Brown, and L.P. Sinclair, at Lisa Logan's house on the Saturday before September 24th, that he had recently stated to someone in the bathroom at school that he had killed that girl but he was just kidding, and that he did not see Miss Buie, McCollum, Brown, or L.P. Sinclair on Saturday September 24th. *Id.* at 45-46. Chris Brown's mother confirmed that Chris had stayed with her mother on Friday, September 23rd and that she had let him into her home when he returned between 11:00 p.m. and midnight on Saturday

22

September 24th. *Id.* at 46. McCollum also implicated Louis Moore in his confession, but Moore was determined to be living in Kentucky at the time of Miss Buie's murder. [DE 149-2 at 34]; [DE 154-7] MAR Hrg. Tr. at 11. Neither Moore, Suber, nor Chris Brown were investigated further in relation to the rape and murder of Sabrina Buie.

On October 22, 1983, less than a month after the arrests of plaintiffs, another young woman went missing in Red Springs, North Carolina. Close to midnight that night, Roscoe Artis was questioned about the missing woman, Joann Brockman, whose body had been found near a pear tree covered partly with dirt and brush. *State v. Artis*, 325 N.C. 278, 289 (1989), *cert. granted, judgment vacated,* 494 U.S. 1023 (1990). Ms. Brockman's body was found naked except for a sweater and bra pushed above her breasts, and an autopsy revealed that she had been manually strangled to death and had died during sexual intercourse. *Id.* Roscoe Artis made several statements to law enforcement on the night of October 22nd and early morning hours of October 23rd; Artis "completed a third, briefer statement at 3:10 a.m. in which he admitted that he had killed Joann Brockman, that he had been advised of and understood his rights, and that he had voluntarily assisted officers in finding Joann's body and pants." *Id.* at 293. One of the investigating officers to whom Artis had shown where to find Ms. Brockman's pants was defendant Locklear. *Id.* According to Artis, Sabrina Buie's death was discussed while he was speaking to law enforcement about Ms. Brockman's murder. [DE 139-2] Interview of Roscoe Artis (April 6, 2015) at 17. Defendant Allen was also involved in Artis' case, having assisted in processing evidence from the crime scene and Artis. [DE 132-1] Artis Trial Tr. at 707-712.

During the Artis investigation, Allen was asked to accompany defendant Locklear and another Robeson County deputy to the Gastonia Police Department to investigate other cases which may have involved Artis. [DE 139-4] Allen Dep. at 26-28. On January 19, 1984, prior to

23

McCollum and Brown's first trial, Locklear and Allen went to Gastonia, North Carolina and received Artis' finger prints from his arrest for the assault of Billie Ann Woods. Locklear and Allen interviewed Ms. Woods, who indicated that she would be willing to testify at Artis' capital trial for the murder of Ms. Brockman. [DE 150-7]. Artis had been arrested in Gaston County Superior Court in 1974 of assault with intent to rape Ms. Woods. [DE 128-4]. Ms. Woods testified at Artis' 1984 trial for the purpose of showing motive, intent, and scienter of Artis. [DE 132-1] Artis Trial Tr. at 764. Ms. Woods testified that when she was sixteen years-old Artis had grabbed her while she was walking between two buildings in Gastonia and that he began to strangle her after telling her that she would "give [him] some." *Id.* at 767-68. Another individual happened to walk past and Artis stopped the assault and began to act as though Ms. Woods had taken money from him. *Id.* at 770. Artis was tried for the murder of Ms. Brockman beginning on August 20, 1984, in Robeson County. District Attorney Joe Freeman Britt prosecuted Artis for the murder of Ms. Brockman and Artis was represented by Earl Strickland, both of whom would be involved in McCollum and Brown's first trial. [DE 129-1] Artis Trial Tr. at 1.

On October 5, 1983, L.P. Sinclair was administered a polygraph examination, in which he denied having any involvement or knowledge of Sabrina Buie's death; the results of this examination revealed that L.P. Sinclair was being truthful. [DE 148-31]. At the 1984 trial of plaintiffs, however, L.P. Sinclair, who was then seventeen years-old, testified that McCollum had confessed to him the day following Miss Buie's murder. [DE 142-3] 1984 Trial Tr. at 1718-1719. L.P. Sinclair further testified that McCollum and Brown had discussed raping Sabrina Buie in his presence and that he [Sinclair] had declined to participate. *Id.* at 1715-16. L.P. Sinclair was questioned about his change-of-story by counsel for plaintiffs during the trial, and testified that his first statement to law enforcement had been a lie and that he now wanted to tell the truth. *Id.* at

24

1736. L.P. Sinclair was killed in 1990, prior to plaintiffs' retrials. [DE 144-1] 1991 Trial Tr. at 1857.

On October 5, 1984, three days prior to the start of McCollum's and Brown's first trial, the fingerprints of L.P. Sinclair and Roscoe Artis were submitted to the SBI for comparison to the latent prints found at the Sabrina Buie crime scene. [DE 148-34]. Artis and L.P. Sinclair are listed as suspects on the fingerprint comparison request. *Id.*; [DE 154-7] MAR Hrg. Tr. at 103-04. The fingerprints of Artis and L.P. Sinclair were never compared to the latent prints from the Sabrina Buie crime scene, however, and the request was canceled on October 5, 1985. *Id.*

Although Mary McLean Richard's interview with Detective Locklear on September 26, 1983, is noted in the records, *see, e.g.,* [DE 149-2 at 51], it is only with the notation of "negative results." Ms. Richards stated in 2014, however, that she witnessed Roscoe Artis attacking Sabrina Buie on the night she was killed, that she attempted to intervene but that Artis frightened her away, and that when she went home and told her mother what she had seen her mother told her to keep quiet. [DE 148-39 at 2-3]. Ms. Richards stated that she provided this information to defendant Sealey during the investigation in 1983. *Id.* at 22-25.

Plaintiffs contend that, taken together, the above-recited evidence demonstrates that defendants acted in bad faith, in particular in failing to investigate Roscoe Artis and the statement of Mary McLean Richards. Additionally, McCollum and Brown in their confessions identify different individuals as having participated in the rape and murder, McCollum states that Miss Buie was stabbed several times when the evidence does not reveal any stab wounds on Miss Buie, and, although his home was searched, no bloody clothing or shoes were recovered from Darrell Suber. These inconsistencies are not explained by the evidence at trial or any further investigation by law enforcement.

25

Defendants dispute that Mary McLean Richards made a statement in 1983 to Locklear or any other member of law enforcement that she witnessed Miss Buie's attack. Defendants further dispute that any additional action should have been taken with respect to investigating Roscoe Artis and that any one of them coached or instructed L.P. Sinclair to testify untruthfully at the 1984 trial. Because genuine issues of material fact exist regarding whether the conduct alleged by plaintiffs' to have violated their Fourteenth Amendment Due Process rights actually occurred, a determination cannot be made at this time as to whether defendants are entitled to qualified immunity.

The Court would note that, as to their false confession claim, plaintiffs' incarceration was a clearly foreseeable result of the alleged fabrication of plaintiffs' confessions, and thus plaintiffs have, if their allegations are true, demonstrated causation. *Washington*, 407 F.3d at 284. As to their claims arising out of a failure to investigate or disclose, only if a finder of fact were to decide that defendants' actions following plaintiffs' arrests, including their failure to investigate Roscoe Artis for Sabrina Buie's rape and murder, failure to disclose evidence of Mary Richards' statement to the prosecution or defense, and failure to test the fingerprints of L.P. Sinclair and Roscoe Artis against those found at the Sabrina Buie crime scene, were done in bad faith could qualified immunity fail to shield defendants for these actions.[4] *See Owens*, 767 F.3d at 396-97.

Accordingly, defendants' motions for summary judgment on the privilege of qualified immunity are denied at this time as to plaintiffs' due process claims.

D.    *Official capacity claim;* Monell *liability*

The final theory advanced by plaintiffs is that all of the constitutional violations inflicted upon them in their wrongful arrest, prosecution, and conviction were as a result of a pattern or

---

[4] Plaintiffs' allegations concerning defendants' own perjured testimony are barred by absolute immunity.

Case 5:15-cv-00451-BO   Document 326-3   Filed 03/20/17   Page 26 of 30

practice of the Red Springs Police Department and the Robeson County Sheriff's Office. As the Town of Red Springs defendants have settled their claims with plaintiffs, this claim lies solely against defendant Sealey in his official capacity as Sheriff of Robeson County.

The Supreme Court has determined that § 1983 applies to local governments. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978); *see also Wilcoxson v. Buncombe Cty.*, 129 F. Supp. 3d 308, 317 (W.D.N.C. 2014) (North Carolina Sheriff is final law enforcement policymaker for county and subject to liability under *Monell*). However, this application is not without limits. "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. In other words, there is no *respondeat superior* liability under § 1983. Municipal liability only results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell* 436 U.S. at 694.

A policy or custom for which a municipality may be held liable may be (1) an express policy, such as a written ordinance or regulation; (2) the decisions of a person with final policymaking authority; (3) an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation marks, alteration omitted). "Proof of the existence of a municipal policy or custom under § 1983 does not require a plaintiff to evidence numerous similar violations," *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 195 (4th Cir. 1994), but to succeed against a municipality, a § 1983 plaintiff must demonstrate that the custom or policy is the "moving force" behind the alleged violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citations omitted).

27

Defendant Sealey has testified that there were no written policies or procedures in the Robeson County Sheriff's Office prior to 1994 or 1995, and that he received no training in how to interview or question someone with a low IQ or mental disability. [DE 139-5] Sealey Dep. at 33-35. The foregoing evidence, should it include a finding by a jury that plaintiffs' confessions were fabricated or coerced, could, in light of the lack of training referenced by defendant Sealey, plainly support plaintiffs' allegation that, at a minimum, the Robeson County Sheriff failed train his deputies in such a way as resulted in the deliberate indifference to the rights of citizens or a practice so persistent and widespread so as to constitute a custom. The Court therefore will allow this claim to proceed to trial.

In sum, the Court finds that plaintiffs' claims arising under the Fourth and Fourteenth Amendments turn on a finding that their confessions were coerced or fabricated. If a finder of fact determines that plaintiffs' confessions were coerced or fabricated, a genuine issue arises as to whether these defendants, in an effort to conceal their coercion or fabrication of the confessions, intentionally and in bad faith failed to investigate or disclose to the prosecution and defense another known and potential suspect, Roscoe Artis, failed to disclose a potential witness to the crime, Mary McLean Richards, and intentionally coerced another individual, L.P. Sinclair, to testify against plaintiffs. A question would further arise as to whether such actions were as a result of a policy or custom which allowed defendants to violate plaintiffs' constitutional rights. If, however, a finder of fact determines that the confessions of the plaintiffs were not coerced and were, in fact, voluntary – whether or not they were truthful – probable cause would have existed for defendants to arrest plaintiffs, and their subsequent actions would likely be more properly deemed to be negligent or grossly negligent, and would thus not rise to the level of a constitutional violation.

*See also Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (no municipal liability under § 1983 where there is no constitutional violation).

Accordingly, the Court cannot determine at this time whether plaintiffs' constitutional rights were violated, and thus whether defendants are shielded by the privilege of qualified immunity. A finder of fact is required to make determinations as to the voluntariness of plaintiffs' confessions and the faith of the officers conducting the investigation into Sabrina Buie's murder after plaintiffs' confessions were obtained. In light of plaintiffs' allegations that the defendants worked in concert to deny plaintiffs' their constitutional rights as well as the specifics regarding the grouping of SBI and Robeson County defendants to engage in different aspects of plaintiffs' interrogations, arrests, and investigations, the Court will not at this time attempt to parse the liability of each individual defendant as it relates to each claim. Finally, because, as discussed in detail above, genuine issues of material fact exist as to whether defendants are entitled to qualified immunity, plaintiffs' motion for entry of summary judgment in their favor must be denied on application of the appropriate Rule 56 standard.

II.     Motion for Sanctions

Plaintiffs have moved for sanctions against the remaining defendants pursuant to Rule 37 of the Federal Rules of Civil Procedure. Plaintiffs argue that defendants have failed to furnish on request documentary evidence related to plaintiffs' claims and that defendants denied possession such documents. Plaintiffs further contend that many or most of those documents had already been turned over to the NCIIC, and that defendants' failure to disclose evidences a continued pattern of deception that has continued since September 1983. Because plaintiffs have gained access to the files and documents they sought through other means, they seek as a sanction an instruction to the jury of defendants' failure to disclose. Fed. R. Civ. P. 37(c)(1)(B).

Fed. R. Civ. P. 37(c) provides that

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
(B) may inform the jury of the party's failure; and
(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

A district court enjoys wide discretion in determining whether to issue sanctions under Rule 37. *See, e.g., S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003). The Court has considered plaintiffs' motion and, in its discretion, finds it to be premature. Plaintiffs may seek to raise any wrongdoing by defendants at trial, and the Court will consider the issue at that time. The motion for sanctions is denied without prejudice.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for sanctions [DE 123] is DENIED WITHOUT PREJUDICE, plaintiffs' motion for summary judgment [DE 127] is DENIED. The motions for summary judgment by defendants Snead and Allen [DE 159] and Sealey and Price as Administrator C.T.A. of the Estate of Locklear [DE 164] are GRANTED IN PART and DENIED IN PART. The motion to file surreply by Snead and Allen [DE 188] is GRANTED and the motion to withdraw as attorney [DE 258] is ALLOWED.

SO ORDERED, this __1__ day of **March**, 2018.

Terrence W. Boyle

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

30